# 13-1388-cr

*To Be Argued By*:
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee*,

—against—

PAUL M. DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD,
ROBERT GREISMAN, RAYMOND CRAIG BRUBAKER, BDO USA, LLP,

*Defendants*,

DAVID PARSE,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT DAVID PARSE

ALEXANDRA A.E. SHAPIRO
MARC E. ISSERLES
JAMES DARROW
CHETAN A. PATIL
SHAPIRO, ARATO & ISSERLES LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant
David Parse*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

JURISDICTIONAL STATEMENT ........................................................................4

ISSUES PRESENTED............................................................................................4

STATEMENT OF THE CASE................................................................................6

STATEMENT OF FACTS ......................................................................................7

ARGUMENT ........................................................................................................19

   I.    PARSE IS ENTITLED TO A NEW TRIAL BECAUSE HIS
       CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY WAS
       VIOLATED ................................................................................................19

        A. The Post-Trial Proceedings.................................................................20

          1. Procedural Background..................................................................20

          2. The District Court Correctly Found The Defendants Were Deprived
            Of A Fair Trial Because Conrad Was Biased .......................................21

          3. Parse And His Attorneys Were Not Aware Of Conrad's Misconduct
            Until After The Trial.............................................................................23

          4. The District Court's Finding Of Waiver...........................................34

        B. Parse Did Not Waive His Right To An Impartial Jury.........................35

          1. The Constitutional Imperative Of Trial By An Impartial Jury Is Not
            Waivable .............................................................................................35

          2. If An Impartial Jury Can Ever Be Waived, The Waiver Must Be
            Knowing, Intelligent, And Personal .....................................................43

          3. Even If Counsel Could Waive A Client's Right To An Impartial
            Jury, B&R Did Not Waive Parse's Rights.............................................47

4.  Alternatively, Parse Is Entitled To A New Trial Under The Plain Error Standard .......................................................................59

II.     PARSE'S COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IF THEY REMAINED SILENT DESPITE OBVIOUS JUROR BIAS ...................60

A. Failure To Strike An Obviously Biased Juror Is Constitutionally Deficient Performance .........................................................61

1.  If Parse's Counsel Actually Knew Conrad Was An Imposter, Their Performance Was Necessarily Deficient ...............................63

2.  If Parse's Counsel Failed To Take Minimal Steps To Find Out Whether Conrad Was An Imposter, That Is Also Deficient Performance .......................................................................................65

B.  Counsel's Unreasonable Performance Was Not Factually Or Constitutionally "Strategic" .................................................66

C.  Parse Was Necessarily Prejudiced ......................................70

1.  Prejudice Should Be Presumed When Counsel's Ineffective Assistance Results In A Biased Jury .....................................70

2.  Parse Was Actually Prejudiced .......................................73

III.    THE MAIL FRAUD CONVICTION SHOULD BE REVERSED ...........73

A. The Evidence Was Insufficient ............................................74

1.  Governing Law Requires Proof Of Specific Intent To Harm The IRS By Depriving It Of Taxes Owed............................................74

2.  There Was No Evidence That Parse Engaged In Any "Backdating," Much Less Backdating Specifically Intended To Defraud The IRS Of Taxes Owed..................................................................77

3.  The Government Failed To Prove That Parse Knew The Tax Shelters Were Fraudulent....................................................80

B.  The Erroneous "Annual Accounting" Instruction Impermissibly Lowered The Scienter Standard...........................................82

ii

1. Background .................................................................................83

2. The Annual Accounting Instruction Misstated The Law .................84

3. The Erroneous Instruction Prejudiced Parse.....................................87

C. The Mail Fraud Scienter Instruction Erroneously Deprived Parse Of His Good Faith Defense........................................................................90

IV.    THE OBSTRUCTION CONVICTION SHOULD BE REVERSED.........94

A.  The Evidence Was Insufficient To Prove That Parse Violated §7212(a) ................................................................................................94

B.  The §7212(a) Statute Of Limitations Expired......................................96

1. Parse Did Not Commit Or Cause Any Obstructive Act Within The Limitations Period.................................................................97

2. The Jury Instructions Erroneously Invited Conviction Based Solely On Another Person's Act Of Obstruction, Even If Parse Did Not Participate In That Act ........................................................101

C. The Erroneous "Annual Accounting" Instruction Also Requires A New Trial...............................................................................................104

V.    THE RESTITUTION ORDER SHOULD BE VACATED......................104

CONCLUSION ...............................................................................106

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942)................................45

*Alleyne v. United States*, 133 S. Ct. 2151 (2013)...................................................105

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)............................................. 104, 105

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)..................................95

*Biagas v. Valentine*, 265 F. App'x 166 (5th Cir. 2008)...........................................62

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)......................56

*Brady v. United States*, 397 U.S. 742 (1970).................................................... 43, 44

*Brewer v. Williams*, 430 U.S. 387 (1977)................................................................58

*Brookhart v. Janis*, 384 U.S. 1 (1966) .............................................................. 43, 44

*Cheek v. United States*, 498 U.S. 192 (1991) ..........................................................76

*Chiarella v. United States*, 445 U.S. 222 (1980) ....................................................99

*Clark v. United States*, 289 U.S. 1 (1933) ..............................................................45

*Coast Quality Constr. Corp. v. United States*, 463 F.2d 503 (5th Cir. 1972) .........86

*Dodge v. Comm'r*, 27 T.C.M. (CCH) 1170 (1968) .......................................... 86, 88

*Doe v. Fed. Grievance Comm.*, 847 F.2d 57 (2d Cir. 1988)............................. 50, 53

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) ................................. 22, 23, 36, 67

*Edward J. Goodman Life Income Trust v. Jabil Cir., Inc.*, 594 F.3d 783 (11th Cir. 2010) .......................................................................................78

*Estes v. Texas*, 381 U.S. 532 (1965) .......................................................................35

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) ....................................66

*Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006) ........................ 38, 62

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ................................................39

*Gomez v. United States*, 490 U.S. 858 (1989) ........................................35

*Gonzalez v. United States*, 553 U.S. 242 (2008)....................................44

*Gray v. Hutto*, 648 F.2d 210 (4th Cir. 1981) .........................................49

*Greiner v. Wells*, 417 F.3d 305 (2d Cir. 2005) ......................................65

*Hale v. Gibson*, 227 F.3d 1298 (10th Cir. 2000) ....................................71

*Henderson v. United States*, 133 S. Ct. 1122 (2013) ..............................42

*Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370 (1983)..................... 84, 85

*Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001)................... passim

*Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992) .................... passim

*Johnson v. Hill*, 274 F.2d 110 (8th Cir. 1960) ........................................52

*Johnson v. Zerbst*, 304 U.S. 304 (1938) ................................... 43, 49, 53

*Kelly v. Robinson*, 479 U.S. 36 (1986) .................................................105

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .......................................68

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) . 35, 40, 41, 52

*McNally v. United States*, 483 U.S. 350 (1987).......................................91

*Miller v. Webb*, 385 F.3d 666 (6th Cir. 2004) ................................. passim

*Mitchell v. Lyons Prof'l Servs., Inc.*, 708 F.3d 463 (2d Cir. 2013)........58

*Neder v. United States*, 527 U.S. 1 (1999)....................................... 70, 90

*New York v. Hill*, 528 U.S. 110 (2000) ............................................................. 43, 44

*Owens v. United States*, 483 F.3d 48 (1st Cir. 2007)................................................71

*Pasquantino v. United States*, 544 U.S. 349 (2005) .............................................104

*Patton v. United States*, 281 U.S. 276 (1930).................................................. 39, 43

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001)........................................... 60, 66, 68

*Pettibone Corp. v. United States*, 34 F.3d 536 (7th Cir. 1994) ..............................87

*Rogers v. McMullen*, 673 F.2d 1185 (11th Cir. 1982)............................................38

*Rompilla v. Beard*, 545 U.S. 374 (2005) ......................................................... 64, 66

*Rose v. Clark*, 478 U.S. 570 (1986) .......................................................................35

*Sanders v. Norris*, 529 F.3d 787 (8th Cir. 2008) ...................................................72

*Singer v. United States*, 380 U.S. 24 (1965) ..........................................................39

*Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012) .................... 104, 105

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................... passim

*Sullivan v. Louisiana*, 508 U.S. 275 (1993).............................................. 70, 71, 72

*Taylor v. Illinois*, 484 U.S. 400 (1988).................................................................46

*The Glidden Co. v. Zdanok*, 370 U.S. 530 (1962) .................................................39

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566 (2d Cir. 1991) ...................................................................................................................53

*United States v. Aguilar*, 515 U.S. 593 (1995) ......................................................51

*United States v. Allen*, 127 F.3d 260 (2d Cir. 1997)...............................................91

*United States v. Battista*, 575 F.3d 226 (2d Cir. 2009)..........................................105

*United States v. Bolinger*, 837 F.2d 436 (11th Cir. 1988) (per curiam)..... 49, 51, 52

*United States v. Breit*, 712 F.2d 81 (4th Cir. 1983) ..................................49

*United States v. Broxmeyer*, 616 F.3d 120 (2d Cir. 2010).....................................100

*United States v. Caldwell*, 83 F.3d 954 (8th Cir. 1996)...........................................46

*United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993) ......................................81

*United States v. Carbo*, 572 F.3d 112 (3d Cir. 2009)..............................................76

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .............................................73

*United States v. Catlett*, 498 F. App'x 352 (4th Cir. 2012)....................................97

*United States v. Cerna*, 603 F.3d 32 (2d Cir. 2010) ...............................................55

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) ........................................37

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ...................................... passim

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ................................. 75, 82

*United States v. Day*, 969 F.2d 39 (3d Cir. 1992) ..................................................68

*United States v. Dean*, 647 F.2d 779 (8th Cir. 1981) ....................................... 37, 58

*United States v. Dean*, 667 F.2d 729 (8th Cir. 1982) (en banc) ............................46

*United States v. DiPetto*, 936 F.2d 96 (2d Cir. 1991)..............................................97

*United States v. Dohan*, 508 F.3d 989 (11th Cir. 2007) .........................................92

*United States v. Fay*, 300 F.2d 345 (2d Cir. 1962).................................................36

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000)........................................90

*United States v. Fuchs*, 218 F.3d 957 (9th Cir. 2000) ..........................................103

*United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997)...........................................100

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) ...............................................57

*United States v. Golitschek*, 808 F.2d 195 (2d Cir. 1986) ........................................92

*United States v. Golomb*, 811 F.2d 787 (2d Cir. 1987) ............................................50

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) .........................................60

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)...........................................70

*United States v. Gushlak*, 728 F.3d 184 (2d Cir. 2013).........................................105

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) .................................... 82, 88

*United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013) ............................................93

*United States v. Head*, 641 F.2d 174 (4th Cir. 1981) ............................................104

*United States v. Joseph*, 542 F.3d 13 (2d Cir. 2008) ..............................................90

*United States v. Kelly*, 147 F.3d 172 (2d Cir. 1998)................................. 94, 96, 97

*United States v. Labat*, 905 F.2d 18 (2d Cir. 1990).................................................99

*United States v. Lewis*, 594 F.3d 1270 (10th Cir. 2010).........................................100

*United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985)............................................82

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982)........................................91

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ........................... 35, 42, 57

*United States v. Morales*, 577 F.2d 769 (2d Cir. 1978)...........................................94

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002) .................................... passim

*United States v. Ogando*, 547 F.3d 102 (2d Cir. 2008) ...........................................57

*United States v. Olano*, 507 U.S. 725 (1993) .........................................................59

*United States v. Persico*, 832 F.2d 705 (2d Cir. 1987)............................................98

*United States v. Peters*, --- F.3d ----, No. 11-610-CR, 2013 WL 5539655 (2d Cir. Oct. 9, 2013) ........................................................................................................105

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006)............................ 82, 101

*United States v. Rattenni*, 480 F.2d 195 (2d Cir. 1973).................................. 36, 37

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) ......................... 75, 76, 79, 91

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970).............75

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .............................................105

*United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009) (per curiam)............... 78, 79

*United States v. Rhone*, 864 F.2d 832 (D.C. Cir. 1989) .........................................76

*United States v. Rossomondo*, 144 F.3d 197 (2d Cir. 1998)...................................76

*United States v. Smith*, 740 F.2d 734 (9th Cir. 1984)..............................................99

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987)................................................75

*United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) (en banc) ................... 59, 60

*United States v. Thompson*, 518 F.3d 832 (10th Cir. 2008) ...................................97

*United States v. Torres Lopez*, 851 F.2d 520 (1st Cir. 1988) ................................98

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978).......................................51

*United States v. Vallone*, 698 F.3d 416 (7th Cir. 2012)........................................76

*United States v. Withers*, 638 F.3d 1055 (9th Cir. 2011) (as amended)................72

*Vanderwater v. Hatch*, 835 F.2d 239 (10th Cir. 1987)..........................................38

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ............................................... passim

*Virgin Islands v. Weatherwax*, 20 F.3d 572 (3d Cir. 1994)...................................72

*Wiggins v. Smith*, 539 U.S. 510 (2003)..................................................................65

## Statutes, Rules, and Other Authorities

U.S. Const. Art. III, sec. 2 ........................................................................39

U.S. Const. amend. VI .............................................................................35

18 U.S.C. §2 ...................................................................................... passim

18 U.S.C. §371 ...........................................................................................6

18 U.S.C. §1341 ................................................................................. 6, 75

18 U.S.C. §3231 .........................................................................................4

26 U.S.C. §6531(6) ..................................................................................97

26 U.S.C. §7201 .........................................................................................6

26 U.S.C. §7212(a) ......................................................................... passim

28 U.S.C. §1291 .........................................................................................4

I.R.C. §165(i) ...........................................................................................85

I.R.C. §172 ...............................................................................................85

I.R.C. §401 ...............................................................................................86

I.R.C. §402(g)(2)(A) ...............................................................................85

I.R.C. §404 ...............................................................................................85

I.R.C. §441(a) ...........................................................................................84

I.R.C. §563 ...............................................................................................85

I.R.C. §663(b) ...........................................................................................85

I.R.C. §666 ...............................................................................................85

I.R.C. §761(c) ...........................................................................................85

I.R.C. §810 ....................................................................................85

I.R.C. §855 ....................................................................................86

I.R.C. §858 ....................................................................................86

I.R.C. §1212 ..................................................................................86

I.R.C. §1311 ..................................................................................86

I.R.C. §1312 ..................................................................................86

I.R.C. §1313 ..................................................................................86

I.R.C. §1314 ..................................................................................86

N.Y. R. of Prof'l Conduct 1.0(k) .................................................49

N.Y. R. of Prof'l Conduct 3.3(b) ............................................ 41, 64

N.Y. R. of Prof'l Conduct 3.5(d) ............................................ 49, 64

N.Y. R. of Prof'l Conduct 8.4(a) ..................................................41

2 L. Sand et al., *Modern Federal Jury Instructions* (2013) ........................... 90, 102

LaFave & Scott, Criminal Law (2d ed. 1986) .........................................50

Model Penal Code §2.02 ...............................................................50

Myron C. Grauer, *The Supreme Court's Approach to Annual And Transactional Accounting For Income Taxes*, 21 Ga. L. Rev. 329 (1986)................................87

Sixth Circuit Criminal Pattern Jury Instruction 4.01A (2013) .............................102

Third Circuit Model Criminal Jury Instruction 7.05 (2013)................................102

## INTRODUCTION AND SUMMARY OF ARGUMENT

It is undisputed that the conviction of David Parse was returned by a jury whose deliberations were contaminated by a mentally unstable juror, a suspended lawyer who had manufactured a "totally fictitious persona" to obtain a seat on the jury.[1] The government now agrees that the juror was "incapable of weighing evidence, measuring credibility, and applying the law as instructed."[2] The district court found the juror's misconduct so severe and her pro-government bias so palpable that it granted a new trial to all defendants—except Parse.

By any measure, Parse was the least culpable of the convicted defendants. The three defendants who obtained a new trial had been convicted of a total of 43 counts of conspiracy, tax evasion, and other crimes. By contrast, Parse had been charged in only six counts, and acquitted of four of them. The district court refused to grant Parse a new trial because it held that his lawyers knew, or should have discovered, that the biased juror had repeatedly lied during voir dire. Even though Parse himself knew nothing about the juror's misconduct, the court held that Parse's lawyers had "waived" his constitutional right to an impartial jury.

This unjust decision violated settled legal principles, contradicted undisputed evidence, and should be reversed.

---

[1] SPA-44; SPA-47. "SPA" refers to the Special Appendix; "A" refers to the Appendix and transcript page, if any.

[2] (A-6087-88).

First, as this Court has emphasized, an impartial jury is critical to our justice system, and as essential as other structural protections that the Supreme Court has held unwaivable. At least in the rare circumstance where a juror's bias has been conclusively established, the right to impartiality should not be waivable, as this Court has said, and the Sixth Circuit has expressly held. Second, if a defendant could consent to a fundamentally unfair trial, settled waiver principles would require the defendant himself to provide a knowing and intelligent waiver. Yet it is undisputed that Parse gave no such waiver here. Third, even if attorneys could unilaterally waive their clients' right to an impartial jury, that did not occur here. The district court misapplied the governing legal standard and disregarded evidence conclusively establishing that Parse's attorneys did not know of the juror's misconduct until after trial. Finally, if Parse's attorneys in fact waived his right to a bias-free jury, his Sixth Amendment right to effective assistance of counsel was violated. The district court's refusal to find ineffective assistance was squarely at odds with its own factual findings.

Parse is entitled to acquittal, or at least a new trial, for additional reasons. To begin with, Parse acted in good faith at all times. This case concerns "tax shelters" that lawyers at Jenkens & Gilchrist ("J&G") and accountants at BDO Seidman ("BDO") designed and marketed. The government contended that the tax shelters lacked "economic substance;" that legal opinion letters defending the

2

shelters contained false statements; and that there were efforts to obstruct audits and mislead the IRS.

Parse did not work on any opinion letters or audits.  He had no legal or tax expertise, and gave no tax advice.  As the district court observed, Parse was "the most unfamiliar [of the defendants] with what the tax laws were" and there was no evidence he "had direct knowledge about it."[3]  He was merely one of multiple Deutsche Bank ("D.B.") brokers who executed financial transactions that D.B.'s lawyers had reviewed and approved, and that J&G used to implement the tax shelters.  Parse relied in good faith on D.B.'s approval process and on the tax experts at J&G, who repeatedly confirmed the legality of the tax shelters and persuaded many sophisticated people that the strategies were valid.

The government's case against Parse focused on three instances in which he executed new transactions or rebooked earlier transactions, to correct errors J&G had made the prior year.  The government alleged that this was "fraudulent backdating," but, in fact, there was no backdating at all.  Consistent with D.B.'s practice, the new transactions were documented transparently to show when they actually occurred, and explicitly referred to "as of" dates to indicate the earlier dates when the transactions should have occurred.  Neither Parse nor anyone else at D.B. altered or destroyed any records.  There was no evidence that the

---

[3] (A-2365/8040-41).

transactions were unlawful, or that Parse knew they would be improperly accounted for on tax returns. Indeed, none of the experienced tax accountants who prepared the tax returns testified that they believed, at the time, that there was anything improper about relying on the transactions Parse executed.

No reasonable jury could have found Parse guilty beyond a reasonable doubt of either mail fraud or tax obstruction, the two charges of conviction. Moreover, given the absence of evidence of criminal intent, Parse was severely prejudiced by erroneous jury instructions that impermissibly lowered the government's burden, on scienter for both charges and on the statute of limitations for obstruction.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. Parse's sentence was imposed on March 22, 2013. Judgment was entered on April 11, 2013. (SPA-73). Parse filed a timely notice of appeal on March 29, 2013. (A-6163). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1.     When the district court grants three defendants a new trial because the verdict is "tainted" by a biased juror who committed perjury on voir dire, yet denies the remaining defendant a new trial on the ground that his attorneys "waived" his right to an impartial jury, whether the judgment should be reversed because:

(a) The constitutional right to an impartial jury is so fundamental that it cannot be waived; the defendant himself did not knowingly and intelligently waive the juror's misconduct; and his attorneys had no actual knowledge of the juror's perjury.

(b) If the issue is forfeiture rather than waiver, there was plain error.

(c) If the defendant's attorneys did waive an impartial jury, he was deprived of his constitutional right to effective assistance of counsel.

2.    Whether Parse is entitled to acquittal on both counts because the evidence was insufficient.

3.    Whether Parse is entitled to a new trial because of a jury instruction that misstated the law on the "annual accounting system" in a manner that deprived him of his good faith defense to the alleged "backdating."

4.    Whether Parse is entitled to a new trial on mail fraud because the jury instructions erroneously permitted conviction even if he acted in good faith.

5.    Whether Parse is also entitled to acquittal, or at least a new trial, on the obstruction count because he committed no relevant acts during the limitations period, and the jury was erroneously instructed to convict if "someone" else committed or caused an act within the limitations period, even if Parse had no involvement.

6.    Whether the restitution order was unconstitutional.

5

## STATEMENT OF THE CASE

Parse was charged with conspiracy in violation of 18 U.S.C. §371 in connection with J&G's tax shelters (Count One), substantive tax evasion in violation of 26 U.S.C. §7201 (Counts 17-19), obstruction of the IRS in violation of 26 U.S.C. §7212(a) (Count 20), and mail fraud in violation of 18 U.S.C. §1341 (Count 25).  (A-84-139; A-155-56).

Parse was tried with J&G's Paul Daugerdas and Donna Guerin, BDO's Denis Field and D.B.'s Craig Brubaker.  Trial before the Honorable William H. Pauley III commenced on March 1, 2011 and lasted 12 weeks.  (A-223-2644/1-9141).  On May 25, 2011, the jury convicted Daugerdas, Guerin and Field on all counts; acquitted Brubaker on all counts; and acquitted Parse of four counts, but convicted him on two.  (A-2647-50/9153-67).

Parse moved for acquittal after the government rested.  (A-2433/8310).  He renewed the motion and moved for a new trial on June 7, 2011.  (A-3021-26).  The district court never ruled on these motions.

On July 8, 2011, Parse and his remaining co-defendants moved for a new trial or, in the alternative, for an evidentiary hearing based upon juror misconduct. (A-4941-78).  On February 15 and 16, 2012, the district court held an evidentiary hearing.  (A-5610/1-5837/380).  On June 4, 2012, the district court granted a new trial for the other defendants, but not Parse.  *United States v. Daugerdas*, 867 F.

6

Supp. 2d 445, 449 (S.D.N.Y. 2012) (SPA-1) ("*Daugerdas-I*").

On August 7, 2012, Parse moved for a new trial based upon ineffective assistance of trial counsel. (A-72). On January 3, 2013, the district court denied that motion. *United States v. Daugerdas*, 915 F. Supp. 2d 493, 494 (S.D.N.Y. 2013) (SPA-65) ("*Daugerdas-II*").

On March 22, 2013, the district court sentenced Parse to 42 months' imprisonment, three years' supervised release, forfeiture of $1 million, and restitution of $115,830,267. (A-6168-73).

With the government's acquiescence, the judge granted bail pending appeal. (A-6158-59/25-26). This appeal followed. (A-6163).

On October 31, 2013, following their retrial, Field was acquitted on all counts, and Daugerdas was acquitted on nine and convicted on seven counts.[4]

## STATEMENT OF FACTS

1. Many tax shelters are legitimate financial investments, even though their primary purpose is to provide tax benefits. (A-2574/8871-72). This prosecution centered on four tax shelter strategies designed and marketed by J&G and BDO, to take advantage of Internal Revenue Code ("IRC") loopholes so taxpayers could claim non-economic tax losses to avoid taxes they otherwise would have owed. (A-893-94/2183-84; A-986/2553-54; A-1038/2759-60; A-1046/2790-92).

---

[4] Guerin pled guilty before the retrial.

The technical details and tax theory underlying the strategies are largely irrelevant on appeal. What is important is that the strategies were complex and subject to expert debate, and many sophisticated people were deceived into believing that they were legal. (*E.g.*, A-4891; A-4874-85). J&G, a well-respected law firm, issued tax opinions defending the transactions. (A-546/803; A-1068/2877-79). Many other prominent firms marketed similar transactions in this period, *United States v. Coplan*, 703 F.3d 46, 56 & n.8 (2d Cir. 2012), and no court had found any J&G transaction unlawful (A-1136/3149).

2. Parse was not a lawyer and had no tax expertise. (A-770/1692). After earning his M.B.A. in 1988, Parse became a broker, and eventually joined D.B. in 1995. (A-5932; A-1689/5350-51; A-1688-89/5347-48). The government emphasized that Parse was a CPA for two years in the mid-1980s (A-2456/8399; A-2460/8417; A-2555/8797), but this was irrelevant. Parse's brief tenure doing audit work—not tax work—occurred many years before he worked on the J&G transactions. (A-5932; A-770/1691-92).

Parse principally provided investment management services in a "relationship" role between customers and D.B.'s traders. (A-1600/4997; A-1659/5231). Parse did not work on the J&G strategies until another broker who had been implementing transactions for J&G clients became the branch manager of Parse's office. (A-1084/2943-44). At that point, Parse became one of several D.B.

8

brokers who handled these transactions.  (A-533/752-53; A-1090/2965-66).

Parse opened accounts for entities J&G formed for the strategies, executed trades, and answered customer questions about the investment aspects.  (*E.g*., A-584/954-55; A-1913/6242; A-2075-76/6887-88).  When Parse had substantive communications with customers, the conversations were about financial, not tax matters.  (A-662/1265-67; *see also* A-770/1693-94; A-812/1856-58; A-871/2092-93; A-885/2149-51).

Neither Parse nor D.B. provided tax advice on the shelters.  D.B. required customers to affirm that they undertook the transactions based on their "own independent decision" and "own judgement and upon advice from such advisers as [they] ha[ve] deemed necessary."  (A-4480; A-3420; A-3953).

Parse was also largely uninvolved in "marketing" the transactions.  All but one of the customers learned about the shelters from J&G or BDO and had no prior relationship with Parse.  The single exception occurred when Parse introduced a customer who had been independently examining "various tax strategies" to Daugerdas.  (A-1631/5118-19).

Parse had no reason to believe the strategies were unlawful.  D.B.'s top management and lawyers had approved D.B.'s involvement.  Its counsel carefully reviewed key documents for each shelter and imposed compliance requirements on J&G.  (A-1090/2963-65; A-1114-16/3059-69; A-4892-93; A-1113/3056-57; A-

9

4475-85; A-1117-18/3074-75; A-1118/3077; A-1124-25/3101-03; A-4887-88).

For example, D.B. required J&G to attest that all clients "understand the financial

and tax ramifications" and that J&G's tax opinion would conclude that the shelter

was supported by "substantial authority." (A-1090/2963-65; A-4886; *see also* A-

1124-25/3101-03; A-1128-29/3116-19; A-4476; A-4894-96; A-4887-88).

The government's own witnesses explained how Parse and his colleagues—

like many lay clients and even other tax professionals—were misled into

concluding that the transactions were legal. J&G's Erwin Mayer testified that

"[t]ax law is very complicated" and "there are tax results that are counterintuitive."

(A-1062/2854; A-1065/2867). He repeatedly told clients that the tax shelters were

"perfectly proper and lawful" (A-1074/2901; *see also* A-1093/2976), and that "as

long as [they] want[ed] to make money," that was "sufficient" to establish a

"business purpose" for the shelters (A-1078/2919). Mayer "persuaded" "very

successful people," "very smart people," "in all areas of business," including

"accountants," "lawyers," and "people in finance," who looked at the strategies

"with great care," that they worked and had economic substance. (A-1082-

83/2936-40).

Daugerdas similarly used his expertise to persuade clients of the shelters'

legality. (*E.g.*, A-832-33/1938-43; A-432-33/351-55). In the fall of 1998, Parse

attended two meetings at which Daugerdas discussed the tax shelters with an

10

executive at Calphalon Corporation who was managing the sale of that business and the shareholders' efforts to dispose of the proceeds from the sale. At the first meeting, Daugerdas explained the tax theory of one of the shelters. (A-1631/5120; A-1654/5208-09). He "seemed very knowledgeable about the tax law" and was "[g]enerally" "impressive." (A-1660/5233). At a follow-up meeting with other former Calphalon shareholders and their personal attorneys, Parse heard a "serious," "careful," "robust discussion focused on the applicable law and regulations" among the lawyers who attended—Daugerdas, the shareholders' tax specialist, and Calphalon's majority shareholder. (A-1660-61/5235-36; A-1631-32/5121-22; A-1655/5212-14; A-1658/5224; A-1913/6241-42). Daugerdas advised that the strategy was valid and he would issue an opinion defending it. (A-1660-61/5235-36; A-1632/5124).

3. The government argued that the deductions J&G's clients took based on the shelters were invalid because the transactions lacked "economic substance" (A-2579/8889-90) under a complex, highly fact-specific, judge-made doctrine that "has been applied differently from circuit to circuit and sometimes inconsistently within circuits," and "is not a model of clarity." *Coplan*, 703 F.3d at 91. There was no evidence that anyone ever discussed economic substance concerns with Parse, or that he was aware of debates among the tax experts.

The government also presented evidence that the J&G opinion letters

11

contained false statements (about the taxpayers' business purpose), and that BDO attempted to obstruct IRS audits. (*E.g.*, A-1781-82/5718-22; A-1788-90/5744-51). There was no evidence that Parse was involved in preparing any opinion letter or participated in any audit.

The government attempted to link Parse (and Brubaker) to the alleged misrepresentations in the opinion letters by arguing that they engaged in a shelter and "received opinion letters containing the same false representations." (A-2457/8406). But there was no evidence that Parse's (or Brubaker's) opinion contained false statements. Parse made a profit of $16,500. (A-4757). He was charged no fees for the opinion. (A-2096/6969; A-3594-3732).[5] Thus, his transaction probably had economic substance. (*See* A-2579/8889-90 (jury instructions on economic substance); *cf.* A-769/1687-88 (Greisman testimony that his own shelter "possibly" worked because he paid no fees)).[6]

The prosecution also claimed that Parse (and Brubaker) were involved in a "coverup" by identifying so-called "dog tech" or "fallen angel" stocks to use for the strategies, purportedly because they were less likely to draw the IRS's attention. (A-2465-66/8438-39). But the evidence shows only that Parse

---

[5] The government's principal argument as to "objective" economic substance was that J&G's clients could not make a profit net of fees. (A-2454/8391-92).

[6] Nevertheless, in January 2003, after D.B. decided to stop executing these transactions, Parse amended his return and paid additional taxes. (A-4565-68). He was not assessed penalties or charged with personal tax evasion.

suggested investments in certain major, successful technology companies such as Microsoft and Lucent (A-4473-74; A-1192-93/3373-77), some of which made money (A-1195/3385; A-1196/3388). Mayer testified that: These stocks were not necessary to the J&G strategies (A-1192/3373); taxpayers did not invest exclusively in these stocks (A-1197/3391-93); and several taxpayers invested in these stocks even though "there would be absolutely no [tax] reason" to do so (A-1198-99/3395-3402). The record thus refutes the government's "dog tech" theory.

The government also relied on one sentence of testimony regarding the second Calphalon meeting described above.[7] This testimony reflects only that, during rigorous tax discussion among the lawyers, Daugerdas said that the transaction had some (albeit low) profit potential, that it was important for the tax strategy that the investment have some profit potential, and therefore the taxpayers needed to have an intent to make a profit even though they were engaging in the strategy for tax reasons. (*See* A-1632/5122; A-1655/5213-14; A-1658/5224; A-1660-61/5235-36; A-6086-87). As explained, at this meeting, Daugerdas also advised that the shelter complied with the tax laws. In that context, the statement would not have alerted Parse that illegal activity was afoot.

---

[7] Dean Kasperzak, a Calphalon shareholder, testified that during the meeting Daugerdas said "that the profit potential was very low and that going forward, should we choose to go forward, if we were questioned about the matter, that our intent was in fact to make a profit, but in order for this tax shelter to work, there had to be, in effect, a loss to balance off the gains from the stock sale." (A-1914/6244).

4.  The government argued that Parse engaged in "fraudulent backdating" with respect to three groups of taxpayers, because these taxpayers' returns reflected corrective transactions in their brokerage accounts that occurred the following year.  But there was no evidence that Parse engaged in any "fraud" or any "backdating."

Parse never destroyed, falsified, modified, or whited-out any record of any transaction.  Correcting errors using "as of" dates was done in the ordinary course of business at D.B.  (A-1742/5563; A-1768/5664-65).  Parse's assistant Carrie Yackee did "quite a bit of correcting" and "as-of transactions," not just for tax shelter customers, and regardless of who made the mistake.  (A-1747/5582; A-1749/5590; A-1754/5611; A-1710/5433-34; *e.g.*, A-4463).  Yackee explained:  "If we discovered an error, we would write up a ticket for that error.  And I would have the form signed by management and then explain what the error was, and then, in turn, giv[e] it to someone in our back office who would then correct it."  (A-1691/5359; *see also* A-1747/5580-81).  The corrected trade "would have a date of when it…should have occurred.  That would be the as of date."  (A-1703/5406).  Once a statement was final, no one could change it.  (A-1755/5612).  So the later "as-of" transaction would be documented on the statement issued for the month in which it actually occurred, and "the notation 'as of' appeared on the statements and related documents *to make clear what had happened*," *i.e.*, "[t]hat there had been a

14

correction after the fact."  (A-1758/5626 (emphasis added)).

Yackee would get approval for correcting errors not only from Parse, but also from Barbara Kositchek (A-1747/5580-82; A-1741/5559; A-1742-43/5563-64; A-4547; *see also* A-1757/5623; A-4913), the assistant branch manager and a "stickler" for D.B. procedures who had "a distinct role" in handling the branch's error corrections (A-1745/5572-73).  Yackee provided Kositchek (or Peter Mott, the branch manager (A-1746/5578)), with all the facts relating to proposed corrections.  (A-1757-58/5623-24).[8]

This procedure was followed for each group of taxpayers.  In 2000, members of the Aronoff family participated in J&G tax shelters through jointly held entities; the individual family members each wished to generate a mix of capital and ordinary losses.  (Equity trades were used for capital losses, and foreign currency trades for ordinary losses.  (A-894/2186; A-897/2198)).  In early 2001, Guerin discovered that the currency and stock transactions were allocated incorrectly among brokerage accounts for the shelters.  On February 9, 2001, Guerin faxed Parse a December 19, 2000 letter that J&G had previously sent authorizing the relevant allocations, and a separate December 19, 2000 letter with the corrected allocations, which Guerin said "*should* have been sent to you."  (A-4500-02; A-4544; A-4545; *see also* A-2129/7099).  Yackee, apparently at Parse's

---

[8] Foreign-currency trade corrections were subject to an approval process outside Yackee's branch.  (A-1758/5624-25; A-1773/5686-87).

direction, asked a colleague to rebook the prior trades to the correct accounts.  (A-4545; A-1735/5532-33; A-4449; A-1841/5952-53; A-4546; A-1734/5528-5530; A-4457-60).

Because the D.B. records transparently and accurately reflected what occurred, Yackee, who did not recall the transactions, could reconstruct what happened just by examining them.  (A-1768/5664).  The December 2000 account statements were unaltered, and the January/February 2001 statements show that the corrections occurred on February 9, 2001, "as of" the December dates.  (A-4508-12; A-4516; A-4519; A-4523; A-4530; *see also* A-4547; A-1735-36/5534-36 (change form reflecting both dates); A-3027-34; A-1736-37/5537-40 (trade tickets reflecting both dates); A-1844/5965-66).

D.B.'s records were just as transparent for the other corrective transactions. In March 2002, J&G sent D.B. a revised authorization letter for Michael Toporek's shelter, requesting corrections to stock and currency trades mistakenly implemented the prior year.  (A-1499-1500/4594-98; A-1498-99/4590-92; A-1501-02/4599-4605; A-1739/5550-51; *compare* A-4168-70 (original authorization letter of December 28, 2001) *with* A-4325-26 (revised December 28, 2001 letter faxed on March 29, 2002)).  On Parse's instructions, Yackee requested that corrective trades be made "as of" the December 2001 dates.  (A-1739-40/5551-53; A-4450-56).  Again, the December 2001 brokerage statements were not changed, and the

16

resulting trade confirmations and statements accurately showed that the corrective transactions occurred on April 4, 2002 with a settlement date of April 5, 2002, while also indicating the "as of" dates.  (A-4496-98; A-4492-95; A-4161; A-4166; A-1741/5556-57; A-4149).

Similarly, in February 2002, J&G faxed Parse letters directing that mistaken 2001 stock transactions for the Coleman and Blair taxpayers be "reversed," with stock transferred to other accounts, and authorizing purchases and sales of foreign currency.  (A-4499 (undated letter faxed on February 11, 2002); A-3083-84 (letter dated December 24, 2001 and faxed on February 11, 2002); A-3085-86 (letter dated December 28, 2001 and faxed on February 11, 2002)).  Yackee emailed other D.B. employees that "there was a mistake made…by the client," and requested that they implement corrective trades using "as of" dates in December 2001.  (A-1710/5433-34; A-1711-12/5437-40; A-4461-62; A-4464-72).  Again, the December 2001 brokerage statements were not changed, and the February 2002 statements reflected the actual dates of the February transactions, while also noting the "as of" dates.  (A-1712/5442-43; A-1726/5497-98; A-3035; A-3076; 4503; *see also* A-4913 (change form)).

Each taxpayer claimed losses arising from the corrective transactions in their tax returns for the prior year, based on opinion letters that J&G issued with full knowledge of all facts.  Moreover, the BDO and American Express professionals

17

who prepared the tax returns and testified knew all pertinent facts and used the corrective transactions, apparently without qualms.  (A-4513-43; A-1841-42/5954-55; A-1505/4615-16; A-1505/4618; A-1740/5554-55; A-1503/4607-09; A-1508/4629-30; A-4496-98; A-4549-64).  Nicole Bencik, a fourth-year tax accountant who prepared the Aronoff returns, testified that at the time of these events, she had "no hesitation" about using the 2001 changes for the 2000 tax returns.  (A-1849/5986).  Similarly, Judy Gagnon/Quedenfeld, who had over 12 years' tax experience, was fully aware that she was relying on a transaction that occurred in April 2002 for Toporek's 2001 return.  (*See* A-1490/4555-58; A-1504-05/4613-15).  Yet she was not charged with any crime or granted any form of immunity and did not testify that she believed at the time there was anything wrong with using the corrective transactions on the 2001 returns. [9]

Parse had nothing to do with these taxpayers' returns, much less any decisions about the use of the corrective transactions in their returns.

5.  The jury deliberated over the course of nine days before reaching its verdict.  The evidence as to Parse and Brubaker was substantially similar, but for the "backdating" allegations.  The length of the deliberations, and the 42 substantive juror notes and responses leading to the mixed verdict (A-2591-

---

[9] Tellingly, the government declined to ask Robert Greisman, the cooperating BDO partner who approved and signed the returns drafted by Bencik (A-1838/5939; A-1845/5968; A-1847/5972; A-1848/5982), whether he believed the rebookings were improper.

2647/8938-9153), confirm that the case was very close, and suggest that the only reason Parse was not acquitted on everything was that the jury instructions provided for a lesser standard of scienter on some counts and with respect to the backdating allegations.

In particular, on the eighth day of deliberations, the jury asked the court, "Can you be guilty of Count Twenty [obstruction] and not guilty of Count One [conspiracy]?" (A-2637-38/9118-19). The court said yes, but reminded the jury to decide each count individually. (A-2639/9126). The jury later asked, "If the jury is unable to reach a verdict on two defendants, will that affect the rest of the defendants?" (A-2642/9136). The court said no. (A-2643/9139). The very next day, the jury asked the court to "clarify" the scienter instruction on conspiracy. (A-2646/9151-52). One hour later, the jury returned its verdict. (A-2647/9153).[10]

## ARGUMENT

## I.   PARSE IS ENTITLED TO A NEW TRIAL BECAUSE HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY WAS VIOLATED

The district court found that Parse's trial was fatally compromised by a biased juror who made a "calculated, criminal decision to get on the jury," and vacated the convictions of Parse's co-defendants. SPA-17; SPA-64. But it refused

---

[10] (*See also* A-4939 (biased juror's letter) (after "we had asked for the Judge's clarification of 'willfully and 'knowingly', I believe, and I had to throw in the towel [on conspiracy]…. The backdating was enough for the other charges….")).

to grant Parse any relief, because his lawyers had "waived" an impartial jury since they "knew," or with "diligence" would have known, of the juror's perjury and did not timely object. SPA-55-63.

This miscarriage of justice should be reversed.

### A. The Post-Trial Proceedings

#### 1. Procedural Background

Catherine Conrad (Juror No. 1) revealed her misconduct on May 25, 2011, the day after the verdict, in a letter to AUSA Okula contained in an envelope bearing a "Love" stamp, "praising the Government's prosecution of the case." SPA-7; (A-4937-40). Conrad wrote that the prosecution "did an outstanding job on behalf of Our Government," and that she "did fight the good fight" against acquitting Parse, but "had to throw in the towel" on the "conspiracy charge." (A-4939). The government waited almost one month, until June 22, 2011, to disclose Conrad's disturbing letter. (A-4936).

By that time, Parse's attorneys (Brune & Richard LLP ("B&R")) had already filed Parse's post-trial motions challenging the sufficiency and weight of the evidence. These motions did not raise juror misconduct. (*See* A-3021-26). In light of Conrad's letter, however, B&R conducted a thorough investigation into her background, and uncovered her extensive perjury. Parse and his co-defendants moved for a new trial on July 8, 2011. (A-4941-78).

20

At a conference on July 15, 2011, the government indicated that it intended to defend the convictions nevertheless, and to pursue discovery of whether "anybody on the defense side had any awareness" of Conrad's misconduct and thereby "waived" a challenge to her bias. (A-5408-09). Substantial discovery and briefing on both the juror misconduct and waiver issues followed.

2.    The District Court Correctly Found The Defendants Were <u>Deprived Of A Fair Trial Because Conrad Was Biased</u>

The district court's ruling that Conrad's bias warranted a new trial is incontrovertible. The government elected not to appeal that ruling and ultimately conceded her bias. (A-6087-88 (citing SPA-44)).

Conrad's perjury at voir dire was "breathtaking." SPA-36. She deliberately and repeatedly lied and misled, in order to hide "her true identity, which would have prevented her from serving on the jury." *Id.* For example, she was not a "stay-at-home wife" whose highest level of education was a "BA." In fact, she was an attorney who had been indefinitely suspended by the First Department and the Southern and Eastern Districts of New York because of chronic alcoholism (which she also concealed from the court). SPA-3-4; SPA-7-13; (A-306/203-04; A-5653/174-76). She concealed an extensive history of arrests, charges, and convictions; falsely claimed to have lived in Westchester County "all [her] life" in order to seem "more marketable as a juror;" and even lied about being a plaintiff in a "pending" personal injury action. SPA-7-13; (A-5656/185-87; A-5647-48/151-

21

53; A-5649-50/160-61).  Conrad's comprehensive disregard for the truth demonstrated that she could "be expected to treat her responsibilities as a juror…with equal scorn."  *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) (Kozinski, J.) (en banc).

Moreover, Conrad's fawning letter to Okula "indicates that [she] identified with the Government" wholly apart from its evidence at trial.  SPA-40.  "Her choice of words" in praising the prosecution's "outstanding job on behalf of Our Government" revealed "that Conrad saw herself not as a fact-finder, but as a partisan for 'Our Government.'"  SPA-7; SPA-40-41; (A-4939; *see also* A-4939 ("(Do I smell competition for [U.S. Attorney] Mr. Bharara??–no, I could not have said that!!)"); A-4940 ("I feel privileged to have had the opportunity to observe la crème de la crème–KUDOS to you and your team!!!")).  Conrad's "bias also bled through" in her letter's assurance that she "did fight the good fight" against acquitting Parse on any counts, but "had to throw in the towel" on the "conspiracy charge" in light of the court's scienter instruction.  SPA-40.

At the evidentiary hearing, Conrad admitted her preexisting bias against the defendants.  She testified that she believed, *before hearing any evidence*, that the defendants were "crooks."  She perversely concluded that "the defense counsel would be wild to have me" on the jury if her true criminal history were known. SPA-14; *see also* SPA-39-40.  She also testified that she knew it was wrong to

perjure herself but did it anyway to get on the jury.  SPA-44; (A-5651/165-67; A-5655-56/184-85; A-5656/188).  A juror "who lies in order to improve his chances of serving has too much of a stake in the matter to be considered indifferent." *Dyer*, 151 F.3d at 982.

The court found that:  Conrad "has a serious mental problem" that was "[n]o doubt…exacerbated by many years of alcohol abuse," and "such a person has no business sitting on a jury in judgment of others," SPA-48; Conrad's statements at the hearing and in her letter demonstrated that she was "actually biased," SPA-39-40; Conrad's perjury, contempt for the judicial process, and mental instability demonstrated both implied and inferred bias, SPA-44-48; and Conrad's presence on the jury "tainted" the verdict, SPA-63.  The court therefore granted a new trial to Parse's co-defendants.  SPA-48.

### 3.    Parse And His Attorneys Were Not Aware Of Conrad's Misconduct Until After The Trial

It was undisputed below that Parse was completely unaware of Conrad's lies before the verdict.[11]

The evidence established conclusively that Parse's attorneys did not know until well after trial that Conrad had created an entirely fictitious persona for herself during voir dire and was actually biased.  As discussed below, B&R's

---

[11] The government never challenged Parse's affidavit, submitted in connection with his ineffective assistance motion, attesting to his lack of knowledge during the trial of Conrad's misconduct.  (A-5872-73).

cursory background research turned up a suspended attorney named Catherine Conrad before her individual voir dire, and in additional research prompted by a puzzling jury note later in the trial. But the evidence unequivocally demonstrated that on both occasions B&R *considered and rejected* the possibility that that person could be Juror No. 1.

        a.     B&R concluded at voir dire that Juror No. 1 was not the suspended attorney Catherine Conrad.

B&R received Conrad's name before voir dire. (A-5613-14/16-17; *see also* A-4985; A-4987-88). On March 1, 2011, during general voir dire of the panel, Conrad said her father "works for DOJ across the street" as "an immigration officer." *Daugerdas-I*/SPA-4; (A-244/85). B&R's Theresa Trzaskoma had "some concern" about Conrad's father's employment with DOJ. (A-5615/23). Accordingly, early the next morning, Trzaskoma ran a Google search for Conrad's name, and saw a 2010 order from the First Department suspending a Bronx attorney named Catherine M. Conrad because of alcohol abuse. (A-5615/23-24; A-5719/262; A-5790-91/333-34; *see also* A-5000-02).

The B&R attorneys then considered the possibility that the prospective juror was the same person as the subject of the suspension order. (A-5718-19/261-62). B&R's jury consultant advised them that "you do not want this lady [*i.e.*, the suspended attorney] on your jury," and that "if this is the same person you should

24

strike her for cause" in light of her alcohol dependency. (A-5719/262).

Accordingly, B&R's "plan was to hear from her on voir dire and find out based on

her answers to Judge Pauley whether she was the same person." (A-5720/263; *see*

*also* A-5618/34).

Based on her answers during the individual voir dire, B&R concluded she

was not. The prospective juror testified under oath that her highest level of

education was a bachelor's degree, and that she was a "stay-at-home wife" who

had always lived in Westchester. The attorneys credited that sworn testimony, and

"concluded that [she] was not the same person" as the suspended attorney who

lived in the Bronx. (A-5618/34; *see also* A-5631/86; A-5723/266; A-5729-30/272-

73; A-5766/309). They therefore did not strike her for cause, as they would have

on their jury consultant's advice, if they had believed she were the alcoholic,

suspended attorney Catherine Conrad. (A-5719/262).

It was reasonable for B&R to rely upon Conrad's answers. The district

court had specifically admonished the parties not to inquire beyond the prospective

jurors' sworn testimony. (A-208/5 ("Well, when somebody declares under

penalties of perjury that they rely on commissions for their income, I wouldn't ask

another question beyond that.")). Indeed, the whole point of swearing the venire is

to make their answers reliably true—as the district court itself observed below,

"[t]he sanctity of an oath is central to the sound administration of justice."

25

*Daugerdas-I*/SPA-1; *see also* SPA-63.  Moreover, Conrad had the opportunity to reveal any "sensitive or potentially embarrassing personal information"—like alcohol dependency or a suspended bar license—"at sidebar," but did not do so. SPA-4.  Furthermore, there was nothing about Conrad's demeanor—which the trial judge had emphasized was critical to his "job[] as the judge to make sure…we don't have any nuts on the jury"[12]—that raised any red flags.  B&R therefore reasonably concluded that the person seated as Juror No. 1 was not suspended attorney Catherine Conrad.

>    b.    B&R's view that Juror No. 1 was not the suspended
>           attorney did not change during trial.

During the three-month trial, Juror No. 1 did nothing to suggest she had any bias or to call into question the veracity of her voir dire testimony.  Instead, she was "attentive," "took a lot of notes," and generally "seemed to be who she had presented herself to be."  (A-5733-34/276-77; *see also* A-5618/35).  Conrad's letter to the government reflects that she was quite conscious of the dutiful image that she presented at trial.  (A-4939 (referring to herself as "the nerdy person with the 'Susan Brune' glasses," "always head down, taking notes!")).  B&R therefore continued to believe that Juror No. 1 was who she claimed to be.  (A-5631/86-88;

---

[12] (A-176/42; *see also id.* ("A nut does not reveal his- or herself in a questionnaire. They reveal themselves by affect, and they reveal themselves even just how they walk into the jury box."); A-184/12 (emphasizing "the importance that I attach to seeing a juror's response in open court," and that "that perspective is probably shared by most trial lawyers")).

A-5766-68/309-11; A-5783/326; A-5810-11/353-54).

> c.     B&R concluded again at the end of trial, after a note
>         from Juror No. 1, that she was not the suspended attorney
>         Catherine Conrad.

On May 11, 2011, after the last closing argument, the district court informed

the parties that Juror No. 1 had sent the court a note, which read in part:

> Will the Court instruct the jury on *respondeat superior*?
> The issue of vic. liab. arose in the testimonies of a few wits. wherein they
> mentioned greisman, Shanbrom + Kerekes, but not specifically Δ Field, +
> also mentioned Erwin Mayer, but not Δ Daug. or Δ Guerin.

(A-2955; A-2564/8832). The court read the note aloud, but read the delta symbols

as "defendant" without mentioning the note's use of a symbol. (A-2564/8832).

Trzaskoma did not focus on the note that evening, or examine it. (A-5618/36; A-

5620/42). But the next morning, on May 12, 2011, she was struck by the note's

use of specialized legal terms. (A-5620/42-43). Trzaskoma therefore reviewed

B&R's information on Juror No. 1 in light of her voir dire, to reassess "the

possibility that this could be the same person as the suspended lawyer." (*Id.*).

Trzaskoma emailed her paralegals, requesting "all of our intelligence on

juror #1, including pre-voir dire info we thought we had[.]" (A-5509; A-5619/39-

40). David Benhamou sent her a summary of Conrad's voir dire testimony (A-

5509) and conducted a Google search, and located the First Department suspension

order and a prior order from the same disciplinary proceeding. (A-5514-18; A-

5520).  Another paralegal sent Conrad's statement that she was a plaintiff in a "pending" personal injury action.  (A-5520).

Trzaskoma compared that information to Conrad's individual voir dire responses and again concluded that, "unless Conrad totally lied about her highest level of education, it can't be the same person as the suspended lawyer."  (A-5531-33).  The paralegals agreed.  (A-5526 ("I don't think she's that [suspended] lawyer, unless she blatantly omitted information during voir dire…(or was able to become a lawyer without going to law school)."); A-5528 ("We think it's not the same person.")).  Consistent with the firm's practice of recording its work product, Trzaskoma instructed the team to retain the information.  (A-5532; A-5620/44).

These exchanges took place during the course of a hectic trial day.  The parties had sorted out complex redactions to the indictment, and the district court was delivering its instructions to the jury.  (A-2566-84/8839-8912).  In the midst of these proceedings, Benhamou suggested to Trzaskoma that he run a "people search" on Westlaw.  Trzaskoma agreed.  (A-5531).  The jury retired to begin deliberations.  (A-2587/8921-22).  Trzaskoma was preparing exhibits to be sent in to the jury (A-5630/83; *see also* A-2590/8933-34; A-2591/8940), when Benhamou emailed her a Westlaw report for the "Catherine M. Conrad" living in Bronxville, Westchester.  (A-5531-53).  Benhamou wrote, "Westlaw thinks this is the same suspended lawyer from the Bronx," but he suggested the report might be

"confusing two people or I picked the wrong one." (A-5531). He pasted into his email information he selected from the report that fit Juror No. 1's voir dire testimony ("If it is her[], some info:"), including an address in Bronxville. (*Id.*). As discussed below, Benhamou omitted substantial information in the report that contradicted the voir dire profile. Benhamou also included the "confusing and maybe incorrect" information that Conrad was "[m]arried to Robert J Conrad" and her "Head of Household" was a "Ms Edwina C Conrad." (*Id.*).

Trzaskoma received this summary and the attached Westlaw report just as the court was sending the redacted indictment, jury charge, and trial exhibits to the jury, and addressing two jury notes. (A-2591-92/8937-42). She did not read the Westlaw report itself, which is nearly 20 pages of condensed information, at the time. (A-5630/83; A-5632/91; A-5535-53). But she reviewed the cover email and data Benhamou selected that matched Conrad's voir dire. That selected information prompted her to respond, "Jesus. I do think that it's her." (A-5555; A-5632/90-91). She asked Benhamou to "track down that lawsuit" to provide some clarity. (A-5555; A-5623/55-56).

Later that afternoon, during a break, Trzaskoma had the opportunity to read the Westlaw report itself. She "came to appreciate why [Benhamou] had described the report as confusing." (A-5622/49; *see also* A-5623/55-56). Benhamou's email describing the report omitted "a lot of really conflicting information…that did not

29

jibe at all with Juror No. 1's voir dire."  (A-5622/49).

- *Name and Residence:* Although the search was for the Catherine M. Conrad who had lived her "whole life" in Westchester (A-306/203), the report included information about a "Catherine Rosa," and listed a "best address" in the Bronx, as well as two other addresses in the Bronx and a third in Brooklyn.  (A-5536; A-5539-45).

- *Age/SSNs:* The report showed Catherine M. Conrad as 41 years old, consistent with Juror No. 1's age, but listed two different social security numbers for the same name, one of which reflected a much younger age.  (A-5536; A-5773-74/316-17).

- *Family:* As Benhamou noted, the report showed Conrad's "Head of Household" to be "Ms Edwina C Conrad."  (A-5544).  But Conrad testified that the only other "member[] of [her] household" was her husband.  (A-306/203).  It also showed that the "spouse" of Catherine M. Conrad was a "Robert J Conrad" listed as 80 years old, and thus an unlikely spouse for a 41-year-old.  (A-5621/46-47; A-5544).

- *Attorney License:* The report showed an attorney license for the Catherine M. Conrad who lived in the Bronx.  (A-5545).  But Conrad testified that she had always lived in Westchester.  (A-306/203).

- *Civil Lawsuit:* The report listed a judgment against a Catherine Conrad in a civil action.  (A-5549).  But Conrad testified that her action was "still pending."  (A-249/105).

In light of this contradictory information, Trzaskoma concluded that the report was conflating two different Catherine Conrads:  the suspended Bronx lawyer and Juror No. 1.  (A-5631/86-87).

Nevertheless, as Trzaskoma and her partners left the courthouse at the end of the day, she brought up the possibility that Juror No. 1 was the suspended lawyer, in light of her jury note; she did not specifically mention the Westlaw report.  (A-

5624/58-59).  The attorneys considered and rejected the possibility.  Laurie

Edelstein remarked that the juror had reported being a plaintiff in a personal injury

lawsuit, at which the concepts of respondeat superior and vicarious liability could

have arisen, and that no trained lawyer could believe those concepts had any role in

the criminal trial at hand.  (A-5624/60; A-5737/280).  The consensus was that it

was "inconceivable" that a lawyer would commit perjury as extensive as that

required for the two individuals to be the same person.  (A-5810/353; A-5738-

39/281-82).

> d.　Other undisputed evidence demonstrates B&R did not
> know Juror No. 1 was the suspended attorney and had no
> intent to sandbag the court.

B&R's actions also conclusively establish that they did not know or believe

that Juror No. 1 had committed perjury during voir dire until after the government

disclosed her letter.

For example, during the trial and in the immediate aftermath of the

conversation among Trzaskoma, Brune and Edelstein discussed above, the B&R

lawyers had two separate conversations with Brubaker's lawyers, confirming that

B&R had concluded Juror No. 1 was not the suspended lawyer.  Trzaskoma and

Paul Schoeman had a conversation outside the courthouse.  Schoeman testified that

Trzaskoma told him that "there was a person with the same name" as Juror No. 1

"who was a disbarred lawyer," but that "it was not the same person as Juror No. 1."

31

(A-5818/361).  Trzaskoma explained that "she had rejected the conclusion that Juror No. 1 was a suspended attorney" (A-5823/366), because Conrad had testified on voir dire that her educational background did not include law school (A-5818/361; *see also* A-5439).

Brune had a similar conversation with Brubaker's other attorney, Barry Berke, around the same time.  (A-5825/368).  Berke testified that Brune told him that B&R "had identified a person with the same name" as Juror No. 1 "who had been a disbarred lawyer."  (A-5826/369).  Berke's view was that "that can't be, because she certainly isn't a lawyer," and Brune confirmed that Conrad had said her highest educational background was "a BA degree."  (*Id.*).  Berke observed, "definitely it can't be the same person" in light of her voir dire testimony, and Brune confirmed, "that's what I think as well."  (*Id.*; *see also* A-5833/376).  As Berke testified, it was "such a far-fetched idea that any citizen would come in here and lie to be a juror."  (A-5832/375).

Moreover, when B&R filed its post-trial motion on behalf of Parse for relief from his conviction on June 7, 2011, they sought an acquittal or a new trial based upon the insufficiency and weight of the evidence.  (A-3023).  If B&R had actually known of Conrad's perjury and bias during trial, and had intended to gamble on the verdict and exploit her misconduct in the event of conviction, they would have raised the issue in that post-trial motion.  If there had been a "sandbagging"

32

strategy,[13] that would have been the time to implement it. Yet they did not do so, and only sought a new trial based on juror misconduct after the government disclosed Conrad's letter.

It was also undisputed that post-trial, B&R conducted extensive legal research on multiple issues, but not juror misconduct. (A-5418; A-5768/311). Parse testified in an uncontradicted affidavit that, before Conrad's letter was revealed, he met with B&R to discuss post-trial motions and appellate issues, and they did not raise any juror misconduct issue. (A-5872). B&R also took no steps to investigate Conrad before receiving the letter, because they did not believe any juror misconduct issue existed. (A-5418; A-5768/311; A-5810-11/353-54).

Conrad's letter, and its inclusion of a telephone number matching that of the suspended lawyer, prompted B&R to hire an outside contractor to help it conduct a full-bore investigation into Conrad's background, including property records, marriage records, criminal records, civil court files, and election records. (A-5626/66; A-5750-51/293-94; A-5798/341; A-5747/290; *see also* A-4979-83). That investigation is what conclusively linked the two Conrads. (A-5798/341).

In sum, after extensive discovery into B&R's contemporaneous records and correspondence, and two days of the government's questioning of Trzaskoma, Edelstein and Brune under oath, there was not one iota of evidence that B&R knew

---

[13] All three B&R partners testified unequivocally that there was no such strategy. (A-5633/95-96; A-5768/311; A-5810-11/353-54).

33

that Juror No. 1 was the suspended lawyer or deliberately concealed any suspicion of Conrad's perjury to sandbag the court in case of a conviction.

4.    The District Court's Finding Of Waiver

The district court concluded that "the right to challenge the partiality of a jury verdict based on a juror's alleged misconduct during voir dire may be waived." *Daugerdas-I*/SPA-49. It also held that B&R could waive Parse's right to a new trial here because "a defendant can waive certain rights through the actions of his attorneys, even if the defendant himself was unaware of the circumstances and actions giving rise to the waiver," and here the issue was one of "trial management," such that Parse was "bound by [B&R]'s actions and decisions at trial." SPA-50. The district court stated, "a defendant waives his right to an impartial jury if defense counsel were aware of the evidence giving rise to the motion for a new trial or failed to exercise reasonable diligence in discovering that evidence." SPA-53. The court found that B&R had waived Parse's right to an impartial jury, because they had "[k]nowledge"—or rather, "believed"—that Juror No. 1 was the suspended attorney Catherine Conrad during the trial, SPA-55, or, in the alternative, had exercised a "glaring lack of reasonable diligence" in that regard, SPA-60.

**B.**     **Parse Did Not Waive His Right To An Impartial Jury**

      1.     The Constitutional Imperative Of Trial By An Impartial Jury
<u>Is Not Waivable</u>

a.  A fair trial is "the most fundamental of all freedoms." *Estes v. Texas*, 381
U.S. 532, 540 (1965).  "One touchstone of a fair trial is an impartial trier of fact—a
jury capable and willing to decide the case solely on the evidence before it."
*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).  The
Sixth Amendment expressly guarantees the accused the right to be tried "by an
*impartial* jury."  U.S. Const. amend. VI (emphasis added).  Trying a criminal
defendant before a biased jury thus "offend[s] the Sixth Amendment" and "violates
even the most minimal standards of due process."  *United States v. Nelson*, 277
F.3d 164, 206 (2d Cir. 2002).

The right to an impartial jury is one of the very few "basic fair trial rights
that can never be treated as harmless."  *Gomez v. United States*, 490 U.S. 858, 876
(1989).  Indeed, an impartial jury is a prerequisite to treating other constitutional
errors as harmless.  *See Rose v. Clark*, 478 U.S. 570, 579 (1986) (harmless error
applies "*if* the defendant had counsel *and was tried by an impartial adjudicator*"
(emphasis added)).  Thus, a finding that a juror was biased and should have been
excused for cause automatically entitles a defendant to a new trial.  *See, e.g.*,
*United States v. Martinez-Salazar*, 528 U.S. 304, 316-17 (2000); *McDonough*, 464
U.S. at 549, 556.

An impartial jury is not just an individual right of the defendant; it is a critical structural aspect of our criminal justice system. Accordingly, a defendant should not be able to unilaterally dispense with it—even with full knowledge and understanding of the consequences. This Court has stated "that the right to an impartial fact finder might be inherently unwaivable": "'[A] defendant cannot waive those rights without enforcement of which the proceedings against him would be fundamentally unfair. *Among such non-waivable rights would be the right to be tried by an impartial tribunal*….'" *Nelson*, 277 F.3d at 205 (quoting *United States v. Fay*, 300 F.2d 345, 350-51 (2d Cir. 1962)). As Judge Kozinski has observed, when a juror perjures herself to get on a jury, "[m]ore is at stake…than the rights of [the defendant]," because "[a] perjured juror is as incompatible with our truth-seeking process as a judge who accepts bribes." *Dyer*, 151 F.3d at 983.

In *Nelson*, this Court refused to find waiver of an impartial jury, even though the defendant and his attorney knowingly consented to the empaneling of a juror who had "revealed actual bias in his answers during *voir dire*," in order to procure a racially mixed jury. 277 F.3d at 201-02, 204. This Court expressly rejected waiver but limited its holding to the particular circumstances of that case, which involved an equal protection violation. *Id.* at 204-06.

Similarly, in *United States v. Rattenni*, 480 F.2d 195, 196-97 (2d Cir. 1973), this Court reversed a conviction where the deliberating jury was improperly

exposed to publicity regarding the defendant's prior convictions and indictments, and one juror admitted to actual bias from the publicity. Justice Clark, sitting by designation, acknowledged that Rattenni's counsel—who had previously learned of the relevant publicity via a conversation "in the courtroom corridor"—was "a little late" to express his "concern" about actual bias. *Id.* at 197. However, "the crucial importance of protecting the integrity of the trial process," *id.* at 198, "controlled the outcome" in *Rattenni. United States v. Dean*, 647 F.2d 779, 784 (8th Cir. 1981).[14]

In addition, where a juror (like Conrad) is so biased that she commits perjury to get on the jury, denying a new trial could "giv[e] the government cause to believe that overlooking juror misconduct will preserve tainted convictions." *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989). A rule precluding waiver in these circumstances ensures that the government has the right incentive to investigate and prosecute juror misconduct, and reduces the risk that "a juror can commit a federal crime [*i.e.*, perjury] in order to serve as a juror in a criminal case and do so with no fear of sanction so long as a conviction results." *Id.*[15]

Echoing this Court's approach to obvious bias, the Sixth Circuit has

---

[14] The Eighth Circuit en banc overruled this decision. *See infra* n.19.

[15] That risk materialized here. Though the government recognized "the potential criminal aspects" of Conrad's perjury (A-5406), it vigorously defended her until the district court ruled, and still has not prosecuted Conrad.

expressly held that neither the defendant nor his counsel can waive a biased jury.

In *Franklin v. Anderson*, 434 F.3d 412, 427-28 (6th Cir. 2006), where a juror

reversed the presumption of innocence, the court held that "[t]here is *no situation*

under which the impaneling of a biased juror can be excused." *Id.* (emphasis

added). The court explained: "Failure to remove biased jurors taints the entire

trial, and therefore…[the resulting] conviction must be overturned." *Id. See also*

*Miller v. Webb*, 385 F.3d 666, 676 (6th Cir. 2004) (granting new trial where juror's

bias was conclusively established, without regard to what counsel or defendant

knew about the juror during the trial); *Hughes v. United States*, 258 F.3d 453, 458-

60 (6th Cir. 2001) (same); *Johnson v. Armontrout*, 961 F.2d 748, 754 (8th Cir.

1992) ("When a defendant fails to object to the qualifications of a juror, he is

without remedy only if he fails to prove actual bias. If a defendant proves that

jurors were actually biased, the conviction must be set aside.").[16]

    b. The Supreme Court has held that other structural features of our judicial

---

[16] Two other circuits have suggested that mere failure to object at the time of trial does not waive a new trial if actual bias is later proven. *See, e.g.*, *Rogers v. McMullen*, 673 F.2d 1185, 1190 (11th Cir. 1982) (where defendant "raises a challenge to the competence or impartiality of a juror on Sixth and Fourteenth Amendment grounds *only after the verdict is returned*…he must be afforded the opportunity to demonstrate that the juror was actually biased or incompetent, that is, that the juror was not 'capable and willing to decide the case solely on the facts before (him)'" (emphasis added)); *Vanderwater v. Hatch*, 835 F.2d 239, 244 (10th Cir. 1987) ("*Subject to exceptions when the conduct alleged clearly affects the fundamental fairness of the proceedings*, an objection alleging juror misconduct may be rejected if not raised in a timely manner." (emphasis added)).

system may not be waived, either at all or unilaterally.  For example, trial by jury is "the preferable mode" of fact-finding "in criminal cases."  *Patton v. United States*, 281 U.S. 276, 312 (1930); *see* U.S. Const. Art. III, sec. 2 ("The Trial of all Crimes…shall be by Jury").  Accordingly, all parties and the court must consent to a bench trial.  *Singer v. United States*, 380 U.S. 24, 25-38 (1965).  Likewise, having 12 jurors is essential to the "phrase 'trial by jury'" in the Constitution, so all parties and the court must consent to trial by fewer than 12.  *Patton*, 281 U.S. at 288, 312.

Additionally, the valid appointment of the presiding judicial officer is so fundamental that parties cannot waive it.  In *Freytag v. Commissioner*, 501 U.S. 868 (1991), the Court held that litigants' consent to appear before a judicial officer did not bar their later challenge to his authority.  *Id.* at 878-79 (considering Appointments Clause argument); *see also The Glidden Co. v. Zdanok*, 370 U.S. 530, 535-36 (1962) (Appointments Clause objection to judicial officers is unwaivable).

Trial by an impartial jury is surely as fundamental to our judicial system as having 12 jurors, or ensuring that the presiding officer is appointed in conformity with the Constitution.  *See Nelson*, 277 F.3d at 209 (relying in part on *Freytag* and *Glidden* in finding juror bias unwaivable).

c.  In concluding that a criminal defendant may waive "the partiality of a

jury verdict," the district court mistakenly relied on dicta in a footnote in the Supreme Court's decision in *McDonough*, a civil case.[17]  *See Daugerdas-I*/SPA-49.  Unlike this case, *McDonough* did not involve an actually biased juror who committed perjury to serve on the jury, rendering a criminal trial fundamentally unfair.  The plaintiffs in *McDonough* filed a post-trial motion alleging that their right to exercise a peremptory challenge was violated by a juror's failure to respond affirmatively to a voir dire question asking whether any prospective jurors or members of their families had sustained "injuries…that resulted in any disability or prolonged pain or suffering."  464 U.S. at 555.  The juror apparently believed that his son's broken leg from an exploding tire was not such an injury, and the Court found that this sort of "mistaken, though honest response to a question" was not a basis to re-do the trial.  *Id.*  Rather, a new trial was necessary only if the juror's failure to disclose the information denied plaintiffs their right to an impartial jury.  *Id.* at 549; *see also id.* at 556.

In the footnote, the Court observed:  "It is not clear…whether the information [about the juror] was known to [plaintiffs] or their counsel at the time of the *voir dire* examination.  If it were, of course, [plaintiffs] would be barred

---

[17] The other juror misconduct cases the district court cited for the proposition that an impartial jury is waivable are from other circuits, with the exception of one irrelevant summary order by this Court involving a sleeping juror.  Many of the cited cases do not even involve proven bias.  The district court ignored *Nelson*, even though Parse raised it (A-5597/11), and the government addressed it at length in opposition (A-5582-84).

from later challenging the composition of the jury when they had chosen not to interrogate [the juror] further upon receiving an answer which they thought to be factually incorrect." *Id.* at 550 n.2. The Court did not consider whether a new trial is necessary where there is a judicial finding that a juror was actually biased and committed serial perjury to get on a criminal jury.

This Court has never interpreted the *McDonough* footnote to preclude relief for a criminal defendant whose verdict was tainted by a biased juror. On the contrary, this Court applied the *McDonough* holding to grant a new trial in *Nelson*, even though the defendant and his counsel there "expressly consented" to the district court's seating of a biased juror. 277 F.3d at 201, 204. Moreover, as noted above, other circuits have either held or suggested, post-*McDonough*, that a new trial always must be granted if juror bias is established.

d. To justify holding the right to an impartial jury waivable, the district court cited the need to deter "sandbagging." *Daugerdas-I*/SPA-50-53. But there is no real-world scenario in which a reasonable attorney or defendant would pursue such a course of action, nor would it be compatible with an attorney's role as an officer of the court. Indeed, keeping juror fraud secret violates an attorney's ethical obligations and subjects her to disciplinary action, *see* N.Y. R. of Prof'l Conduct 3.3(b); *id.* 8.4(a)—a rather extreme risk for an attorney to take just for the prospect of what might be, at best, a retrial. It is thus not surprising that here the

41

evidence conclusively demonstrates that B&R never had any intent to hijack the trial in this manner. As the Supreme Court explained in responding to a similar argument: "If there is a lawyer who would deliberately forgo objection *now* because he perceives some slightly expanded chance to argue for 'plain error' *later*, we suspect that, like the unicorn, he finds his home in the imagination, not the courtroom." *Henderson v. United States*, 133 S. Ct. 1122, 1129 (2013).[18]

\* \* \*

After extensive post-trial proceedings, the district court concluded, based on largely uncontroverted facts, that a juror at Parse's trial was biased against the defendants and "ha[d] no business sitting on a jury in judgment of others." *Daugerdas-I*/SPA-48. The trial was so unfair that the court vacated the verdicts of the other three convicted defendants, even though the trial "spanned three months and included 9,200 pages of testimony from forty-one witnesses." SPA-2. Yet only Parse—the least culpable of these defendants—was denied his right to a fair trial. If ever there were a case in which waiver would be so unjust that it should not be permitted, this is it. The retrial demonstrated the importance of an impartial

---

[18] Even if "sandbagging" were a real-world concern here, the need to deter it would not outweigh the constitutional imperative to ensure that no verdict is tainted by a biased juror. The Supreme Court has expressly permitted similar tactics in a related context. *See Martinez-Salazar*, 528 U.S. at 315 (defendant who makes for-cause challenge and has remaining peremptory challenges has "the option of letting [a biased juror] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal").

jury:  the defendants who were retried were acquitted of the majority of the counts against them.  Parse too has a right to be tried by an impartial jury.  The ruling below gravely undermines the integrity of his conviction and creates a serious miscarriage of justice.  It should be reversed.

> 2.    If An Impartial Jury Can Ever Be Waived, The Waiver Must Be Knowing, Intelligent, And Personal

Even if a defendant could waive his right to an impartial jury under some circumstances, such a waiver would require that the defendant himself deliberately and knowingly relinquish that fundamental right.  Because Parse was unaware of Conrad's perjury and actual bias until after the trial, he did not waive his constitutional right to a fair trial.

It is well settled that waiver of trial rights "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *Patton*, 281 U.S. at 312 (requiring "express and intelligent consent of the defendant" to waive 12-person jury).

Only the defendant himself could validly waive his right to a jury free from actual bias.  "For certain fundamental rights, the defendant must personally make an informed waiver." *New York v. Hill*, 528 U.S. 110, 114 (2000) (citing, as examples, *Johnson v. Zerbst*, 304 U.S. 304, 464-65 (1938), involving right to counsel, and *Brookhart v. Janis*, 384 U.S. 1, 7 (1966), regarding right to trial).  For

most other rights, waiver may be by "action of counsel." *Id.* The dividing line is between "basic rights," which the attorney cannot waive "without the fully informed and publicly acknowledged consent of the client," and matters relating to the "manage[ment]" and "conduct of the trial," over which the attorney has "full authority." *Gonzalez v. United States*, 553 U.S. 242, 248 (2008).

The issue of whether to allow a biased, flagrant perjurer to sit in judgment of a criminal defendant is not, as the district court suggested, about trial management or tactics. *See* 553 U.S. at 248-49 (trial management comprises issues like "what arguments to pursue," "what evidentiary objections to raise," and "what agreements to conclude regarding the admission of evidence"). It is one of those few "basic trial choices [that] are so important that an attorney must seek the client's consent in order to waive the right." *Id.* at 250-51 (identifying as examples the choices "to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal"). That is because the right to an impartial jury is a fundamental aspect of both the right to a jury and the right to a trial, each of which must be personally waived by the defendant. *See Brady*, 397 U.S. at 748 (guilty plea requires "*defendant's* consent that judgment of conviction may be entered without a trial" and is "a waiver of his right to trial before a jury or a judge" (emphasis added)); *Brookhart*, 384 U.S. at 7 (no waiver where "*petitioner himself* did not intelligently and knowingly agree to be tried in a proceeding which was the equivalent of a

44

guilty plea" (emphasis added)); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942) ("*an accused*, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury" (emphasis added)).

A biased juror "is a juror in name only…a mere pretense and sham." *Clark v. United States*, 289 U.S. 1, 11 (1933); *see also Armontrout*, 961 F.2d at 755 ("Trying a defendant before a biased juror is akin to providing him no trial at all."); *Dyer*, 151 F.3d at 983 ("[A] juror who lies his way into the jury room is not really a juror at all."). Accordingly, a jury that includes a person like Conrad is not really a jury at all, and any waiver must be by the defendant himself.

This Court has not squarely addressed whether, assuming the right to an impartial jury could ever be waived, defense counsel has authority to waive it on the defendant's behalf. The Sixth and Eighth Circuits agree that defense counsel cannot do so. For example, in *Hughes*, the Sixth Circuit granted a habeas petition where defendant's trial counsel had failed to strike a juror who admitted bias on voir dire. 258 F.3d at 460. The court held counsel's failure to strike that juror unconstitutionally ineffective assistance of counsel, explaining: "The question of whether to seat a biased juror is not a discretionary or strategic decision," because "[t]he seating of a biased juror who should have been dismissed for cause requires reversal of the conviction." *Id.* at 463. Moreover, "[i]f counsel's decision not to

45

challenge a biased venireperson could constitute sound trial strategy, then sound trial strategy would include counsel's decision to waive, in effect, a criminal defendant's right to an impartial jury." *Id.* And because defense counsel cannot waive the right to trial by jury "'without the fully informed and publicly acknowledged consent of the client,' then counsel cannot so waive a criminal defendant's basic Sixth Amendment right to trial by an *impartial* jury." *Id.* (citing *Taylor v. Illinois*, 484 U.S. 400, 417 n.24 (1988)) (emphasis added); *see also Miller*, 385 F.3d at 675-76 ("whether to seat a biased juror cannot be a discretionary or strategic decision," because "there is no sound trial strategy that could support what is essentially a waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury"); *Armontrout*, 961 F.2d at 754-55 (granting habeas petition where "two members of the jury were actually biased against" defendant, and trial counsel "made no attempt to remove [those] jurors for cause even though he was prompted to do so by [defendant] himself").[19]

---

[19] Whereas the Sixth Circuit precludes even waiver by the defendant himself, the Eighth Circuit enforces only a defendant's personal and knowing waiver of actual bias. *See United States v. Caldwell*, 83 F.3d 954, 956 (8th Cir. 1996) (where defendant himself learned during trial that a juror had said "all four of them's…guilty," defendant waived a new trial); *United States v. Dean*, 667 F.2d 729, 730-31 (8th Cir. 1982) (en banc) ("[T]he appellant, by not bringing *his knowledge* of possible juror bias to the attention of the district court judge prior to the jury's rendition of its verdict, waived his right to a new trial based on such juror bias." (emphasis added)).

3.     Even If Counsel Could Waive A Client's Right To An Impartial
       Jury, B&R Did Not Waive Parse's Rights

Even assuming B&R could waive Parse's rights, the district court's analysis was fatally flawed because the court applied the wrong waiver standard. The court should have examined whether Parse's counsel had *actual knowledge* of Conrad's misconduct during the trial. Instead, the judge incorrectly found waiver in light of what (in its view) the attorneys merely "believed;" his concerns about how they conducted the post-trial motion; and what they should have known with "reasonable diligence." *Daugerdas-I*/SPA-55; SPA-60. And the district court compounded these legal errors flatly ignoring conclusive proof that at the time of the trial, B&R believed Juror No. 1 was *not* the suspended attorney Catherine Conrad. Accordingly, the decision below should be reversed even if B&R could unilaterally waive Parse's constitutional rights.

a.     The district court erroneously treated mere belief as
       actual knowledge.

The district court said that it found B&R *knew* during the trial that Conrad was the suspended attorney. *See* SPA-55-59 (discussing B&R's "Knowledge"). However, on closer examination, apart from the court's improper use of the firm's post-trial advocacy, *see infra* pp.55-57, its analysis erroneously focused on what B&R tentatively *believed* (briefly, before they concluded that Juror No. 1 was not the suspended attorney), rather than what they actually knew.

47

This is apparent from the very first sentence of the section entitled "Knowledge": "[C]ounsel for Parse *believed* that Juror No. 1 was the suspended New York attorney named Catherine M. Conrad." SPA-55 (emphasis added). The principal evidence that the court cited was Trzaskoma's email stating "Jesus. I do think that it's her," in response to paralegal Benhamou's email about the Westlaw report after the jury note. The district court said that statement was a "vivid declaration that Juror No. 1 was suspended attorney Catherine M. Conrad," and thus a declaration of Trzaskoma's "knowledge." SPA-55-56. But on its face the statement is nothing of the kind. Rather, it describes what Trzaskoma believed at that moment. The court itself elsewhere referred to the very same statement as a "vivid affirmation of *belief*." SPA-58 (emphasis added); *see also* SPA-59 n.11 (finding "that Trzaskoma *believed* [that Juror No. 1 lied]" (emphasis added)).

Similarly, the district court concluded, "[o]ther [B&R] lawyers acknowledged that Trzaskoma had drawn a strong link between the Catherine M. Conrad described in the 2010 Suspension Order and the Catherine M. Conrad seated as Juror No. 1." SPA-56 (citing emails sent at the end of the trial about discovery of suspension order months earlier). But a "strong link" is not actual knowledge, and the cited emails reflect nothing more than Trzaskoma's consideration during voir dire of the *possibility* that the two Conrads were the same person. Elsewhere in the "Knowledge" discussion, the court's language reflects a

48

state of mind far less certain than actual knowledge. *See* SPA-57 (prior to voir dire, Trzaskoma "possessed information indicating that a 'Catherine M. Conrad' was a suspended attorney").

The standard is knowledge, not mere tentative belief. In order to "intentional[ly] relinquish[] or abandon[]" a "known right," *Zerbst*, 304 U.S. at 464, one must deliberately and knowingly choose to give up the right. Parse's attorneys could not waive his right to trial by an impartial jury unless they *knew* there was a biased juror—or at least that one of the jurors was actually a disbarred attorney who misrepresented her identity under oath and could be biased.[20]

Authorities addressing juror misconduct in other contexts similarly require actual knowledge of misconduct, not mere belief. For example, the rules of professional ethics impose a duty on lawyers to report only *known* juror misconduct. *See* N.Y. R. of Prof'l Conduct 3.5(d) ("A lawyer shall reveal promptly to the court improper conduct by a member of the venire or a juror…of which the lawyer has *knowledge*." (emphasis added)); *id.* 1.0(k) ("'Knowingly,' 'known,' 'know,' or 'knows' denotes actual knowledge of the fact in question.").

---

[20] The out-of-circuit cases the district court cited to conclude that the right to an unbiased jury can be waived involved *knowing* waivers. *See United States v. Breit*, 712 F.2d 81, 83 (4th Cir. 1983) ("the evidence establishes beyond a reasonable doubt that Breit knew before the verdict the critical information" regarding jurors' potential prejudice); *Gray v. Hutto*, 648 F.2d 210, 211 (4th Cir. 1981) (finding waiver because defense counsel was told of the information regarding potential bias); *United States v. Bolinger*, 837 F.2d 436, 439 (11th Cir. 1988) (per curiam) (same).

Accordingly, in an analogous context, this Court has held that lawyers cannot be disciplined for their awareness of a witness's perjury unless they had "actual knowledge that [the] witness committed a fraud on the court." *Doe v. Fed. Grievance Comm.*, 847 F.2d 57, 63 (2d Cir. 1988). In *Doe*, this Court held that even belief rising to the level of a strong suspicion does not establish actual knowledge; an attorney is not obliged to reveal a witness's perjury unless he has "actual knowledge" that the witness lied under oath. *Id.* The attorney in question had been told by his client that the witness had lied under oath in a deposition and "*believed* that [the] witness had lied at the deposition" because of "inconsistencies" between his testimony and other evidence. *Id.* at 58-60 (emphasis added). Though these beliefs may have caused the attorney to "suspect strongly that witness lied, they did not amount to actual knowledge that witness committed a fraud on the court." *Id.* at 63.

*Doe* is consistent with the well-established principle that the knowledge element in criminal statutes implies a "much higher degree of certainty" than mere "belief." *United States v. Golomb*, 811 F.2d 787, 792 (2d Cir. 1987); *see* LaFave & Scott, Criminal Law §3.7(f) (2d ed. 1986) ("'[K]nowledge' and the knowing-type of 'intention' require a consciousness of almost-certainty…."); Model Penal Code §2.02(7) ("[K]nowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist"); *id.*

50

§2.02(b)(ii) (knowledge of criminal consequences entails "practical certainty"); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978) (knowledge requires "practical certainty"); *United States v. Aguilar*, 515 U.S. 593, 600-01, 614 (1995) (reversing conviction for obstruction of grand jury because defendant did not actually "kn[o]w that his false statement would be provided to the grand jury" even though, as dissent noted, defendant testified that it was "his 'impression'" that FBI agents would report his false statements to grand jury).

> b. The district court erroneously applied
> a "reasonable diligence" standard.

The district court also concluded that waiver occurs when there is merely a "fail[ure] to exercise reasonable diligence in discovering…evidence [of juror misconduct]." *Daugerdas-I*/SPA-53. But this is fundamentally inconsistent with the very concept of waiver, which, as explained, requires knowledge that one is giving up a right forever.

The district court made no effort to reconcile its application of a diligence standard with this hornbook law. Instead, it relied principally on out-of-circuit cases, none of which addresses the fundamental disconnect between waiver and mere negligence, and most of which were civil cases where jurors were not actually biased. The court also cited *United States v. Bolinger*, 837 F.2d 436 (11th Cir. 1988) (per curiam), which did not apply a diligence standard. *Bolinger* held that "where the defendant or defense counsel *knows* of juror misconduct or bias

51

before the verdict is returned but fails to share this *knowledge* with the court until after the verdict is announced, the misconduct may not be raised as a ground for a new trial." *Id.* at 439 (emphasis added). The information communicated to the defense "did not disclose the full extent" of the juror's misconduct, but the court found that the defense had sufficient information to *know* about the misconduct, because he was informed during jury deliberations that the juror had told his aunt he thought the defendant was guilty. *Id.* at 438-39. By contrast, here the defense concluded that there was *no* juror misconduct, so they had no obligation to "contact[] the district court for instructions." *Id.* at 439.

The court's reliance on *Johnson v. Hill*, 274 F.2d 110 (8th Cir. 1960), which *McDonough*'s footnote cites, was also misplaced. In *Hill* there was "no showing of intentional deception on the part of the juror" and the appellant's "substantial rights" were not affected. *Id.* at 116. And surely the Supreme Court did not intend by a single citation to jettison the long-established knowing and intelligent waiver standard. *McDonough* itself observed that if the relevant information "was *known* to respondents or their counsel," then they could not "later challeng[e] the composition of the jury when they had chosen not to interrogate [the juror] further upon receiving an answer which they thought to be factually incorrect." 464 U.S. at 550 n.2 (emphasis added); *accord Nelson*, 277 F.3d at 204 (if waiver of impartial jury is permissible despite actual bias, "'intentional relinquishment or

abandonment of a known right'" would be required (quoting *Zerbst*, 304 U.S. at 464)).

The district court also was concerned that without a diligence standard courts could find waiver "solely on actual knowledge, to a 100% certainty." SPA-60. That is not so. As this Court has explained, "actual knowledge" of similar fraud does not require "proof beyond a moral certainty that fraud has been committed," but simply that the party "must clearly know, rather than suspect…a fraud." *Doe*, 847 F.2d at 63. That is the only correct standard of waiver.

> c. The district court's fact-findings were clearly erroneous.

Even if the district court applied the correct legal standard, its factual findings were "directly contrary to the only testimony [and other evidence] presented," and therefore must be "set aside" as clearly erroneous. *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 571 (2d Cir. 1991).

*First*, the district court's "knowledge"/belief findings cannot be reconciled with a mountain of evidence conclusively establishing that B&R did not believe, let alone know, that Juror No. 1 had perjured herself until after they read her letter to Okula. *See generally supra* Point I.A.3.

The district court focused its "Knowledge" analysis on the two instances when Trzaskoma looked into the possibility that Juror No. 1 was the suspended lawyer, in light of the 2010 suspension order and, later, the Westlaw report. SPA-

55.  But the court ignored the evidence that, during voir dire, B&R considered but rejected that possibility because of her voir dire testimony.  *Supra* Point I.A.3.a. Also, the district court relied upon emails from May 12, 2011 discussing what B&R had found on Conrad over two months earlier, SPA-55-56, but ignored that, in her final email on the issue during voir dire, Trzaskoma flatly rejected the possibility of a link between Juror No. 1 and the subject of the suspension order (A-5531 ("[U]nless Conrad totally lied about her highest level of education, it can't be the same person as the suspended lawyer")).  The court also failed to acknowledge that in the same post-hoc May 12, 2011 exchange, others at B&R confirmed that they had concluded during voir dire that Juror No. 1 was *not* the suspended attorney.  *Supra* p.28.

As for the events following Juror No. 1's note, the court did not reconcile its one-sided, hindsight-informed reading of the Westlaw report with the contradictory portions of the same report appearing to conflate two different people, or the fact that, as a whole, the portions of the report relating to the disbarred lawyer cannot be squared with Conrad's voir dire.  *Supra* pp.29-30.  Trzaskoma's initial "vivid affirmation of belief" that Juror No. 1 was the suspended attorney was not "based on" the Westlaw report, as the court suggests.  SPA-58.  Trzaskoma sent her "Jesus" email before she read the report herself, based upon paralegal Benhamou's email summarizing only selected parts of the report.  Also, the court ignored the

unanimous testimony that, after Trzaskoma actually reviewed the report herself and conferred with her colleagues, they all rejected the possibility that Juror No. 1 was the suspended lawyer in light of her jury note and her voir dire, which was confirmed by Shoeman's and Berke's testimony.

In short, it was clear error for the district court to cherry-pick evidence about Trzaskoma's momentary belief that Juror No. 1 could be a suspended attorney and ignore the testimony and documents showing that B&R later rejected that possibility. *See, e.g.*, *United States v. Cerna*, 603 F.3d 32, 39-40 (2d Cir. 2010) (finding of knowing waiver was clearly erroneous because district court did "not explain how it resolved the apparent conflict between the evidence" and "failed to synthesize the evidence in a manner that accounts for conflicting evidence").

The district court minimized B&R's reliance upon Conrad's sworn voir dire responses as mere "rationalization" or an "excuse." SPA-28; SPA-61. But the judge had *instructed* the parties not to inquire further beyond those responses, and his opinion stresses the importance of attorneys' respect for the "sacred" oath, SPA-63. Yet after several dramatic pages describing Conrad's extraordinary perjury, the district court ignored the testimony of the B&R attorneys that they found it "inconceivable" anyone would lie so extensively just to become a juror. (A-5810/353; *see also* A-5832/375).

To the extent the court purported to find "knowledge" based on B&R's

conduct of the post-trial proceedings, SPA-55, it erred. The court criticized B&R for two alleged misstatements in its post-trial brief;[21] resisting discovery of its work product; a statement at a hearing on July 15, 2011;[22] and not immediately disclosing all the information it had during the trial. *See* SPA-56-59. However, as Professor Stephen Gillers, a prominent legal ethics scholar explained, the two statements in the firm's brief were "true as reasonably read;" the July 15 statement was not false; and the firm had no obligation, early in the post-trial proceedings, to disclose more information about its limited discoveries during voir dire and after the "respondeat superior" note. (A-5850-51).

In any event, given the undisputed contemporaneous evidence conclusively establishing that B&R twice considered and rejected the possibility that the information they had related to Juror No. 1, their actions long after trial are not probative of what they knew (or even believed) about Conrad before the verdict. *See, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (even if testimony is "discredited" that is not "a sufficient basis" for inferring its

---

[21] The statements were that B&R "had no basis to inquire whether Conrad was lying in response to each of the Court's questions" during voir dire (A-4976) and that Conrad's letter to the government "caused defendants concern and prompted them to investigate" (A-4953).

[22] The B&R attorney said, "we were not aware of the facts that have come to light" (after Conrad's letter), and then immediately after that made clear that there was more information and that B&R would provide it in writing. (A-5411; *see also* A-5850-51). The subsequent letter disclosed the pertinent facts. (A-5416-37).

opposite); *cf. United States v. Glenn*, 312 F.3d 58, 69 (2d Cir. 2002) (post-hoc

"false exculpatory statements" are "insufficient proof" of wrongdoing where other

evidence is as consistent with innocence as guilt); *United States v. Ogando*, 547

F.3d 102, 109 (2d Cir. 2008) (same).

*Second*, the court's finding that B&R was not reasonably diligent was

clearly erroneous. When B&R first learned that a juror with the same name as

Juror No. 1 was a suspended lawyer, they reasonably decided to rely on her voir

dire responses to assess whether it was the same person, and reasonably rejected

the possibility in light of those responses. Likewise, after her note, they inquired

further into the possibility, obtained the Westlaw report, and after reviewing it,

reasonably concluded that it was confusing two different people rather than

assuming that—contrary to her oath—Juror No. 1 had deliberately committed

perjury to serve on the jury.

The judge's hindsight bias caused him to set too high a bar for counsel, and

ignored the reality of the "fast paced," "pressure[d]" trial setting. *Martinez-*

*Salazar*, 528 U.S. at 316. He himself failed to appreciate the significance of

information that he alone possessed—Conrad's use of "Δ" instead of "defendant"

in her jury note. The court also met Conrad personally after the verdict, but

apparently her demeanor set off no alarm bells. (*See* A-4939).

Given the imperative to "indulge in every reasonable presumption against

waiver," *Brewer v. Williams*, 430 U.S. 387, 404 (1977), the waiver finding

contravened undisputed evidence and should be reversed.

> d.　　Parse should not be penalized for B&R's conduct.

Even in the civil context, this Court has recognized the unfairness of

penalizing a client who is uninvolved in his attorneys' alleged misconduct. In

*Mitchell v. Lyons Professional Services, Inc.*, 708 F.3d 463, 469 (2d Cir. 2013),

this Court reversed and remanded the dismissal of plaintiffs' action because of

their attorney's delays and noncompliance with court orders. The Court held that

if the misconduct "were solely a result of [the attorney's] actions and not those of

his clients," that would counsel "in favor of a less drastic sanction imposed directly

on the lawyer," rather than the clients. *Id.* The general rule that "a client is

typically bound by the acts of his lawyer" did not justify a sanction upon blameless

clients when lesser sanctions were available. *Id.*

This reasoning applies even more forcefully here, because the consequence

is to send a man to prison based upon a fatally flawed, unfair trial. Parse was

unaware of Conrad's misconduct, and uninvolved in the conduct of the post-trial

motion. To the extent B&R was at fault, the penalty should not fall upon Parse.

*See id.* (noting availability of sanctions on counsel); *Dean*, 647 F.2d at 783 ("[t]he

way to address counsel's unjustified delay in raising the question of juror bias is to

proceed against counsel in an appropriate forum" rather than punishing client).

4.    Alternatively, Parse Is Entitled To A New Trial Under The
        <u>Plain Error Standard</u>

"Whereas forfeiture is the failure to make the timely assertion of a right,

waiver is the 'intentional relinquishment or abandonment of a known right.'"

*United States v. Olano*, 507 U.S. 725, 733 (1993).  Forfeited error that is "plain"

may be corrected; waiver extinguishes the right altogether.  *Id.* at 733-34.  The

parties and the court below treated the issue presented as one of waiver.  *See, e.g.*,

*Daugerdas-I*/SPA-49.  If this Court were instead to determine that B&R merely

forfeited Parse's objection to Juror No. 1 by failing to "timely assert[]" that

objection, *Olano*, 507 U.S. at 733, the violation of Parse's constitutional right to an

impartial jury could be corrected on appeal if it was plain error.  *See* Fed. R. Crim.

P. 52(b); *United States v. Thomas*, 274 F.3d 655, 667 (2d Cir. 2001) (en banc)

(describing four-part test).

       That test is easily satisfied here.

       First, the district court correctly ruled that Conrad was biased, and the

government has acquiesced in that ruling.  Accordingly, it is indisputable that there

was an "error" because Parse was convicted in violation of his constitutional right

to an impartial jury.

       Second, the error was "plain."  The Supreme Court and this Circuit have

never upheld a verdict by an actually biased jury.  The error was so plain to the

district court that it vacated the convictions of Parse's co-defendants.

59

Third, the denial of a new trial for Parse necessarily "affect[s] substantial rights" because a conviction by a biased jury is a structural error that by definition cannot be harmless. *Supra* Point I.B.1. When "the defendant was denied a right so fundamental" as to be "structural," this Court "must inevitably conclude that a fair trial was not possible." *United States v. Gonzalez*, 110 F.3d 936, 947 (2d Cir. 1997).

Finally, the miscarriage of justice presented by upholding the tainted verdict against Parse, while granting new trials to his convicted co-defendants, "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Thomas*, 274 F.3d at 667.

## II. PARSE'S COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IF THEY REMAINED SILENT DESPITE OBVIOUS JUROR BIAS

The purpose of the constitutional requirement of effective assistance of counsel is "to ensure a fair trial." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*, counsel's assistance is unconstitutionally ineffective when her "role in the proceeding" failed "to produce a just result." *Id.* at 686-87. A defendant establishes a violation of his right to effective assistance of counsel by satisfying a two-part test: that his "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687; *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001).

Here, the district court determined that Parse's trial counsel waived the bias

60

of Juror No. 1 because counsel knew, or upon investigation would have known, that she was an "imposter." And yet, according to the district court, the lawyers did nothing. As explained, there is no factual support for those findings. But if this Court disagrees and affirms those findings, then counsel's silent consent to the presence of an obviously biased juror was necessarily "deficient" under *Strickland*. It was reversible error, and a miscarriage of justice, for the court to find that Parse waived his claim of juror misconduct because of flagrantly unreasonable acts of his counsel, and then refuse to find those same acts unreasonable when evaluating Parse's ineffective assistance claim.

If this Court were to find a waiver, counsel's constitutionally deficient performance necessarily prejudiced Parse because it subjected him to trial by a biased jury. That egregious, structural error undermined the fairness of the entire proceeding, and requires, in these circumstances, a presumption of prejudice. Even if Parse were required to demonstrate actual prejudice, he has done so here.

### A.  Failure To Strike An Obviously Biased Juror Is Constitutionally Deficient Performance

Deficient performance occurs when, under "prevailing professional norms" and judged from "counsel's perspective at the time," counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-89. The courts of appeals agree that, under this test, it is constitutionally unreasonable for a defense lawyer to sit and do nothing when she is aware of obvious signs of

juror bias.

For example, in *Hughes*, the Sixth Circuit reversed a denial of a claim of ineffective assistance. 258 F.3d at 455. The petitioner argued that, during voir dire, a juror stated "she did not think she could be fair," and that neither defense counsel nor the district court objected or responded. *Id.* at 456-57. The Sixth Circuit held that counsel's failure to undertake any corrective action or inquiry despite the juror's "express admission of bias" was "simply a failure 'to exercise the customary skill and diligence that a reasonably competent attorney would provide.'" *Id.* at 462 (quoting *Strickland*, 466 U.S. at 764). The Sixth Circuit has repeatedly reaffirmed *Hughes*. *See Miller*, 385 F.3d at 676 (applying *Hughes* to analogous facts of express statement of bias followed by no action by counsel); *Franklin*, 434 F.3d at 428 (rejecting argument that trial counsel's lack of objection to biased juror could be "strategic[]").

Similarly, the Fifth Circuit has held that two jurors' "unchallenged statements during voir dire that they could not be 'fair and impartial' obligated…counsel to use a peremptory or for-cause challenge on these jurors." *Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006). The failure to do so was deficient performance under *Strickland*. *Id.* at 609-10; *see also Biagas v. Valentine*, 265 F. App'x 166, 170 (5th Cir. 2008) (following *Virgil* in granting habeas petition because of counsel's failure to strike biased juror).

62

Finally, in *Armontrout*, defense counsel knew that members of the venire and the jury had heard damaging testimony about the defendant at a prior trial, and that his client was presented to the jury in the prior case in shackles and under guard. He nonetheless failed to object to or question any prospective juror for bias. Instead, he stood silent, relying on the "jurors' silence to two general questions propounded by the prosecutor." 961 F.2d at 755. The Eighth Circuit held that this "constituted ineffective assistance of counsel of a fundamental degree." *Id.* at 756.

1.  If Parse's Counsel Actually Knew Conrad Was An Imposter, Their Performance Was Necessarily Deficient

The district court found that Parse's counsel actually knew that Conrad was an "imposter"—a disbarred attorney who had perpetrated an "extensive[]," "breathtaking," and "criminal" fraud about her identity in order to sit in judgment of the defendants. *Daugerdas-I*/SPA-28; SPA-6; SPA-36; SPA-17. If one accepts this finding, it means B&R actually knew of an obvious sign of bias that would have necessarily disqualified Conrad from service. SPA-48. Yet "[d]espite 'actionable intelligence that Conrad was an imposter,'" the district court found Parse's counsel decided to do nothing. *Daugerdas-II*/SPA-69.

Accepting these findings, Parse's lawyers failed to provide constitutionally effective counsel under *Hughes*, *Virgil*, and *Armontrout*. Indeed, in two respects, counsel's performance was even *more* deficient than the lawyers' conduct in those cases.

63

First, the lawyers in those cases were presented with statements of bias that further questioning might have cured. *Hughes*, 258 F.3d at 459-460 (observing that additional questioning might have rehabilitated the apparently biased juror); *Miller*, 385 F.3d at 674-75 (same); *Armontrout*, 961 F.2d at 753-56 (counsel failed to "question a single…juror about the impressions they gained" in the prior trial); *Virgil*, 446 F.3d at 611 (focusing on "unchallenged statements" of bias). Here, by contrast, the district court found Parse's lawyers had "actionable intelligence" that Conrad had perpetrated an extensive fraud on the court. No investigation could have rehabilitated such a juror or explained away this supposedly obvious bias. There is no conceivable excuse for keeping silent.

Second, the lawyers in the *Hughes* lines of cases did not conceal relevant information of juror misconduct and fraud from the court—the bias there was expressed in open court. Here, by contrast, the district court found that Parse's counsel had "actionable intelligence" of juror fraud that they *alone* possessed. If they had that secret knowledge, they were duty bound by professional rules of practice to disclose it to the court. N.Y. R. of Prof'l Conduct 3.3(b); *id.* 3.5(d).

These standards provide a vital guide to reasonable performance. *See Strickland*, 466 U.S. at 688 ("Prevailing norms of practice…are guides for determining what [performance] is reasonable…."); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (defective investigation violated governing standards of practice);

*Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005). Indeed, the district court opened and closed its waiver opinion with express references to ethical violations. *Daugerdas-I*/SPA-1 (counsel "cast aside" their "obligation to be forthright" with the court and "breached" their "unflagging duty of candor to the tribunal"); SPA-63-64 ("An attorney's duty to inform the court about suspected [sic] juror misconduct trumps all other professional obligations…. Any reluctance to discuss this information…cannot be squared with the duty of candor owed to the tribunal."). Yet the court then ignored these purported ethical violations in rejecting Parse's ineffective assistance of counsel claim.

> ## 2. If Parse's Counsel Failed To Take Minimal Steps To Find Out Whether Conrad Was An Imposter, That Is Also Deficient Performance

The district court found that, even if B&R did not actually know that Conrad was an imposter prior to jury deliberations, they failed to exercise reasonable diligence to find out for certain. If this Court were to affirm that finding, Parse's counsel has necessarily rendered constitutionally deficient performance.

*Strickland* asks what a reasonable attorney would do with information known at the time: "[i]n assessing the reasonableness of an attorney's investigation…a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Here, in the district court's view, a reasonable attorney aware of the facts known to Parse's counsel would have inquired further. The court found B&R had sufficient information prior to jury deliberations to be on "notice" that Conrad was an imposter, and they could have taken "simple steps" to make an informed conclusion. *Daugerdas-I*/SPA-60-62. Yet, it found that B&R unreasonably relied on Conrad's voir dire answers and chose to "do nothing." SPA-62-63; *see also Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003) (omissions by counsel arising from "oversight, carelessness, ineptitude, or laziness" are not competent performance); *Pavel*, 261 F.3d at 218; *Rompilla*, 545 U.S. at 383.

According to the district court, Parse's lawyers purportedly were aware of obvious signs that Conrad was lying about her identity, and yet chose to do nothing about it. These findings directly contradict the court's conclusion that B&R made a *reasonable* decision to stop investigating whether Conrad was in fact an imposter. The court's Kafkaesque ruling foreclosed Parse's every possible avenue of relief from this miscarriage of justice. That is not the law: Either B&R did not waive Parse's rights, or they were unconstitutionally ineffective.

### B. Counsel's Unreasonable Performance Was Not Factually Or Constitutionally "Strategic"

The district court failed to engage with any of the authorities or analysis discussed above. Instead, it decided that B&R's performance was reasonable, even if they "believed that Juror No. 1 was the suspended New York attorney named

Catherine M. Conrad," because counsel purportedly made a "strategic decision…to keep an imposter on the jury." *Daugerdas-II*/SPA-69. That conclusion is wrong.

Tellingly, the district court does not explain what the purported strategy was. Presumably, it did not mean that Parse's counsel actually *wanted* an imposter to serve on the jury, in the hope that Conrad would be favorable to the defense or likely to acquit. The court's own logic shows that no rational defense lawyer would voluntarily choose to put her client's fate in the hands of an imposter who repeatedly lied to get on the jury. *Daugerdas-I*/SPA-44 ("Someone who commits fraud to get on a jury cannot…sit in judgment of others who are accused of fraud."); *Dyer*, 151 F.3d at 983 ("A juror…who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process.").

Instead, by "strategic decision," the district court appears to have meant "sandbagging," *i.e.*, that B&R wanted Conrad on the jury because her presence would give the defense a trump card over any conviction. *Daugerdas-II*/SPA-69 ("strategic decision" was "to gamble on a jury that included Juror No. 1"). But there was no evidence of such a "strategy." B&R's post-trial motions did not raise jury misconduct until *after* the government disclosed Conrad's letter praising the prosecution. Nor would such a strategy even make sense, as "[n]o reasonable lawyer would forego competent litigation of meritorious, possibly decisive claims

67

on the remote chance that his deliberate dereliction might ultimately result in"

collateral attack. *Kimmelman v. Morrison*, 477 U.S. 365, 382 n.7 (1986) ("it is

virtually inconceivable that an attorney would deliberately invite the judgment that

his performance was constitutionally deficient in order to win federal collateral

review for his client" and "counsel's client has little, if anything, to gain and

everything to lose through such a strategy"); *United States v. Day*, 969 F.2d 39, 46

n.9 (3d Cir. 1992) ("[W]e refuse to presume that ineffective assistance of counsel

is deliberate.").

Moreover, any "strategic" sandbagging motive cannot convert

constitutionally deficient performance into reasonable performance. The district

court seemed to assume that merely labeling an attorney's decision "strategic"

makes the decision constitutionally reasonable. That is not the law. A decision is

strategic only if it is an objectively "reasonable," "sound trial strategy."

*Strickland*, 466 U.S. at 689. As this Court explained in *Pavel*, the mere fact that a

lawyer's decision is "'strategic' in the sense that it related to a question of trial

strategy" or "that it was taken…to advance a particular goal" does not make it

constitutionally reasonable. Rather, a "strategic" decision for *Strickland* purposes

is a "conscious, reasonably informed decision…with an eye to benefitting [the]

client." 261 F.3d at 218. The strategy itself must be objectively reasonable to

satisfy *Strickland*.

The purported strategy of seating an obviously biased juror is not objectively reasonable. "The question of whether to seat a biased juror is not a discretionary or strategic decision" and thus necessarily constitutes deficient performance. *Hughes*, 258 F.3d at 463. Moreover, "[i]f counsel's decision not to challenge a biased venire-person could constitute sound trial strategy, then sound trial strategy would include counsel's decision to waive, in effect, a criminal defendant's right to an impartial jury." *Id.* Yet, as discussed above, counsel may not unilaterally waive that right. *Supra* Point I.B.2. Indeed, because the presence of a biased juror creates a structural error that undermines the fairness of the entire trial, "to argue sound trial strategy in support of creating such a structural defect seems brazen at best." *Hughes*, 258 F.3d at 463. Thus, "no sound trial strategy could support counsel's effective waiver of [the client's] basic Sixth Amendment right to trial by impartial jury." *Id.*; *see also Miller*, 385 F.3d at 676 (same); *cf. Armontrout*, 961 F.2d at 755 (describing argument that trial counsel's failure to remove a biased juror was strategic as "incredibl[e]").

The persuasive analysis of *Hughes* dictates the same conclusion here. There can be no sound trial strategy for failing to strike or further investigate a juror in the face of obvious signs of bias. A contrary conclusion would permit a lawyer to effectively waive an unwaivable constitutional right, and would permit a lawyer to purposefully inject structural error into the case.

### C.    Parse Was Necessarily Prejudiced

A defendant shows prejudice under *Strickland* when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The district court concluded that (1) the *Strickland* prejudice inquiry required Parse to show a reasonable probability that he would have been acquitted by an impartial jury, and (2) Parse could not make that showing because the evidence of his guilt was "overwhelming." *Daugerdas II*/SPA-71. Both conclusions are wrong.

#### 1.    Prejudice Should Be Presumed When Counsel's Ineffective Assistance Results In A Biased Jury

In the circumstances of this case, prejudice should be presumed. The presence of a biased juror is a structural error that compromises the entire proceeding and thus *requires* reversal, regardless of evidence of guilt, or any inquiry into whether the error was "harmless." *Supra* Point I.B.1. Structural errors require reversal without regard to the evidence at trial because they "affect[] the framework within which the trial proceeds, rather than simply…the trial process itself." *Neder v. United States*, 527 U.S. 1, 8 (1999). Because the "precise effects" of structural error are "unmeasurable," "unquantifiable and indeterminate," *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993), any "harmless" error analysis becomes "a speculative inquiry into what might have occurred in an alternate universe," *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006); *see also*

*Owens v. United States*, 483 F.3d 48, 64 & n.14 (1st Cir. 2007) (impermissibly requires the defendant to prove the "impossible" (citing *Sullivan*, 508 U.S. at 281)).

In light of these principles, every Circuit to have considered the question has held that a defendant convicted by biased jury need not demonstrate *Strickland* prejudice based on the evidence at trial, because of the fundamental defect in the trial process. In *Virgil*, where the Fifth Circuit held that trial counsel was ineffective for failing to object to two biased jurors, the court held: "Given the fundamental nature of the impartial jury and the consistent line of Supreme Court precedent enforcing it…'the result of [the proceeding] is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" 446 F.3d at 612-13. Likewise in *Armontrout*, the Eighth Circuit held that "a defendant whose attorney fails to attempt to remove biased persons from a jury panel is prejudiced." 961 F.2d at 756. *See also Hughes*, 258 F.3d at 463 ("[G]iven that a biased juror was impaneled in this case, prejudice under *Strickland* is presumed, and a new trial is required."); *Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000) ("Defense counsel's failure to attempt to remove" a "biased" juror "constitutes prejudice under *Strickland*.").[23]

---

[23] This Court need not reach the broader question whether *any* structural error is sufficient to presume prejudice under *Strickland*, an issue dividing the other Circuits. *See United States v. Withers*, 638 F.3d 1055, 1067 (9th Cir. 2011) (as

Trial before a biased jury makes a *Strickland* prejudice inquiry impermissible not only because it is a "structural defect," but also because it means "there has been no jury verdict within the meaning of the Sixth Amendment and therefore the entire premise of *Chapman* review is simply absent." *Sullivan*, 508 U.S. at 208. In *Sullivan*, the Supreme Court held that when an erroneous reasonable doubt instruction was given, harmless error review does not apply. *Id.* at 281-82. The Court reasoned that a verdict by a jury that was not properly instructed on reasonable doubt is equivalent to no jury verdict at all, and no amount of "appellate speculation about a hypothetical jury's action" can remedy this error: "The most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error. That is not enough." *Id.* at 280. Because "[t]rying a defendant before a biased jury is akin to providing him no trial at all," *Armontrout*, 961 F.2d at 755, the verdict rendered by the jury in that non-trial cannot be constitutionally legitimate under *Sullivan*. *See* 508 U.S. at 280 ("The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action…it requires an actual jury finding of guilty.").

amended) (acknowledging circuit split). Conviction by a biased jury is a particular and fundamental kind of structural error requiring that prejudice be presumed. *See Virgil*, 446 F.3d at 607, 613; *Sanders v. Norris*, 529 F.3d 787, 791 (8th Cir. 2008); *Virgin Islands v. Weatherwax*, 20 F.3d 572, 580 (3d Cir. 1994).

Accordingly, the district judge's conclusion that "Parse would have been convicted even if his counsel behaved unimpeachably," *Daugerdas-II*/SPA-71, reflects nothing more than his opinion of how a hypothetically impartial jury would have decided Parse's fate. That is flatly impermissible under *Sullivan*, and deprives Parse of his right to be tried by a jury.

### 2. Parse Was Actually Prejudiced

In any event, contrary to the district court's conclusory assertion, the evidence of guilt was far from strong. As demonstrated *infra*, it was insufficient. The prejudice is obvious from the results of the retrial of Daugerdas and Field, who were collectively acquitted of 16 of 23 counts by an impartial jury.

## III. THE MAIL FRAUD CONVICTION SHOULD BE REVERSED

First, even viewing the evidence in the light most reasonable to the government, "no rational trier of fact could have found [Parse] guilty beyond a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). Because there was insufficient evidence of intent to defraud, Parse is entitled to acquittal on the mail fraud charge. Second, at a minimum, a retrial is required because erroneous jury instructions on the "annual accounting system" of federal tax law and on mail fraud scienter, individually and cumulatively, deprived Parse of a fair trial.

73

## A.     The Evidence Was Insufficient

Count 25 charged Parse with committing mail fraud by "participat[ing] in a scheme to defraud the IRS through the design, marketing, and implementation of the [allegedly] fraudulent tax shelter transactions." (A-155). To find Parse guilty, the jury had to find a mail-fraud scheme to deprive the IRS "of money or property"—*i.e.*, taxes owed. (A-2582/8902). The government asserted two theories in this regard: (1) the J&G shelters lacked economic substance, and (2) even if the shelters had economic substance, the alleged "backdating" fraudulently deprived the IRS of taxes due from the Aronoffs, Coleman/Blair, and Toporek. To prove either theory, the government had to establish that Parse had a specific intent to defraud the IRS by depriving it of taxes owed, an intent he could not have unless he understood that it was improper to claim tax losses based on these transactions. The government failed to prove that Parse had any such understanding or intent, as to either the tax shelters or the tax accounting for the corrective transactions. Furthermore, even if mere deceit were legally sufficient to establish a specific intent to defraud, Parse did not participate in any deceit and would still be entitled to acquittal.

### 1.     Governing Law Requires Proof Of Specific Intent To Harm The IRS By Depriving It Of Taxes Owed

The mail fraud statute criminalizes use of the mails in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of

false or fraudulent pretenses." 18 U.S.C. §1341. One of the essential elements is proof of a specific, "conscious knowing intent to defraud." *United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991). "Such wrongful intent is the essence of the crime." *Id.*; *accord United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).

This fraudulent intent requires "a contemplated harm to the victim." *Starr*, 816 F.2d at 98; *accord United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994). "Misrepresentations amounting only to a deceit are insufficient to maintain a mail…fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim." *Starr*, 816 F.2d at 98; *D'Amato*, 39 F.3d at 1257 (same); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180-81 (2d Cir. 1970) (same); (A-2582/8903-04). Thus, where the alleged mail fraud scheme involves depriving the victim of money or property, as it does here, the defendant is guilty only if he specifically intended to deprive the victim of that money or property. *See, e.g.*, *Starr*, 816 F.2d at 99-101 (reversing mail fraud conviction despite evidence that defendants deceived their customers, because there was no evidence defendants intended to harm them).

In this case, then, the government had to show that Parse specifically intended to harm the IRS by depriving it of taxes owed—an intent he could not have formed unless he understood the tax law and knew that J&G's view of the tax accounting for the transactions was legally incorrect. This Court has described the

government burden's in this context as "even more onerous" than that of proving

intent to commit tax evasion, which requires "a voluntary, intentional violation of a

known duty." *Regan*, 937 F.2d at 827 (citing *Cheek v. United States*, 498 U.S.

192, 201 (1991)).

Indeed, courts have held that where the alleged intent to deprive the victim

of money or property depends on a violation of highly technical, complex rules

like the tax laws, specific intent to defraud requires a showing that the defendant

understood those rules. *See United States v. Vallone*, 698 F.3d 416, 483 (7th Cir.

2012) (under *Cheek*, defendant's "good faith belief in the legality of the trusts,

even if it was mistaken, would…preclude a finding" that he committed mail fraud

and related tax offenses); *United States v. Rossomondo*, 144 F.3d 197, 199, 203 (2d

Cir. 1998) (erroneous instruction required reversal of mail fraud conviction where

error "could have utterly vitiated" good faith defense based on mistaken

understanding of pension fund regulations); *United States v. Rhone*, 864 F.2d 832,

835-36 (D.C. Cir. 1989) (instruction that "ignorance of the law is no excuse" in

mail fraud prosecution dependent on entitlement to unemployment benefits

erroneously suggested that defendant was "guilty regardless of whether she knew

she was violating the law"); *see also United States v. Carbo*, 572 F.3d 112, 117-18

(3d Cir. 2009) (in pre-*Skilling* honest services mail fraud case based on conflict of

interest, government must prove defendant's "knowledge" that "failure to disclose

76

the conflict of interest is illegal"). Thus, the government had to prove that Parse knew either the corrective transactions or the tax shelters generally could not properly be used to claim tax losses.

Accordingly, the mail fraud scienter instructions were erroneous. *See infra* Point III.C. However, the evidence was insufficient even assuming those instructions were correct, not only because Parse lacked specific intent to deprive the IRS of taxes he understood were owed to it, but also because he engaged in no deceitful conduct.

### 2. There Was No Evidence That Parse Engaged In Any "Backdating," Much Less Backdating Specifically Intended To Defraud The IRS Of Taxes Owed

*First*, even if mere deceit were sufficient, there was no evidence of deceit with respect to the corrective transactions. The government repeatedly labeled them "backdating," and used inflammatory rhetoric about "falsifying" dates transactions,[24] but there was zero evidence that Parse or his assistant ever backdated anything. They did not alter, falsify, white-out, reissue, or destroy any D.B. record or other document. Rather, they created an accurate paper trail that showed exactly what happened *and when*. Indeed, the same records the government claimed were "falsified" enabled Yackee, who did not recall the transactions, to reconstruct the entire chain of events. *See supra* pp.14-16.

---

[24] (*E.g.*, A-353/33; A-355/42; A-2447/8365; A-2456/8402; A-2460/8417; A-2472/8463).

These records also listed "as of" dates, but there is nothing inherently wrong or illegal about that. Parse implemented the new transactions because J&G told him it had given incorrect instructions the previous December that did not accurately reflect J&G's clients' intent. *See supra* pp.15-17. The government introduced no evidence, and cited no legal authority, that it is illegal to transparently record "as of" dates in this manner, *i.e.*, by recording the date when the corrective transaction actually occurred, and the "as of" date when the transaction should have occurred. To the contrary, there was evidence that the transactions were consistent with D.B.'s procedures, including for non-tax-related transactions, and that Kositchek and other managers at D.B. gave independent approval for them. *See supra* pp.14-15. There was therefore no proof that Parse did anything deceptive with regard to the corrective transactions.

The once-prevalent corporate practice of setting strike prices for employee stock options using earlier dates provides a useful analogy. It is not illegal for a company to price its stock option grants using such "as of" dates, so long as it accurately records and discloses when it granted the options, properly accounts for them under GAAP, and discloses them in a public company's SEC filings. *See, e.g.*, *United States v. Reyes*, 577 F.3d 1069, 1073 (9th Cir. 2009) (per curiam); *Edward J. Goodman Life Income Trust v. Jabil Cir., Inc.*, 594 F.3d 783, 788 (11th Cir. 2010). To prove criminal liability, the government must prove that the

78

defendant understood that the backdating led to false filings and improper accounting. *See, e.g.*, *Reyes*, 577 F.3d at 1076 (remanding backdating prosecution for new trial where "[t]he principal issue" was "intent," and prosecutorial misconduct undermined defendant's "defense…that he thought the transactions were properly accounted for"). Similarly, what turned out to be illegal here was the decision by J&G and the tax preparers to use the new transactions on the prior year's tax returns. Yet Parse had nothing to do with that decision.

*Second*, even if Parse had actually engaged in "backdating," there is no evidence that he specifically intended to deprive the IRS of taxes due, because there was no proof that Parse believed that it was improper to use the "as of" dates for tax purposes. J&G requested the corrective transactions, but Parse did not know that the tax advisors would account for the transactions in violation of the tax laws, and he never discussed the issue (which was debated among J&G lawyers) with anyone. (A-1288/3753-54). *Supra* pp.17-18.

Furthermore, it would hardly have been obvious to a layperson like Parse that the tax laws prohibited the use of the "as of" dates. The so-called "annual accounting system" that the government insisted forbids what J&G and the tax preparers did is riddled with exceptions, and its application is subject to expert debate. *See infra* Point III.B.2; *Regan*, 937 F.2d at 827 ("One of the most esoteric areas of the law is that of federal taxation…. [I]t is rare that a 'simple, direct

79

statement of the law can be made without caveat.'"). There is no basis to infer that Parse knew how this complex "system" applied to the corrective transactions.

      3.    The Government Failed To Prove That Parse Knew The Tax Shelters Were Fraudulent

     The government tried to overcome Parse's lack of tax knowledge by asking the jury to infer from other evidence that he understood the tax shelters were fraudulent. None of this evidence remotely establishes scienter.[25] *First*, there was no evidence that Parse participated in false statements to or deceit of the IRS. The government's argument that Parse's own tax shelter somehow showed he knew there were false statements in others' opinion letters is unsupported by any "affirmative proof." *Coplan*, 703 F.3d at 76. There was no evidence regarding Parse's business purpose, much less evidence that the business purpose representations in his opinion letter were false. *Id.* ("speculation and surmise" insufficient to sustain conviction). *See supra* p.12. The opinion did not affirmatively state that the primary reason for the transaction was tax-related, but that does not make it false. *See* 703 F.3d at 66 (rejecting argument as "spurious").

_____

[25] Despite the presence of the biased juror, the jury rejected virtually identical arguments about Brubaker. No rational jury would have accepted these arguments as to Parse, but not Brubaker (who, unlike Parse, had a law degree and was alleged to have lied in deposition testimony). Thus, it appears that even this biased jury likely concluded that Parse was unaware the tax shelters were fraudulent and convicted him only for the "backdating," based on the erroneous jury instructions, discussed *infra*, further demonstrating that no *rational* jury could have found that Parse knew the tax shelter strategies were fraudulent.

Moreover, the record provides no support for the "dog tech" argument. *Supra* pp.12-13. And even if Parse had recommended stocks less likely to draw IRS attention, that does not establish an intent to defraud the IRS. At most, it shows that Parse knew the obvious facts that the strategies were aggressive and it was in clients' interests to try to reduce the possibility of an audit. Trying to "make the IRS's job harder" in this manner "just isn't illegal," much less a fraudulent deprivation of taxes owed to the IRS. *United States v. Caldwell*, 989 F.2d 1056, 1058 (9th Cir. 1993) (Kozinski, J.) (reversing conviction of defendant who "used numbered accounts, promised to keep no records of clients' transactions and vowed not to disclose information about…accounts to third parties" to "help[]…customers avoid paying taxes").

Likewise, the testimony about the Calphalon meeting that the government emphasized in closing and at sentencing hardly fills the void of scienter evidence. *Supra* p.13. Indeed, in *Coplan*, this Court reversed the convictions of *two tax professionals* who, like Daugerdas, tried to imbue tax shelters with business purpose in similar fashion. 703 F.3d at 73-76 (reversing tax obstruction conviction of lawyer-accountant who helped draft supposedly false "IDR" responses, where taxpayer testified that "[t]he purpose of entering into the transaction was really to generate [tax] loss" and that hedging was "a factor" but not reason for deal).

*Second*, there was no evidence that Parse had the specialized tax knowledge

81

required to analyze the economic substance of J&G's strategies.  *See United States v. Mallas*, 762 F.2d 361, 363-64 (4th Cir. 1985) (reversing conspiracy charge where lawfulness of tax shelter unclear).  The district court itself remarked on Parse's "unfamiliar[ity]" with tax law.  (A-2365/8040-41).  Parse's brief stint as an auditor, business degree and "sophistication" are irrelevant.  Numerous other sophisticated people, including lawyers and highly successful businesspeople, were similarly persuaded that Daugerdas had discovered a legitimate loophole.  *Supra* pp.8-11.  The inferential leap the government invited by pointing to Parse's CPA and M.B.A. is improper speculation at best.  *D'Amato*, 39 F.3d at 1256.

### B. The Erroneous "Annual Accounting" Instruction Impermissibly Lowered The Scienter Standard

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *United States v. Hassan*, 578 F.3d 108, 129 (2d Cir. 2008); *see also United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (same).  "An erroneous instruction, unless harmless, requires a new trial."  *Hassan*, 578 F.3d at 129.

The instruction on the "annual accounting system" misled the jury and improperly lowered the scienter standard for the "backdating" allegations.  It erroneously stated that it is *always* illegal under the tax law to "reopen" a transaction from a prior year when in fact the "system" is complex and riddled with exceptions.  The tax professionals apparently should not have used the new

transactions in the prior year returns, but that was not at all obvious, and certainly not to a layperson. Yet the court mischaracterized the annual accounting immediately after describing examples of obviously wrongful conduct, such as falsifying documents. The juxtaposition of the misstatement about annual accounting with these examples eviscerated Parse's good faith defense, by conveying that no person would have believed that the new transactions with the "as of" dates could be used on a prior year's tax return.

### 1. Background

In the conspiracy instructions, the court gave certain "example[s]" of misconduct that an illegal conspiracy "may include." (A-2576/8877). The court told the jury that it is illegal to agree to engage in acts of obstruction ("to destroy documentation of income; to destroy records" and "to create false documentation") or fraud ("fraudulent or deceptive conduct that would have the effect of impairing the ability of the IRS to collect tax revenue."). (*Id.*).

The court then gave the following "example" relating to the "backdating" allegations: "such conduct can also include falsifying the date of the transaction for tax purposes. In this regard, I instruct you that the income tax laws are administered on the basis of an annual accounting system, which prohibits the reopening of a prior year's tax return to take account of events occurring in later years." (*Id.*).

The defense objected to the "annual accounting" instruction on the ground that it misstated the tax law, and impermissibly conveyed to the jury that the defendants could not in good faith have believed that any attempt to "reopen" a prior year's transaction was lawful.  (A-2746-48; A-2371-73/8063-73; A-2882-86).  The district court gave the instruction over this objection.  (A-2576/8877; A-2814; A-2846).

### 2.    The Annual Accounting Instruction Misstated The Law

Contrary to the instruction, the "annual accounting" approach under the administration of the federal tax laws does not uniformly "prohibit[] the reopening of a prior year's tax return to take account of events occurring in later years."  Rather, the IRC routinely and explicitly *permits* (and sometimes requires) the reopening of a prior year's transactions for *exactly* that purpose in many situations.

Under an annual accounting approach, a taxpayer's income and deductions are tallied up at the close of the tax year, even if the transaction that gives rise to a particular source of income or a deduction itself remains open at that time.  *See, e.g.*, I.R.C. §441(a)[26] ("Taxable income shall be computed on the basis of the taxpayer's taxable year.").  This treatment is, as a general matter, "a practical necessity if the federal income tax is to produce revenue ascertainable and payable at regular intervals."  *Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370, 377 (1983).

---

[26] Citations to "IRC" are to Title 26 of the United States Code.

However, "strict adherence to an annual accounting system would create transactional inequities" because "[o]ften an apparently completed transaction will reopen unexpectedly in a subsequent tax year, rendering the initial reporting improper." *Id.*

The tax law thus frequently permits deviations to "approximate the results produced by a tax system based on transactional rather than annual accounting." *Id.* at 381. Contrary to the district court's instruction, many of these Code-based exceptions explicitly permit the "reopening" of prior years to take account of events occurring in later years. *See, e.g.*, I.R.C. §165(i) (disaster loss may be taken into account for prior tax year); I.R.C. §172 (net operating loss carrybacks to prior years); I.R.C. §402(g)(2)(A) (retroactive allocation of excess deferrals until March or April of following year); I.R.C. §404(a)(6) (contributions to employee plan deemed made at close of preceding tax year if made after that year but before return is filed); I.R.C. §404(h)(1)(B) (same); I.R.C. §404(m)(2)(B); I.R.C. §563 (certain dividends paid after close of taxable year "considered as paid during such taxable year"); I.R.C. §663(b) (payment or credit to estate or trust within first 65 days of any year considered made on the last day of preceding year); I.R.C. §666 (allocation of accumulation distribution of certain trusts to preceding tax years); I.R.C. §761(c) (modifications to partnership agreement may be made at or before filling of tax year's return); I.R.C. §810 (operating loss carrybacks for insurance

companies); I.R.C. §855 (regulated investment companies may consider certain dividends paid in previous tax year); I.R.C. §858 (same for REITs); I.R.C. §1212 (capital loss carrybacks).[27]

Indeed, certain provisions explicitly permit reopening prior year returns for the very purpose undertaken by J&G and the tax preparers here, that is, to retroactively correct an error.  Although these provisions do not apply directly to the transactions at issue, they demonstrate the misleading overbreadth of the jury instruction.  *See* I.R.C. §1311-14 (permitting corrections of certain errors in prior returns barred by statute of limitations or otherwise); *see, e.g.*, I.R.C. §401(a)(2) (permitting return of contribution to certain qualified employer plan trusts within six months, if "made by a mistake of fact or law"); I.R.C. §401(b) (permitting retroactive changes in such plans up to time of filing).  In fact, there is even authority for the very approach that J&G and the preparers undertook here, *i.e.*, giving retroactive effect to intended transactions that were mistakenly entered into in the prior tax year.  *E.g.*, *Dodge v. Comm'r*, 27 T.C.M. (CCH) 1170 (1968) (taxpayer intended to convey one-fifth interest in property in 1960, but mistakenly transferred entire interest and mistake was only discovered in subsequent year; tax

---

[27] Ironically, the government capitalized on net operating loss carry-forward deductions authorized by the IRC *in this very case*, in order to attempt to bring certain transactions within the statute of limitations.  Carry-forward losses are by definition inconsistent with annual accounting.  *See Coast Quality Constr. Corp. v. United States*, 463 F.2d 503, 509 (5th Cir. 1972).

effect given to intended one-fifth transfer).

In sum, the district court misled the jury by stating that an "annual accounting system" absolutely prohibited the "reopening" of a prior tax year to take account of later events. There simply is no such "system." *See Pettibone Corp. v. United States*, 34 F.3d 536, 539 (7th Cir. 1994) (Easterbrook, J.) (recognizing "the interdependence among periods within the corporate taxation system" and observing "that from both economic and legal standpoints the nominal one-year accounting period for taxes is deceiving"); Myron C. Grauer, *The Supreme Court's Approach to Annual And Transactional Accounting For Income Taxes*, 21 Ga. L. Rev. 329, 337-38 (1986) (observing that "our tax system should now be regarded as a hybrid system" between annual and transactional accounting).

### 3.   The Erroneous Instruction Prejudiced Parse

By juxtaposing the erroneous statement that "reopening" a prior return is *necessarily* illegal with conduct that seems obviously wrong, such as destroying or falsifying documents, the district court suggested that the "annual accounting rule" was so fundamental that even laypeople would know its contours. The implicit message was that D.B.'s use of "as of" dates was itself obviously illegal, thus diluting Parse's defense that he, in good faith, relied on tax experts for the proper tax treatment of the corrective transactions and did not believe he was doing

anything wrong.

It was perfectly reasonable for Parse, who had no tax expertise, to rely on these tax experts.  The application of "annual accounting" treatment is complex, and in fact the IRC authorizes "reopening" in numerous circumstances, including for implementing certain corrective transactions.[28]  Moreover, the new transactions were consistent with D.B. procedure and documented in transparent, accurate records.  The tax preparers who used the "as of" dates were fully aware of when the corrective transactions occurred, and unlike Parse, they had tax expertise; yet there was no evidence that they believed at the time that using the corrective transactions on prior years' tax returns was improper.  By suggesting that it would have been obvious even to a layperson that this tax accounting was illegal, the instruction gutted Parse's good faith defense.  *See Hassan*, 578 F.3d at 132-33 (reversing conviction because jury instruction permitted jury to convict even if government did not carry its burden to prove scienter).  Conrad's conclusion that Parse was just "stupid" for the backdating (A-5660/203), confirms the point.

This error was compounded by the court's refusal to permit the jury to hear

---

[28] Although there was no evidence that Parse discussed tax issues with anyone, Daugerdas apparently told other J&G lawyers he believed a transaction occurring after the tax year ended could be used to "effectuate taxpayer intent."  (A-1288/3754).  He also mentioned "scrivener error."  (*Id.*).  *See Dodge*, 27 T.C.M. (CCH) 1170 (permitting corrections to transactions in prior tax years in light of claimed "error of the scrivener" and "unilateral mistake").

evidence of exceptions to the annual accounting approach. Parse attempted to elicit evidence from a witness about net operating loss carrybacks, and in particular, that there was "no brick wall" imposed by the tax law to prevent attribution of such losses to a prior year. (A-589/974-75). The district court sustained the government's objection that the carryback evidence would be "confusing," and would undermine "the applicability" of its annual accounting charge. (A-589/976; A-590/980). But this evidence would have shown, at least in one context, that it is not always illegal to "reopen" a prior transaction. The court's exclusion of the evidence thus contributed to the false picture of the annual accounting "brick wall" that was presented to the jury.

The government also took full advantage of the erroneous annual accounting instruction, repeatedly invoking it to argue that the jury could convict Parse on all counts regardless of whether the shelters had economic substance. (A-2460/8417-18 ("[U]nder the law it's illegal to falsify the dates of a transaction to gain a tax advantage"); A-2460/8417 (arguing that it would be "very clear" from court's instructions that "[i]t is illegal to falsify the dates of transactions so that you can claim tax losses in a prior year")). They went so far as to suggest based on the purported clarity of this rule that Parse, as a former CPA, must have understood that the tax use of the corrective transactions was illegal: "It's not a hard thing to understand. If anyone knows that, it's a CPA like…Parse." (A-2460/8417); *see*

89

*United States v. Joseph*, 542 F.3d 13, 18-19 (2d Cir. 2008) (vacating conviction where "risk of an improper conviction" from erroneous instruction was "heightened by the Government's summation").

Accordingly, and given the dearth of scienter evidence, the government cannot demonstrate that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder*, 527 U.S. at 18; *see United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) ("overwhelming evidence" required to show harmless error).

### C. The Mail Fraud Scienter Instruction Erroneously Deprived Parse Of His Good Faith Defense

The instructions on scienter erroneously failed to inform the jury that it must find that Parse acted with the intent to violate the tax laws by depriving the IRS of taxes it was owed, and accordingly, robbed Parse of his good faith defense.

1. The specific intent instruction omitted language Parse requested that would have required that he acted with specific intent to defraud "and with a bad purpose either to disobey or to disregard the law" (A-2582/8903-04), which Parse requested because the instruction "did not include a 'willfulness' requirement." (A-2885 (citing 2 L. Sand et al., *Modern Federal Jury Instructions* ¶44.01 (2013) (Instruction 44-5)); *see also United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir. 1982) (mail fraud statute "require[s] that the defendant must have acted willfully and with a specific intent to defraud"), *overruled on other grounds*, *McNally v.*

90

*United States*, 483 U.S. 350 (1987).  The district court also denied Parse's request to replace general language requiring "a purpose of causing harm to the victim," with the phrase "for the purpose of obtaining money or property from the alleged victim," which, as Parse noted, "tracks more closely the language of the mail fraud statute."  (A-2885; A-2584/8912 (preserving objections)).

2.    Because this mail fraud charge was predicated on alleged tax evasion, the failure to require willfulness or even an intent to deprive the IRS of money or property was reversible error.  A district court "must tailor its instructions to the facts of the case before it," and "a charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts." *Regan*, 937 F.2d at 828; *cf. United States v. Allen*, 127 F.3d 260, 265 (2d Cir. 1997) (reversing conviction for failure to charge theory of defense).

As explained, the government had to prove that Parse intended to deprive the IRS of money or property—*i.e.*, taxes he believed were *actually* owed.  Parse could only form such intent if he understood that the tax shelters lacked economic substance or that the corrective transactions could not be used on a prior year's tax return.  Thus, the failure to instruct the jury that it had to find that Parse acted with bad purpose to violate the law, or, at least, to deprive the IRS of money or property, was error.  *Supra* Point III.A.1 (collecting cases).

That error was exacerbated by the misleading "good faith" instruction.

Although the instructions stated that good faith was a complete defense to each charge, they also said: "In determining whether the government has proved that a defendant *willfully* committed the crimes charged or *whether the defendant acted in good faith*, you must consider all the evidence bearing on the defendant's state of mind." (A-2583/8905 (emphases added)). This language erroneously conveyed that good faith was only a defense to charges requiring "willfull[ness]"—here only tax evasion and conspiracy (A-2577/8882; A-2580/8895-96), but not mail fraud (or obstruction). *See United States v. Golitschek*, 808 F.2d 195, 202-03 (2d Cir. 1986) (reversing conviction where internal inconsistencies nullified specific intent instruction).[29]

3.    These errors prejudiced Parse. The jury acquitted him of conspiracy to commit mail fraud (and all the other conspiracy and tax evasion charges), but convicted him of substantive mail fraud. This verdict was reached one hour after the jury requested and received a "clarif[ication]" about knowledge of unlawfulness for the conspiracy instruction (A-2645/9146), which explained that "[a] defendant need not know the specific law he or she was violating, such as a specific statute, but *must have been aware that the nature of the conduct in which he or she engaged was illegal*" (A-2646/9151-52 (emphasis added)). No similar

---

[29] Parse did not specifically object to the good faith instruction below, but its effect on errors to which he did object is reviewed *de novo*. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

instruction was provided for mail fraud. (A-2582/8903-04). Given the lack of evidence that Parse believed he was engaged in illegal conduct, the absence of an instruction that to convict, the jury must find that Parse acted with a "bad purpose either to disobey or to disregard the law" was plainly at least one reason for this mixed verdict. Indeed, the government has conceded that the differing verdicts "exactly tracked" the "difference between wilfully [sic], [which] was required in the conspiracy count and for the tax evasion counts, and knowingly which was really the mens rea relating to the other [counts]." (A-5925; *see also* A-4992 (Conrad stated that she "held out for two days on the conspiracy charge" for Parse but "had to throw in the towel" after the clarification on scienter)).

\* \* \*

Even if the instructional errors on the annual accounting rule and specific intent were not individually prejudicial, their combined effect fatally prejudiced Parse. Their cumulative message to the jury was that any idiot would have known that the "as of" dates could not be used, and that for mail fraud, it did not matter whether Parse believed that the corrective transactions would be used unlawfully. These instructional errors, taken together, deprived him of a fair trial. *See, e.g.*, *United States v. Haynes*, 729 F.3d 178, 197 (2d Cir. 2013) (reversing conviction where individual errors "may not provide a basis" for reversal, but "when considered together, in the context of this trial, these errors call into serious doubt"

93

whether defendant received fair trial); *United States v. Morales*, 577 F.2d 769, 777 (2d Cir. 1978) (multiple errors in scienter instructions cumulatively deprived defendant of fair trial).

## IV.   THE OBSTRUCTION CONVICTION SHOULD BE REVERSED

Parse is entitled to acquittal, or at least a new trial, on the obstruction count as well.  The evidence was insufficient as to both elements of the offense, and the statute of limitations expired.  Erroneous instructions on the statute of limitations and the annual accounting rule also deprived Parse of a fair trial.

### A.   The Evidence Was Insufficient To Prove That Parse Violated §7212(a)

Count Twenty charged Parse with violating 26 U.S.C. §7212(a), which criminalizes "corruptly…obstruct[ing] or impeded[ing], or endeavor[ing] to obstruct or impede, the due administration of [the IRC]."  The "'key words'" in the statute are "'corruptly' and 'endeavors.'"  *Coplan*, 703 F.3d at 73 (quoting *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998)).

Thus, the district court instructed the jury that the government had to prove two elements:  First, that "the defendant you are considering acted corruptly," which "requires consciousness of unlawfulness."  (A-2581/8899).  Second, that "*the defendant you are considering* acted with the specific intent to impede or obstruct the due enforcement of the Internal Revenue laws," which "simply means

94

any effort to obstruct the administration of the tax code." (*Id.* (emphasis added)). Notably, to convict a particular defendant, the jury had to find that *that defendant* committed an obstructive act; the district court declined to give any secondary liability or *Pinkerton* instructions for obstruction. (A-2389-40/8134-35).[30]

No reasonable jury could have found beyond a reasonable doubt that the government proved either element.

*First*, no reasonable jury could find that Parse acted deceitfully or with the intent to violate the tax laws. *Supra* Points III.A.2 & III.A.3. Accordingly, the evidence was insufficient, as to both the "backdating" and tax shelter fraud theories, to show that Parse acted with the requisite "consciousness of unlawfulness" necessary to satisfy the "corruptly" element of §7212(a). (A-2581/8899 (jury instructions)); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005) ("corruptly" in similar obstruction of justice statute requires consciousness of wrongdoing).

*Second*, there was no evidence that Parse engaged in any obstructive conduct. With respect to the corrective transactions, as explained above, all Parse did was implement new transactions to correct errors that occurred the previous year. Parse did not conceal anything, but instead accurately documented the new transactions in D.B. records, which provided a clear paper trail enabling the IRS to

---

[30] Its substantive instruction on willful causation liability under 18 U.S.C. §2(b) applied only to the tax evasion counts. (A-2580/8893-95).

determine what happened and when it happened.  This plainly did not "obstruct" or "impede" the IRS's ability to investigate the transactions.

*Coplan*, in which this Court reversed a tax professional's §7212(a) conviction, is analogous.  The defendant was charged with causing false statements to be submitted to the IRS in IDR responses, but the evidence was insufficient because nothing in the IDR responses was actually false or misleading.  703 F.3d at 73-76; *see also id.* at 63-66, 69-70 (reversing convictions for "conspiracy to defraud" where evidence was insufficient to show that tax professional-defendants engaged in any knowing acts of deceit); *compare Kelly*, 147 F.3d at 176 (affirming §7212(a) conviction where defendant furnished IRS document intended to convey falsely that he had assigned income to third party).  Similarly, because Parse did not conceal or misrepresent when the new transactions occurred, there was no evidence of "backdating" sufficient to constitute an obstructive act.

Nor was there any evidence that Parse "endeavor[ed]" to impede the IRS with respect to the J&G shelters.  As explained, Parse did not design the tax shelters or give anyone tax advice.  He had no involvement with IDR responses or audits, and there was no proof that he ever lied to the IRS.

## B.    The §7212(a) Statute Of Limitations Expired

Even assuming *arguendo* that the evidence was sufficient to convict Parse for obstruction, the conviction should be reversed on statute of limitations grounds.

First, Parse's involvement in tax-shelter-related transactions occurred entirely outside the statute of limitations, and he did not "willfully cause" anyone to commit an act of obstruction within the limitations period. Second, a vastly overbroad and erroneous instruction allowed the jury to convict Parse solely because *someone else* committed or caused an act of obstruction within the limitations period, even if Parse did not participate in that act.

> 1. Parse Did Not Commit Or Cause Any Obstructive Act Within The Limitations Period

Section 7212(a) has a six-year statute of limitations, 26 U.S.C. §6531(6); *Kelly*, 147 F.3d at 177, running from the date of the "last corrupt act" committed *by the defendant*. *See United States v. Catlett*, 498 F. App'x 352, 355 (4th Cir. 2012); *United States v. Thompson*, 518 F.3d 832, 858 (10th Cir. 2008); *cf. United States v. DiPetto*, 936 F.2d 96, 98 (2d Cir. 1991) (tax evasion limitations period runs from date of "last act of evasion"). The government thus had to prove that Parse himself committed an act of obstruction after February 3, 2003. (A-2742; A-2583/8907). It failed to carry this burden.

The statute of limitations for a substantive offense turns on whether the defendant *himself* committed an act within the limitations period. *See Thompson*, 518 F.3d at 857-58 (for obstruction charge (unlike conspiracy charge) "the government was required to prove beyond a reasonable doubt that [defendant himself] committed a corrupt act on or after" the cutoff date); *see also United*

*States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) (statute of limitations for substantive RICO offense determined based on acts of defendant, not other members of enterprise); *United States v. Torres Lopez*, 851 F.2d 520, 524-25 (1st Cir. 1988) (same). There is no evidence that Parse himself engaged in any conduct, much less any obstructive conduct, with respect to any J&G shelter after April 2002, when he implemented Toporek's corrective transactions. At sentencing, the government conceded that "[a]ll of the backdating events" "took place before" February 3, 2003. (A-6127). Though the government argued that the jury "must be deemed to have found" that Parse committed an obstructive act after that date (*id.*), it failed to identify any such act—because there was none.

In light of this absence of evidence, the government argued, prior to its about-face at sentencing, that Parse somehow "caused" taxpayers to commit obstructive acts within the limitations period. (A-2442/8343-44). The bill of particulars identified the tax returns of two taxpayers that were filed within the limitations period—a 2002 return for Toporek filed on December 22, 2003; a 2003 return for Knoedler Archivum filed on September 13, 2004; and a 2004 return for Knoedler Archivum filed on March 14, 2005—which supposedly claimed carry-forward losses from J&G shelters implemented in 2001 and 2002. (A-157-61; A-2434/8313-14).

The government's theory was based on 18 U.S.C. §2(b), which provides,

"[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  Generally, if a crime was committed within the limitations period, a defendant who "willfully caused" its commission may be prosecuted under §2(b) even if his "causing" acts occurred outside the limitations period.  *Cf. United States v. Smith*, 740 F.2d 734, 736 (9th Cir. 1984) (statute of limitations for causing false statements to be made to the government began to run when statements were submitted).  In Parse's case, however, this theory cannot solve the statute of limitations problem, for two reasons.

*First*, the jury was never asked to decide whether Parse was guilty *of obstruction* under a §2(b) theory.[31]  It was told that it could convict only if *Parse personally* committed an obstructive act.  (A-2581/8899 (requiring proof that "*the defendant you are considering* acted corruptly" (emphasis added)).  A conviction cannot be sustained on a theory the jury was never asked to consider.  *See Chiarella v. United States*, 445 U.S. 222, 236 (1980) ("[W]e cannot affirm a criminal conviction on the basis of a theory not presented to the jury."); *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (same).

---

[31] The indictment does not cite §2 in the obstruction count, and the government never requested a substantive §2(b) instruction with respect to obstruction.  By contrast, the indictment does cite §2 in the tax evasion counts, and the government explicitly requested and received a substantive §2(b) instruction for tax evasion. (*See* A-2701-02; A-2356-57/8004-08; A-2580/8893-95).

*Second*, there was no evidence that Parse willfully caused any act of obstruction within the limitations period. "Willful causation" under §2(b) requires the "*mental state necessary* to violate the underlying" statute, *United States v. Gabriel*, 125 F.3d 89, 101 (2d Cir. 1997) (emphasis added), here, "consciousness of unlawfulness" (A-2581/8899). There was no evidence Parse gave these taxpayers advice on any tax issue (*see* A-1854/6004-05; A-4327)—let alone carry-forward losses claimed long after he stopped executing J&G transactions. Also, the taxpayers appear to have claimed any losses in their later-filed returns after J&G sent them letters warning of increasing IRS scrutiny of the shelters (A-1213/3456-58), and then advising them that it could no longer support the tax shelters. (*Id.*; A-1869/6063; *see also* A-3486-3593; A-3984-4148). Accordingly, there was no evidence that Parse caused, much less "willfully caused," these filings or any other obstructive act within the limitations period. *See United States v. Broxmeyer*, 616 F.3d 120, 128-29 (2d Cir. 2010) (defendant did not cause victim to travel across state lines where victim's conduct did not result from defendant's promise); *United States v. Lewis*, 594 F.3d 1270, 1274-75 (10th Cir. 2010) (reversing conviction for causing agent's fraudulent statements where government introduced no evidence that defendant knew agent was making false statements).

2. The Jury Instructions Erroneously Invited Conviction Based
Solely On Another Person's Act Of Obstruction, Even If Parse
Did Not Participate In That Act

At a minimum, Parse is entitled to a new trial because the district court gave

a novel and erroneous statute of limitations instruction that invited the jury to

convict him based on other people's conduct, even if he was completely

uninvolved.

The jury was charged: "[I]n order for you to find any defendant guilty [of

obstruction], the government must prove that the defendant you are considering *or*

*someone involved in the offense* committed *or caused to be committed* an act of

obstruction related to the obstruction count on or after" February 3, 2003. (A-

2583/8907 (emphases added)). The court included the phrase "someone involved

in the offense" over the defendants' objections. (A-2442/8343; A-2584/8912).

This instruction had no legal basis, was incorrect as a matter of law, and was not

harmless. *See, e.g.*, *Quattrone*, 441 F.3d at 177.

The invitation to consider acts caused or committed by "someone involved

in the offense" other than the defendant was unprecedented. We are aware of no

authority extending the statute of limitations for a substantive offense based on

another person's actions, no matter how remote from the defendant. The term

"someone" expressly invited the jury to consider acts committed by anyone, so

long as he or she was somehow "involved in"—whatever that means—the J&G

shelters. This instruction rendered timely an otherwise time-barred substantive offense based on the acts of others, even complete strangers.

Even if acts "willfully caused" by Parse could satisfy the statute of limitations, the instruction goes far beyond any valid §2(b) theory. *See* Sand, *supra*, ¶11.02 (Instruction §11-3) (suggesting instruction asking whether defendant *intentionally caused* another person to commit crime); *id.* cmt. ("Under section 2(b), a person who causes an innocent party to commit an act which, if done with the requisite intent, would constitute an offense, may be found guilty as a principal…."); *accord* Third Circuit Model Criminal Jury Instruction 7.05 (2013); Sixth Circuit Criminal Pattern Jury Instruction 4.01A (2013). By its own terms, the instruction is not limited to acts that Parse "willfully caused"—or even "caused"—but invited consideration of *any* act committed by *anyone* involved in the offense. Indeed, the instruction even permitted the jury to consider obstructive acts *caused by* "someone involved in the offense." That is not the law. As explained above, the obstruction charge against Parse can be made timely based only on his own acts or acts that he caused. He cannot be held accountable for the acts of others, let alone acts caused by others.

The prejudice is plain. Parse easily could have been convicted based on acts committed or caused by any person, whether or not Parse willfully caused those acts. Given the sheer volume of evidence that related only to other defendants,

there were plenty of allegedly obstructive acts committed or caused after February 3, 2003 that had nothing to do with Parse. For example, the government's summation highlighted evidence about alleged lies that *other people told* in which Parse had zero involvement, but which occurred during the limitations period: BDO-drafted "false" IDR responses between March 2003 and December 2003 (A-2469/8451; *see* A-1319-20/3877-83; A-1790/5749-58; A-1816-17/5853-58; A-4777-4809; A-4810-15; A-4816-20); J&G-drafted false IDRs regarding a Brubaker customer, in July 2003 (A-2469/8452); and allegedly improper "coaching" by BDO during an audit on October 25, 2003 (*id.*; A-4446-48). And almost immediately after reciting this evidence, the government raised the statute of limitations, and took full advantage of the erroneous instruction, saying: "[you] need only find that the defendant at issue *or someone involved in the offense* committed some act in furtherance of the tax evasion events within the period of the statute of limitations. This can even be one of the taxpayers who filed a false information document request or a false tax return." (A-2470/8457-58 (emphasis added)).

Accordingly, it is highly likely that Parse was convicted of obstruction even though his statute of limitations had expired, solely because someone else committed or caused an act within the limitations period. This requires a new trial. *See United States v. Fuchs*, 218 F.3d 957, 962-63 (9th Cir. 2000) (reversing based

on erroneous statute of limitations instruction); *cf. United States v. Head*, 641 F.2d 174, 178-79 & n.6 (4th Cir. 1981).

### C. The Erroneous "Annual Accounting" Instruction Also Requires A New Trial

For the reasons explained *supra* in Point III.B, the erroneous "Annual Accounting" instruction requires a new trial on both charges, including the §7212(a) count.

## V. THE RESTITUTION ORDER SHOULD BE VACATED

Over objection (A-5940; A-6124; A-6097; A-6161; A-6135/2), the district court essentially found that Parse had been convicted of the broad tax evasion conspiracy of which he was acquitted. Despite conceding that Parse profited the least (2%), it saddled him with $115,830,267 in restitution based on 54 uncharged alleged tax evasions. (A-6151-52; A-6172; A-6041-43; A-6096). This violated Parse's Fifth and Sixth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

*Apprendi* applies to monetary punishments. *Southern Union Co. v. United States*, 132 S. Ct. 2344, 2350-51 (2012). The jury must determine, beyond a reasonable doubt, the facts needed to support maximum "criminal 'sentence[s],' 'penalties,' or 'punishment[s].'" *Id.* at 2351. Restitution constitutes punishment. *See Pasquantino v. United States*, 544 U.S. 349, 365 (2005); *Kelly v. Robinson*,

479 U.S. 36, 49 n.10, 53 (1986).[32]  Accordingly, any facts underlying a maximum

restitution amount must be proven to the jury beyond a reasonable doubt.

*Apprendi* applies to all mandatory punishment, not only maximum

sentences.  *Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013).  Restitution was

mandatory.  *See United States v. Battista*, 575 F.3d 226, 230 (2d Cir. 2009).

Accordingly, under *Alleyne*, *Apprendi* applies to the district court's restitution

judgment.

Although this Court concluded in *United States v. Reifler*, 446 F.3d 65 (2d

Cir. 2006), that judicial fact-finding of the restitution amount does not violate

*Apprendi*,[33] *Reifler* is no longer good law.  *Reifler* held that *Apprendi* does not

apply to restitution, because restitution depends on the amount of the victim's loss,

rather than a fixed range.  446 F.3d at 118.  *Southern Union* rejected that logic and

thus invalidated *Reifler*'s holding.  132 S. Ct. at 2350-51.

The restitution order must therefore be vacated.

---

[32] *But see United States v. Peters*, --- F.3d ----, No. 11-610-CR, 2013 WL 5539655, at *4 (2d Cir. Oct. 9, 2013) (dicta).

[33] *See also United States v. Gushlak*, 728 F.3d 184, 193, 195 (2d Cir. 2013) (dicta).

## CONCLUSION

This Court should direct a judgment of acquittal or, at a minimum, vacate Parse's conviction and grant a new trial.

Dated:  November 6, 2013

Respectfully submitted,

 /s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Marc E. Isserles
James Darrow
Chetan A. Patil
SHAPIRO, ARATO & ISSERLES LLP
500 Fifth Avenue
40th Floor
New York, New York 10110
Phone: (212) 257-4880
Fax: (212) 202-6417

*Attorneys for Defendant-Appellant David Parse*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

The undersigned counsel of record for Defendant-Appellant David Parse certifies pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) that the foregoing brief contains 24,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the Word Count feature of Microsoft Word 2011; and that this brief has been prepared in 14-point Times New Roman.

Dated: November 6, 2013     /s/ Alexandra A.E. Shapiro
               Alexandra A.E. Shapiro