# 13-1388-cr

*To Be Argued By*:
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee*,

—against—

PAUL M. DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD,
ROBERT GREISMAN, RAYMOND CRAIG BRUBAKER, BDO USA, LLP,

*Defendants*,

DAVID PARSE,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT DAVID PARSE

ALEXANDRA A.E. SHAPIRO
MARC E. ISSERLES
JAMES DARROW
CHETAN A. PATIL
SHAPIRO, ARATO & ISSERLES LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant
David Parse*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................. 4

  I.  PARSE DID NOT WAIVE CONRAD'S PROVEN BIAS .......................... 4

    A.  The Government Mischaracterizes The Standard Of Review ..................... 4

    B.  Conrad's Proven Bias Is Not Waivable ........................................ 5

    C.  If A Defendant Can Waive The Right To An Impartial Trial Despite Clear Evidence Of Jury Bias, He Must Do So Personally And Knowingly .............. 19

    D.  B&R Did Not Waive Conrad's Bias ........................................... 22

      1.  The District Court's Findings Were Clearly Erroneous .......................... 22

      2.  The District Court Applied The Wrong Legal Standards ......................... 27

    E.  Parse Is Entitled To A New Trial On Plain Error Review ......................... 30

  II.  IF B&R KNOWINGLY WAIVED CONRAD'S BIAS, THEY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL .................................. 31

    A.  Failure To Object To A Juror Known To Be Biased Is Not Constitutionally Reasonable Strategy .......................................................... 31

    B.  Prejudice Should Be Presumed ................................................ 34

    C.  Parse Was Actually Prejudiced ................................................ 36

  III.  THE EVIDENCE WAS INSUFFICIENT ..................................... 36

    A.  The Government Repeatedly Mischaracterizes The Evidence .................. 38

    B.  The Government Failed To Prove "Fraudulent Backdating" ..................... 40

    C.  No Reasonable Jury Could Find Beyond A Reasonable Doubt That Parse Knowingly Participated In Tax Shelter Fraud ................................. 41

IV. THE "ANNUAL ACCOUNTING" INSTRUCTION ERRONEOUSLY
LOWERED THE SCIENTER STANDARD........................................................45

V. THE MAIL FRAUD INSTRUCTION FAILED TO ADEQUATELY
INFORM THE JURY OF THE SCIENTER REQUIREMENT.........................50

VI. THE OBSTRUCTION CHARGE WAS UNTIMELY .................................55

VII. THE RESTITUTION ORDER SHOULD BE VACATED........................59

CONCLUSION ..........................................................................................................61

# TABLE OF AUTHORITIES

**Cases**

*Alleyne v. United States*, 133 S. Ct. 2151 (2013)......................................................60

*Anderson v. City of Bessemmer*, 470 U.S. 564 (1985) ..................................... 25, 26

*Biagas v. Valentine*, 265 F. App'x 166 (5th Cir. 2008)..........................................32

*Clark v. United States*, 289 U.S. 1 (1933) ................................................................7

*Dodge v. Commissioner*, 27 T.C.M. (CCH) 1170 (1968)........................................49

*Doe v. Fed. Grievance Comm.*, 847 F.2d 57 (2d Cir. 1988) ........................... 26, 27

*Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004) ........................................................25

*Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc) ......................... 7, 13, 21

*Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215 (2d Cir. 2006) ...........................19

*Fountain v. United States*, 357 F.3d 250 (2d Cir. 2004) ................................. 51, 52

*Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006) ..............................................10

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ....................................................... 15, 16

*Gomez v. United States*, 490 U.S. 858 (1989) ........................................................30

*Gomez v. United States*, 705 F.3d 68 (2d Cir. 2013) ..............................................35

*Gonzalez v. United States*, 553 U.S. 242 (2008)....................................................20

*Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370 (1983)..........................................48

*House v. Bell*, 547 U.S. 518 (2006) ........................................................................16

*In re Zarnel*, 619 F.3d 156 (2d Cir. 2010) ..............................................................60

*Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992) ..................................... 10, 11

*Johnson v. Hill*, 274 F.2d 110 (8th Cir. 1960)........................................................28

*Johnson v. Zerbst*, 304 U.S. 304 (1938) ................................................................20

iii

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ......................................................34

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984)...............5, 28

*Mitchell v. Lyons Professional Services, Inc.*, 708 F.3d 463 (2d Cir. 2013)...........29

*Morales v. Thaler*, 714 F.3d 295 (5th Cir. 2013)....................................................32

*Neder v. United States*, 527 U.S. 1 (1999)...............................................................54

*Oyague v. Artuz*, 393 F.3d 99 (2d Cir. 2004)............................................................4

*Paroline v. United States*, 134 S. Ct. 1710 (2014) ...................................................61

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001)................................................... 32, 33

*Pettibone Corp. v. United States*, 34 F.3d 536 (7th Cir. 1994) ...............................48

*Puckett v. United States*, 556 U.S. 129 (2009) ........................................................20

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ..........................................34

*Rogers v. McMullen*, 673 F.2d 1185 (11th Cir. 1982)..............................................11

*Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012) ......................... 59, 60

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................................33

*Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001)...............................17

*United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977) ...................................56

*United States v. Billups*, 536 F.3d 574 (7th Cir. 2008)............................................19

*United States v. Carmenate*, 544 F.3d 105 (2d Cir. 2008) .......................................4

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) .............................................37

*United States v. Cedeño*, 644 F.3d 79 (2d Cir. 2011).................................................4

*United States v. Cerna*, 603 F.3d 32 (2d Cir. 2010) ................................................25

*United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989) .........................................18

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ......................... 38, 39, 41, 45

iv

*United States v. Dean*, 647 F.2d 779 (8th Cir. 1981) .......................... 10, 11, 14, 18

*United States v. Diaz-Albertini*, 772 F.2d 654 (10th Cir. 1985).............................11

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2002) ...........................................20

*United States v. Durham*, 139 F.3d 1325 (10th Cir. 1998)........................................8

*United States v. Fay*, 300 F.2d 345 (2d Cir. 1962) ....................................................8

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011)........................................57

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000) ........................................54

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002). ....................................... 38, 45

*United States v. Gole*, 158 F.3d 166 (2d Cir. 1998) ................................................52

*United States v. Gole*, 21 F. Supp. 2d 161 (E.D.N.Y. 1997) ...................................52

*United States v. Golomb*, 811 F.2d 787 (2d Cir. 1987) ...........................................27

*United States v. Guzman-Padilla*, 573 F.3d 865 (9th Cir. 2009) ...........................20

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) ........................ 46, 47, 50, 54

*United States v. Haynes*, 398 F.2d 980 (2d Cir. 1968) ...........................................10

*United States v. Ianniello*, 866 F.2d 540 (2d Cir. 1989)........................................12

*United States v. Johnson*, 347 F.3d 412 (2d Cir. 2003)................................... 16, 36

*United States v. Johnson*, 688 F.3d 494 (8th Cir. 2012)................................. 11, 30

*United States v. Labat*, 905 F.2d 18 (2d Cir. 1990)................................................57

*United States v. Langford*, 990 F.2d 65 (2d Cir. 1993) ..........................................28

*United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982)......................................51

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ................................ 16, 17

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)..............................................54

*United States v. Micke*, 859 F.2d 473 (7th Cir. 1988) ............................................41

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002) .................................... passim

*United States v. Olano*, 507 U.S. 725 (1993) ..........................................21

*United States v. Osuala*, No. 12-3573, 2014 WL 349877 (2d Cir. Feb. 3, 2014) ...56

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ...................................... 28, 29

*United States v. Precision Med. Labs., Inc.*, 593 F.2d 434 (2d Cir. 1978) ....... 51, 52

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ................................ 48, 50

*United States v. Ragland*, 375 F.2d 471 (2d Cir. 1967) ........................... 3, 9, 17, 21

*United States v. Rattenni*, 480 F.2d 195 (2d Cir. 1973) ...........................................9

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) ...................................... 51, 52

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ................................................59

*United States v. Richardson*, 238 F.3d 837 (7th Cir. 2001) ...................................34

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ..................................................4

*United States v. Rizzo*, 349 F.3d 94 (2d Cir. 2003) ..................................................26

*United States v. Robinson*, 744 F.3d 293 (4th Cir. 2014) .......................................19

*United States v. Saldana*, 427 F.3d 298 (5th Cir. 2005) ..........................................20

*United States v. Siddiqi*, 959 F.2d 1167 (2d Cir. 1992) ...........................................28

*United States v. Spencer*, 995 F.2d 10 (2d Cir. 1993) (per curiam) ........................4

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ...........................................28

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ..............................................28

*United States v. Thompson*, 518 F.3d 832 (10th Cir. 2008) ...................................56

*United States v. Tureseo*, 566 F.3d 77 (2d Cir. 2009) .............................................54

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948) ........................................25

*United States v. White*, 698 F.3d 1005 (7th Cir. 2012) (per curiam) ......................47

*United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000)..........................................37

*Vanderwater v. Hatch*, 835 F.2d 239 (10th Cir. 1987)..................................... 10, 11

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ................................................. 32, 35

*Yee v. Escondido*, 503 U.S. 519 (1992) ..................................................................19

**Statutes, Rules, and Other Authorities**

18 U.S.C. §2 ........................................................................................ 57, 58

26 U.S.C. §7206(2) ...................................................................................56

## **INTRODUCTION**

It is undisputed that the trial below was fatally tainted by a juror who lied her way onto the jury and was actually biased against all defendants. Judge Pauley granted a new trial for the main defendants, who had been convicted of all 43 counts against them. At a retrial with an unpolluted jury, they were acquitted of most charges.

But David Parse was never given the chance to defend himself before an impartial jury, even though the first jury had acquitted him of four of the six counts against him. Judge Pauley found that Parse's attorneys, without his knowledge or consent, supposedly "waived" his constitutional right to an impartial jury. The judge further found, perversely, that this was not ineffective assistance of counsel. Parse bore no personal responsibility whatsoever for the failure to remove the juror, Catherine Conrad, during trial. It was a gross miscarriage of justice to exclude him from the necessary relief granted to the lead defendants solely because of his lawyers' conduct. The judge weakly defended the result as "anomalous, but entirely just."[1] But the "anomaly" is itself the injustice. No man should be deprived of his liberty based on a conviction rendered by an indisputably biased jury—especially where other defendants convicted of many more counts by the same biased jury did not suffer the same fate.

---

[1] SPA-64.

The government ignores the biased jury for the first 66 pages of its brief, and then downplays the extent of Conrad's massive bias and fraud. Instead, it provides a deeply misleading account of the trial record. Apparently the government hopes that its false portrayal of Parse's conduct will deter this Court from remedying the miscarriage of justice that occurred here, even though a new trial is *always* required where the jury was biased. In any event, there is no evidence supporting the government's assertions that Parse sent "revised" account statements to anyone, or that he executed transactions against clients' wishes, or suggested that anyone deceive the IRS. The government defends sufficiency based on these and other misstatements contradicted by the actual evidence. In doing so, it also ignores all the evidence that Parse had no tax expertise and relied in good faith on those who did to ensure the transactions he worked on complied with the law. The evidence against Parse was so weak that Conrad herself conceded that she had sought to convict Parse on all charges, but had to "throw in the towel" on the charges that required willfulness.[2]

When the government finally reaches the waiver issue, it contends that Parse's attorneys knew during trial that Conrad had perjured herself and "gambled on the verdict," with the goal of raising her misconduct later if there was a conviction. But this is demonstrably wrong: the post-trial motions B&R filed

---

[2] (A-4939).

before they ever saw Conrad's letter *did not raise juror misconduct*. Had B&R known of Conrad's perjury, that would have been the time to raise it. But, it was only after the government disclosed Conrad's fawning letter to AUSA Okula that B&R commenced an investigation that led to its *second* new trial motion, which first raised Conrad's bias. The government conspicuously avoids mentioning the original post-trial motion anywhere in its 122-page brief, even mislabeling Parse's ineffective assistance motion as his "second" new trial motion. It seeks to affirm the conviction based on a "sandbagging" theory that is conclusively disproven by the actual facts.

Likewise, the government ignores most of the authority we cite on waiver and ineffective assistance. For example, we argue that, where there is clear and unequivocal evidence that a conviction was tainted by actual bias, the conviction cannot stand, irrespective of ordinary waiver principles. Decisions of the Supreme Court, this Court, and other courts of appeals show that the need to remedy such a fundamental miscarriage of justice outweighs the "sandbagging" and other concerns that justify waiver rules. The government never offers any response to this point. Its *pièce de résistance*, *United States v. Ragland*, 375 F.2d 471 (2d Cir. 1967), is a half-century-old case that it never bothered to cite below. And, like its other waiver cases, *Ragland* involves a garden-variety, unsubstantiated post-trial

claim of juror bias. It therefore has no bearing on Parse's arguments or the unique facts of this case.

As demonstrated below, the government's remaining arguments are equally toothless. This Court should reverse or, at a minimum, grant David Parse the fair trial that he never received.

## ARGUMENT

## I.  PARSE DID NOT WAIVE CONRAD'S PROVEN BIAS

All the government's legal and factual arguments in defense of the waiver ruling are unavailing.

### A.  The Government Mischaracterizes The Standard Of Review

*First*, appellate review of "whether a defendant has effectively waived his federal constitutional rights in a proceeding" is *de novo*, not for abuse of discretion. (GBR-86).[3]  *See, e.g.*, *Oyague v. Artuz*, 393 F.3d 99, 104 (2d Cir. 2004); *see also United States v. Carmenate*, 544 F.3d 105, 107 (2d Cir. 2008); *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam).  Moreover, a "district court abuses its discretion 'when…its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding.'" *United States v. Cedeño*, 644 F.3d 79, 81 (2d Cir. 2011).

---

[3] "GBR" refers to the government's brief; "BR" refers to Parse's opening brief. The case the government cites, *United States v. Rigas*, 583 F.3d 108, 125 (2d Cir. 2009), does not involve a claim of juror bias, or waiver of a constitutional right.

*Second*, the government erroneously suggests that Parse must establish his innocence to obtain a new trial free of juror bias. (*See* GBR-82-83 (citing cases involving claims that verdict is against weight of evidence)). But it is settled law that a defendant has no obligation to show actual prejudice if the jury was biased; a new trial is automatically granted. *See, e.g.*, *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 549, 556 (1984); *United States v. Nelson*, 277 F.3d 164, 204 n.48 (2d Cir. 2002); SPA-48.

### B. Conrad's Proven Bias Is Not Waivable

1. From the government's portrayal of the proceedings below, one would never know the extraordinary extent of Conrad's proven, pro-government bias. The government is vague, saying only that Conrad engaged in "misconduct" (GBR-3, 32-33, 78-79, 82, 86, 101 n.34, 105), or "lied during voir dire" (*e.g.*, GBR-78). It even suggests that Parse somehow "benefited" from Conrad's presence on the jury. (GBR-106; *see also* GBR-114). In fact, the district court unequivocally found that:

- Conrad's letter to Okula revealed that she "identified with the Government" and "saw herself not as a fact-finder," but as a pro-government "partisan." SPA-40-41. Her specific bias against Parse "bled through" in her assurance to Okula that she "wanted to convict [Parse] 100%" and "did fight the good fight" against his acquittal on any counts, but ultimately "had to throw in the towel" on the "conspiracy charge." SPA-7, 40.[4]

---

[4] Conrad's letter was no congratulatory note to "Government personnel" (GBR-68), but a sycophantic personal message to Okula. (A-4939 ("(Do I smell

5

- Conrad made clear in her testimony that she believed, before trial began, that the defendants were "crooks." SPA-14.

- "Not only did Conrad lie" about herself on voir dire, "she created a totally fictitious persona in her drive to get on the jury," revealing her "strong personal interest in the outcome of the case." SPA-44.

- Conrad's "breathtaking" perjury at voir dire *alone* demonstrated her bias, because it showed "she is inherently unable to perform the crucial function of ascertaining the truth." SPA-46; *see also* SPA-44. A "mountain" of evidence demonstrated that Conrad "is a pathological liar who does not know the difference between truth and lie," and whose presence was "simply intolerable." SPA-46-47.

- Conrad's "erratic" behavior and fundamental "contempt for the judicial process" reflected "significant mental instability" and a "serious mental problem" that had been "exacerbated by many years of alcohol abuse." SPA-47-48. For example, "[w]hen asked if she had lied about not being a lawyer because no one specifically asked her [about it], Conrad responded, 'Sir, that's posing the quantum theory, if the tree doesn't fall and nobody sees it.'" SPA-48.

- "[S]uch a person has no business sitting on a jury in judgment of others." SPA-48.

- Conrad's actual bias against the defendants and "sweeping dishonesty" made her unfit to "evaluate the credibility of witnesses, much less sit in judgment of others who are accused of fraud." SPA-44.

---

competition for [U.S. Attorney] Mr. Bharara?? – no, I could not have said that !!)"). Conrad described herself physically, included her cell phone number because that is how she was "most accessible," and posted the letter with a "Love" stamp. (A-4939; A-5658-59/196-97; A-4937). Conrad even "included her cell phone number in the return address" of the letter. SPA-41.

These are just a few examples of the travesty of justice that infected Parse's trial and that compelled the district court to conclude that the trial was fundamentally unfair.  SPA-44, 46, 63.  The government acquiesced in that finding; expressly conceded at sentencing that Conrad was "incapable of weighing evidence, measuring credibility, and applying the law as instructed" (A-6087-88); and does not challenge the finding on appeal.

2.     Given the overwhelming evidence that Parse's conviction was rendered by an *actually* biased juror who perpetrated a massive fraud on the court, his right to an impartial jury could not have been waived.  The Supreme Court and numerous courts of appeals have made clear that trial before a biased juror is akin to no trial at all.  *See, e.g.*, *Clark v. United States*, 289 U.S. 1, 11 (1933); *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) (en banc) (Kozinski, J.); (BR-45).  This concern is particularly acute here because "[a] perjured juror is…incompatible with our truth-seeking process."  *Dyer*, 151 F.3d at 983; (BR-36, 45).

The right to trial by an impartial jury is so fundamental to our justice system that this Court has indicated it might be categorically unwaivable.  In *Nelson*, this Court stated that "'a defendant cannot waive those rights without enforcement of which the proceedings against him would be fundamentally unfair.  *Among such non-waivable rights would be the right to be tried by an impartial tribunal*.'"  277

F.3d at 205 (quoting *United States v. Fay*, 300 F.2d 345, 350-51 (2d Cir. 1962)).

This Court expressed "continued allegiance" to *Fay*'s "powerful dicta that the right

to an impartial fact finder might be inherently unwaivable." *Id.*; (*see* BR-35-36).[5]

The Supreme Court has held that numerous fundamental constitutional rights

are not waivable, either at all or by a criminal defendant alone. These rights

include the right to a trial by a judge appointed pursuant to the Appointments

Clause; the right to no fewer than 12 jurors; and the right to trial by jury. (BR-38-

39). There is good reason to think the right to an *impartial* jury—a fundamental,

structural guarantee just as, if not more, important than these other rights—should

be categorically unwaivable too.[6]

But this Court need not go so far in order to reverse because Parse is arguing

that the right to an impartial jury is not waivable when there is clear and

_____

[5] The government points out that *Nelson* involved a for-cause challenge and an equal protection violation. (GBR-87-88). But that does not undermine the force of the Court's strong endorsement of the principle that a defendant's right to be tried by an impartial tribunal cannot be waived. *See* 277 F.3d at 205-07.

[6] The government apparently does not dispute that the right to be tried before a jury free from bias is fundamental and structural, or the well-settled principle requiring automatic reversal upon a showing of bias. (BR-35-36). Nor does the government challenge our analogies to the Appointments Clause and the right to 12 jurors. It does say the right to an impartial jury is not as fundamental as the right to trial by jury, because the Tenth Circuit found that analogy inapt in *United States v. Durham*, 139 F.3d 1325, 1333 (10th Cir. 1998). (GBR-92). But *Durham* concerned only "what constitutes a valid waiver to defective jury composition" where a juror came "from outside of the district." *Id.* at 1332-33. Unlike here, there was no "'inherently personal right of fundamental importance…involved.'" *Id.* at 1333.

unequivocal evidence of actual jury bias.  In those rare cases, this Court has uniformly granted a new trial, regardless of whether the defendant or his lawyer arguably should have objected to the juror earlier.  *See Nelson*, 277 F.3d at 204-05; *United States v. Rattenni*, 480 F.2d 195, 196-97 (2d Cir. 1973).

3.     The government takes the extreme position that the right to an impartial jury is *always* waivable, even in the face of clear and unequivocal evidence of juror bias.  It relies primarily on *Ragland*, *supra*.  (GBR-84-85).  If *Ragland*, which was decided 47 years ago, controlled, surely the government or the district court would have cited it below.  They did not, because *Ragland* does not remotely stand for that proposition.[7]

In *Ragland*, the defendant and his counsel knew that several members of the venire had previously served on the jury in a similar case with overlapping witnesses, but never objected to the composition of the jury.  375 F.2d at 475.  The Court held this waived the defendant's right to an impartial jury.  *Id.*  In *Ragland*, unlike here, there was no judicial finding of actual bias.  In fact, it was clear that the bias claim was meritless.  The Court emphasized that "federal courts have uniformly" held that such prior jury service does not indicate bias, *id.* at 476 n.2,

---

[7] The government ignored *Ragland* in its briefs below arguing that the right to an impartial jury is waivable.  Dkt. No. 491 at pp.10-18; Dkt. No. 523 pp.33-44.

and subsequently held in a related case that it did not.  *See United States v. Haynes*, 398 F.2d 980, 985-86 (2d Cir. 1968).

*Ragland* thus provides no support for the government's contention that the right to an impartial jury is always waivable.

4.      Numerous decisions in the Sixth and Eighth Circuits apply the rule that we advance here.  *E.g.*, *Franklin v. Anderson*, 434 F.3d 412, 428 (6th Cir. 2006) ("There is no situation under which the impaneling of a biased juror can be excused."); *Johnson v. Armontrout*, 961 F.2d 748, 754 (8th Cir. 1992) ("When a defendant fails to object to the qualifications of a juror, he is without remedy only if he fails to prove actual bias.  If a defendant proves that jurors were actually biased, the conviction must be set aside." (citation omitted)); *United States v. Dean*, 647 F.2d 779, 783 (8th Cir. 1981) ("In this case we are confronted with actual, not potential, juror bias.  We cannot permit actual, proven bias which prevents a juror from impartially deciding the case, without doing incalculable harm to the jury system as an institution."), *rev'd en banc*, 667 F.2d 729 (1982). (*See generally* BR-37-38, 45-46 (collecting cases)).  The Tenth and Eleventh Circuits have also explicitly distinguished ordinary situations of waiver from "*exceptions* when the [juror] conduct alleged clearly affects the fundamental fairness of the proceedings."  *Vanderwater v. Hatch*, 835 F.2d 239, 244 (10th Cir. 1987) (emphasis added); *see also Rogers v. McMullen*, 673 F.2d 1185, 1190 (11th

Cir. 1982) (defendant who does not object at voir dire "must be afforded the opportunity to demonstrate that the juror was actually biased or incompetent").

The government points out that these cases are from other circuits, and urges the Court to ignore their reasoning, because the Eighth Circuit later found *Armontrout* "inconsistent" with prior decisions, and, sitting en banc, reversed the *Dean* panel. (GBR-90-91, 105). But the Sixth Circuit has never wavered from its position precluding waiver in a case like this one. And these decisions are persuasive authority, so any arguable internal split in the Eighth Circuit is irrelevant.[8] The only question for this Court is which opinions are right on the merits.

5.     None of the government's additional cases supports its position that the right to an impartial jury is waivable in the face of clear and unequivocal juror bias. Except for the en banc *Dean* opinion, all the government's other cases (*see* GBR-84-86, 88, 90, 92), like *Ragland*, applied the "waiver" principle to run-of-the-mill bias claims based upon speculative or, at best, equivocal evidence.[9] This

---

[8] *United States v. Johnson*, 688 F.3d 494 (8th Cir. 2012), did not address waiver when the defendant "prove[s] actual bias," as in *Armontrout*, and was therefore careful to distinguish *Armontrout* and its Eighth Circuit progeny only "[t]o the extent [they] conflict with our previous precedent." *Id*. at 501.

[9] It is unclear whether bias was established in *United States v. Diaz-Albertini*, 772 F.2d 654 (10th Cir. 1985), but the Tenth Circuit subsequently held that when, as here, the juror's "conduct…clearly affects the fundamental fairness of the proceedings," there can be no waiver. *Vanderwater*, 835 F.2d at 244.

case could not be more different. There is no doubt as to Conrad's actual bias—it was clearly and irrefutably established after an evidentiary hearing. As explained, the extent of Conrad's bias and the elaborate fraud she perpetrated appears unprecedented. It certainly has no analog in any case we are aware of.

The government asserts that the "waiver rule" "would be a hollow one if it applied only in the absence of bias or prejudice." (GBR-94). But there is a "paucity of cases in the federal courts which have dealt with proven juror bias" because "'actual' juror bias is difficult, if not impossible, to prove." *Dean*, 667 F.2d at 732. The quantum of evidence necessary even to justify a hearing is extremely high, and rarely emerges. *See United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (post-verdict evidentiary hearings into juror misconduct "should be avoided whenever possible" and only "when a party comes forward with 'clear, strong, substantial and incontrovertible evidence...that a specific, non-speculative impropriety has occurred'"). Parse's argument therefore leaves the waiver doctrine unaltered in the vast majority of cases. The right is unwaivable only in the exceedingly rare case where the verdict is tainted by clear and unequivocal evidence of actual juror bias.

6. The government is unable to cite a case to support its sweeping rule that the right to an impartial jury is always waivable, no matter how biased that

12

juror later is found to be. Instead, it argues that this rule is necessary to deter "sandbagging." (GBR-85-86, 89, 90-92). This argument fails for several reasons.

*First*, the risk of sandbagging is low to non-existent where there is clear and unequivocal evidence of juror bias. Where there is only some vague whiff of bias, a lawyer might decide to withhold a potential trump card in case of a guilty verdict. For example, suppose a juror has a relationship to law enforcement agents not involved in the case. The lawyer is aware of this fact, but it does not come up on voir dire. Suppose further that the lawyer feels this potential negative is outweighed by his sense that the juror could be fairer to the defense than others on the venire. In this scenario, a reasonable lawyer might opt to forego an inquiry into potential juror bias, because he would rather keep the juror and "gamble" on the verdict. This is the sort of situation presented in the waiver cases the government cites. (GBR-85-86, 94-95).

Parse's case is dramatically different because, under the district court's reasoning, his lawyers had actual knowledge that Conrad was an "imposter" who perpetrated a massive fraud to get on the jury. (SPA-28, 36, 44). A juror like that is inherently biased against the defendant. *Dyer*, 151 F.3d at 983 ("Just as we would presume bias if the brother of the prosecutor were on a jury, we presume bias where a juror lies in order to secure a seat on the jury."); *id.* ("How can someone who herself does not comply with the duty to tell the truth stand in

13

judgment of other people's veracity?"); *id.* (juror who commits perjury cannot be expected to comply with "her responsibilities…to listen to the evidence, not to consider extrinsic facts, [and] to follow the judge's instructions"). There is no conceivable tactical upside to "gambling" on such a juror simply in the hopes of retaining the option to bring up the information post-trial. (BR-41-42).[10]

The government is unable to point to a single case in which a lawyer (or his client) concealed knowledge of clear perjury or bias during the trial in order to sandbag the court.[11] That is powerful evidence that "sandbagging" is simply not implicated in a case, like this one, involving purported knowledge of clear juror bias.

*Second*, even assuming some unreasonable lawyer might actually consider a sandbagging strategy in the face of actual evidence of juror bias, there are *already* adequate deterrents to such gamesmanship. It would be an ethical violation (and

---

[10] Similarly, if a lawyer has secret, concrete information not of perjury, but of other anti-defense animus (*e.g.*, the juror was overheard commenting that the defendant must be a crook because he was charged), any "gamble on acquittal" would likely lose because of the very anti-defendant bias the lawyer is concealing. It would make no sense to stand silent rather than bring that information to the attention of the trial court. Doing so would plainly amount to ineffective assistance, an ethical violation, and perhaps malpractice. As for the government's concern about any supposed incentive to "sandbag" if a defense lawyer has secret knowledge that a juror harbors anti-*government* bias (GBR-91-92), that scenario would provide no basis for an appeal if the "gamble" failed.

[11] Even in *Dean*, "appellant and counsel…had hearsay reports but no direct proof of the juror misconduct prior to the verdict." 647 F.2d at 785.

14

ineffective assistance) for a lawyer who knew that a juror was an "imposter" not to bring that information to the court's attention. (*See* BR-41-42, 49-50). The government offers no reason why the threat of suspension or losing one's law license is not a sufficient deterrent.

*Third*, any remaining concern about "sandbagging" is vastly outweighed by the need to remedy the fundamental injustice that occurs where there is clear and overwhelming evidence that a verdict is tainted by juror bias. *Nelson* illustrates the point. The government emphasizes that the defendants there initially made a for-cause challenge to the biased juror. But the question of waiver arose because African-American defendants accused of assaulting a Jewish person "expressly consented to" leaving a biased Jewish juror on the panel in exchange for adding African Americans to the jury. 277 F.3d at 204. In other words, the defendants gambled that their chances of a favorable verdict were better if they consented to the biased juror. Nonetheless, this Court allowed them to pursue that "waived" bias claim on appeal. *Id.* at 211. In so ruling, *Nelson* implicitly acknowledged that the fundamental injustice of a biased jury outweighs any sandbagging concern.

Likewise, in *Freytag v. Commissioner*, 501 U.S. 868 (1991), the petitioners expressly consented to a special trial judge, but "after the judge ruled against them" argued that his appointment violated the Constitution. *Id.* at 892-93 (Scalia, J., dissenting). The Court excused the waiver because of "'the strong interest of

15

the federal judiciary in maintaining the constitutional plan of separation of powers.'" *Id.* at 879. And it expressly found that critical structural aspect of the system significant enough to outweigh Justice Scalia's concern about sandbagging. *Id.* at 895; (*see* BR-39). The government has no answer to *Freytag*.

There are other situations in which ordinary principles of waiver give way because of a fundamental miscarriage of justice. For example, a defendant may waive the right to appeal or seek collateral relief when he pleads guilty, but such waivers cannot prohibit the defendant from later "alleging that ineffective assistance of counsel renders the plea agreement itself invalid," or from raising "potential constitutional problems" with his sentence. *United States v. Johnson*, 347 F.3d 412, 415 (2d Cir. 2003). Similarly, the Supreme Court has recognized a "miscarriage of justice" exception in extraordinary cases to permit federal courts to review waived federal habeas claims by a state prisoner. *E.g.*, *House v. Bell*, 547 U.S. 518, 536 (2006).

And though it involved a for-cause challenge, *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), is similar. (BR-42 n.18). The government dismisses *Martinez-Salazar*, but the Supreme Court there again expressly authorized a form of "sandbagging": choosing not to exercise a peremptory challenge against a juror who might be biased while still preserving the issue for appeal. *See* 528 U.S. at 315 (defendant "had the option of letting [the juror] sit on

16

the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal"). Justice Scalia, concurring in the judgment, took issue with that aspect of the majority's opinion, because "normal principles of waiver…disable a defendant from objecting on appeal to the seating of a juror he was entirely able to prevent." *Id.* at 318. But the Court disagreed. *See also Thompson v. Altheimer & Gray*, 248 F.3d 621, 623 (7th Cir. 2001) (Posner, J.) (interpreting *Martinez-Salazar* as permitting sandbagging).[12]

The government never acknowledges the miscarriage of justice that resulted from the imposter's presence on Parse's jury, or the harm to the judicial system

---

[12] *Ragland*'s waiver analysis was based primarily on an assumption that *Martinez-Salazar* rejected—that a defendant must exercise a peremptory challenge against a juror who may be biased. On appeal, Ragland argued that nine jurors were potentially biased; he had exercised only one of his 10 peremptory challenges. 375 F.2d at 475. To justify applying waiver, the Court focused on the failure to use the remaining peremptory challenges to strike the potentially biased jurors:

> [T]he purpose of requiring that the fitness of a juror be challenged at the inception of trial is to permit an inquiry into his impartiality at a time when he can be replaced if shown to be biased. *Were the rule otherwise, a defendant could, as appellant seeks to do herein, fail timely to exercise his challenges and, after verdict, claim prejudice on appeal if the verdict displeases him. In the instant case, for example, all nine jurors appellant now suggests may well have been partial could have been removed from the panel by the exercise of the nine unused peremptory challenges.*

*Id*. (emphasis added). *Martinez-Salazar* vitiates this reasoning.

that would be caused by allowing such a verdict to stand. As the *Dean* panel aptly observed:

> We cannot permit actual, proven bias which prevents a juror from impartially deciding the case, without doing incalculable harm to the jury system as an institution. "The truth pronounced by Justinian more than a thousand years ago that 'Impartiality is the life of justice' is just as valid today as it was then." [A]ctual bias…goes to the heart of the integrity of the judicial proceeding.

647 F.2d at 783.

*Finally*, the specter of "sandbagging" is not the only gamesmanship concern here. As this Court has held, permitting the government to use a waiver theory where a juror, as here, commits a massive fraud on the court is impermissible, because it would "giv[e] the government cause to believe that overlooking juror misconduct will preserve tainted convictions." *United States v. Colombo*, 869 F.2d 149, 152 (2d Cir. 1989). In *Colombo*, this Court ignored a waiver and remanded for a hearing on bias, explaining: "courts cannot administer justice in circumstances in which a juror can commit a federal crime in order to serve as a juror in a criminal case and do so with no fear of sanction so long as a conviction results." *Id.* at 152; (*see* BR-37). That is just what happened here. The government still has not prosecuted Conrad. The government fails to respond, fails to explain how its waiver theory can be squared with *Colombo*, and offers no remedy for the harm that Conrad has caused Parse and the judicial system.

18

### C. If A Defendant Can Waive The Right To An Impartial Trial Despite Clear Evidence Of Jury Bias, He Must Do So Personally And Knowingly

The decision to waive trial before an impartial jury is necessarily a personal one that a lawyer has no authority to make for the defendant. Because it is undisputed that Parse did not personally and knowingly waive Conrad's bias, there can be no valid waiver. (BR-23 n.11, 43-46).

1. The government strains to argue for plain error review of this argument (GBR-96), but the error was preserved. Parse's claim below that he did not waive his right to an impartial jury preserved his specific argument on appeal that he did not waive that right because B&R had no authority to do so without his consent. *See* Dkt. No. 497 pp.1-3; Dkt. No. 524 pp.9-13. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. Escondido*, 503 U.S. 519, 534 (1992); *see also Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006) ("[A]ppeals courts may entertain additional support that a party provides for a proposition presented below."); *United States v. Robinson*, 744 F.3d 293, 300 & n.6 (4th Cir. 2014) (general challenge below to defendant's criminal history score preserved more precise argument that prior conviction did not count as prior sentence); *United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008) ("overall argument" below that prior conviction was not a crime of

19

violence preserved new argument based on statutory text); *United States v. Guzman-Padilla*, 573 F.3d 865, 877 n.1 (9th Cir. 2009) (general argument that seizure was justified because probable cause was not required preserved new argument under "border search" doctrine). Thus, "[i]n federal criminal cases, Rule 51(b) tells parties how to preserve *claims* of error." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (emphasis added).

Moreover, Parse cited cases below, such as *Johnson v. Zerbst*, requiring personal waiver, thereby adequately putting the trial court "on notice" that personal waiver "concerns are implicated" here. Dkt No. 497 p.1; Dkt. No. 524 p.8. *See United States v. Dukagjini*, 326 F.3d 45, 60 (2d Cir. 2002) (argument below need only "put a trial court on notice that [the constitutional] concerns are implicated"); *United States v. Saldana*, 427 F.3d 298, 314 n.67 (5th Cir. 2005) ("A defendant's invocation of *Blakely* without further explanation is sufficient to preserve *Booker* error on appeal.").

Plain error review does not apply.

2.      The decision to "waive" a biased imposter's presence on the jury is not "the kind of strategic decision reserved to counsel." (GBR-96). The government's contention that "only four fundamental decisions" (GBR-96) are reserved to defendants personally is wrong. In *Gonzalez v. United States*, 553 U.S. 242 (2008), the Supreme Court's latest word on the subject, the Court did not

impose an arbitrary cap of four personal rights.  Instead, it held that a right is reserved to the defendant personally if it is a "basic right" that does not relate to the management of the trial.  (*See* BR-43-44).

The right to be tried before a jury free of bias is a basic right.  To be sure, some decisions relating to the composition of the jury and claims of potential bias may be strategic decisions that a lawyer is authorized to make.  (GBR-96-97).  But the decision to leave a known perjurer on the jury is *never* a legitimate strategy, because it is tantamount to a decision not to be tried by a jury at all, *Dyer*, 151 F.3d at 983; *supra* p.7—a decision the government itself *concedes* is one of the "four fundamental decisions" reserved to "defendants personally."  (GBR-96); (BR-45-46).

3.      Even if the issue had not been preserved, the error is plain.  If a biased jury can be waived, it is "clear under current law" that defense counsel cannot do so unilaterally.  *United States v. Olano*, 507 U.S. 725, 734 (1993).  It is the logical consequence of clearly established Supreme Court case law.  (BR-43-46).  Indeed, *Ragland* held that there was a waiver because "it [wa]s certain that *both* appellant *and* his counsel" were aware of the facts indicating potential juror bias.  375 F.2d at 475 (emphasis added).

### D.    B&R Did Not Waive Conrad's Bias

Even if B&R could unilaterally waive Conrad's bias, the district court's finding that they did so was fatally flawed by multiple factual and legal errors. (BR-47-58). The government tries to shield these errors from review by mislabeling them as credibility determinations. But the government ignores key uncontroverted facts demonstrating that B&R did *not* know of Conrad's perjury before the verdict and never contemplated any sandbagging strategy. It also has no response to controlling authority that it was clear error for the district court to make findings without even acknowledging such undisputed evidence. The government is also unable to refute that the district court applied incorrect *legal* standards in three independent respects. (BR-47-58).

### 1.    *The District Court's Findings Were Clearly Erroneous*

The district court's "knowledge" finding, like the government's brief, ignores indisputable evidence that B&R did *not* actually know, during trial, of Conrad's extraordinary perjury.

The notion is completely inconsistent with B&R's conduct following the verdict. The government contends that at the end of the trial, B&R deliberately left a known perjurer on the jury so that, if Parse were convicted, they could later seek

a new trial on the ground that Conrad was biased. (GBR-106).[13] But it fails to explain why B&R did not act on their knowledge before they saw Conrad's letter.

B&R filed post-trial motions on June 7, 2011, several weeks before the government disclosed the letter. This was the time for them to execute their supposed "sandbagging" strategy and play the alleged trump card, but the motion did not mention juror misconduct. (BR-32-33). What was B&R waiting for? It is crystal clear that B&R did not even *contemplate* any juror bias motion until they received the letter. Tellingly, the government nowhere mentions the June 7 post-trial motions, or undisputed evidence that before the letter's disclosure, B&R was researching several potential appellate issues *but not juror misconduct*. (BR-32-33). The undisputed evidence conclusively disproves the "sandbagging" theory.

It is also undisputed that it was Conrad's disturbing letter to Okula that led B&R to retain someone to investigate her background. It was only *after* that investigation, armed with Conrad's newly revealed phone number, that they developed conclusive evidence of her perjury and bias. (BR-33). If Conrad had not sent the letter, there would have been no investigation and no motion for new trial based on her bias.

---

[13] The government apparently no longer disputes that B&R concluded following voir dire that Juror No. 1 and the suspended lawyer were two different people.

The government also cannot square the district court's findings with other undisputed evidence showing that B&R did not know of Conrad's true identity during trial. Even if Traszkoma's "Jesus" email reflected her belief at the time she sent it, there was uncontroverted evidence that she and her partners subsequently concluded that Conrad could not be the suspended attorney. That evidence included testimony from two witnesses with no stake in the outcome, whose credibility neither the government nor the district court ever questioned: the two lawyers for Defendant Brubaker who testified that during the trial, in two separate conversations that occurred after the discovery of the Westlaw report, different B&R attorneys stated that they had specifically considered and *rejected* the possibility that Juror No. 1 was suspended lawyer Conrad. (BR-31-32). The government cannot reconcile this undisputed evidence with the picture it wants to paint about B&R's conduct, and so does not even try.

Contrary to the government's argument, the district court made few credibility findings, explicit or implicit. Most of those findings, moreover, related to its criticism of the way B&R handled the post-trial motions, which is legally irrelevant, as explained below.[14]

---

[14] The government also fails to grapple with Professor Gillers's opinion that B&R did not act unprofessionally. (BR-56).

But even if the district court had made any legally relevant credibility findings, that would not change the result. A district judge may not "insulate his findings from review by denominating them credibility determinations" when those findings are "contradict[ed]" by "[d]ocuments or objective evidence." *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) ("Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based upon a credibility determination."); *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395-96 (1948) (clear error to rely on testimony by multiple witnesses "[w]here such testimony is in conflict with contemporaneous documents"); *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (Sotomayor, J.) ("[R]eviewing for clear error allows an appellate court to examine the district court's credibility determinations in light of the evidence in the record as a whole, in order to determine whether the credibility assessment can be reconciled with other evidence….").

The district court's purported "credibility determinations" are thus irrelevant, because the court committed clear error by failing to resolve, synthesize, or even *acknowledge* the mountain of other undisputed evidence contradicting its finding of B&R's knowledge. *See United States v. Cerna*, 603 F.3d 32, 39-40 (2d Cir. 2010) (clear error to fail to "resolve[] the apparent conflict between the evidence" or "'synthesize the evidence in a manner that accounts for conflicting

evidence'"); (BR-53-56). The government makes no effort to dispute this well-settled principle or distinguish any of these controlling authorities.

The district court's purported inference of knowledge is "[im]plausible in light of the record viewed in its entirety" in other respects as well. *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003) (citing *Anderson*, 333 U.S. at 573-74). (*See generally* BR-57). The district court's hindsight-biased findings and the government's defense of them fail to account for the realities of trial practice, including the quick judgment calls the attorneys had to make on the Conrad issue in the midst of numerous other pressing issues. (*See* BR-29). As this Court explained in *Doe v. Federal Grievance Committee* :

> We must always be mindful that the perspective of a judge differs greatly than that of the practicing attorney. "From the perspective of [a]…judge…a particular fact may be as clear and certain as a piece of crystal or a small diamond. A trial lawyer, however, must often deal with mixtures of sand and clay. Even a pebble that seems clear enough at first glance may take on a different hue in a handful of gravel."

847 F.2d 57, 63 (2d Cir. 1988) (quoting *Nix v. Whiteside*, 475 U.S. 157, 190 (1986) (Stevens, J., concurring).

Finally, the government does not dispute Parse's argument that the district court's alternative finding that B&R failed to exercise reasonable diligence was clearly erroneous. (*See* BR-57).

## 2. *The District Court Applied The Wrong Legal Standards*

*First*, the district court applied the wrong legal standard by relying on what it found B&R merely "believed," rather than what they actually knew. SPA-55-56, 58, 59 n.11; (BR-47-49). The government apparently agrees that as a matter of law, mere belief is not equivalent to knowledge, for it does not take issue with that argument or the authorities supporting it. (*See* BR-49-51). Instead, the prosecution insists that because the court used the word "knowledge" in a heading and a concluding sentence, it must have correctly found knowledge. (GBR-100 (citing SPA-55, 59)). It also argues that Judge Pauley used the word "belief" to somehow "underscore" or "emphasize the extent of Trzaskoma's knowledge." (GBR-100-01). These arguments miss the point. The district court's *analysis* in reaching its purported conclusion found nothing more than Trzaskoma's "belief." (*See* BR-47-48); *see also Daugerdas-II*/SPA-69. And belief, however extensive, is as a matter of law different from, and far less certain than, knowledge. (BR-47); *United States v. Golomb*, 811 F.2d 787, 792 (2d Cir. 1987); *Doe*, 847 F.2d at 63. Even if Trzaskoma "in fact had come to 'believe'" Juror No. 1 was the suspended lawyer, as the government contends (GBR-101), that does not establish her *knowledge*.

*Second*, the government makes only a half-hearted effort to defend the district court's application of a "reasonable diligence" standard. (*See* GBR-104-

05).  This is not surprising, given its concession that waiver requires "intentional[ly]" giving up a "known right."  (GBR-83, 107).  The government even urges the court "not [to] reach this issue" (GBR-104), and, as noted, does not dispute that the district court's purported fact-finding under this standard was itself clearly erroneous (*see* BR-57).

In any event, Judge Pauley's principal case, *Johnson v. Hill*, 274 F.2d 110, 116 (8th Cir. 1960), involved an unproven claim of potential bias, and the misconduct had no effect on the appellant's "substantial rights."  (*See* BR-52).  *McDonough* cited *Johnson*, but *McDonough* itself requires that the misconduct be "known."  464 U.S. at 550 n.2.  The government's cited cases from this Circuit do not involve juror misconduct motions, but rather motions for new trial based on newly discovered *exculpatory* evidence.  *See United States v. Siddiqi*, 959 F.2d 1167, 1172 (2d Cir. 1992); *United States v. Persico*, 645 F.3d 85, 108-09 (2d Cir. 2011).

The reason the government was unable to cite any Second Circuit cases supporting its argument is that this Court does not apply its "newly discovered evidence" due diligence test to Rule 33 motions based on juror misconduct.  *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 303-04 (2d Cir. 2006); *United States v. Stewart*, 590 F.3d 93, 133-34 (2d Cir. 2009); *United States v. Langford*, 990 F.2d 65, 68-69 (2d Cir. 1993).  This is obvious from that test itself: in addition to

being "'newly discovered,'" the "'evidence'" has to be "'material,'" "'not merely cumulative or impeaching,'" and "'likely [to] result in an acquittal.'" *Persico*, 645 F.3d at 109; (*see* GBR-83). Those criteria have nothing to do with whether newly discovered evidence shows that a juror was biased.

*Third*, the only evidence on which the district court based its purported "knowledge" finding, other than the "Jesus" email, was the court's negative interpretation of "[t]he actions of Parse's attorneys in connection with the new trial motion." SPA-56. But those actions, long after the trial, are not legally probative of what B&R knew at the relevant time. (*See* BR-56-57). The government has no response to this legal argument.

*Finally*, punishing Parse when he was not involved in his attorneys' alleged misconduct was legally erroneous, because if there was misconduct the proper remedy was to refer the attorneys for a disciplinary inquiry. (*See* BR-58). The government attempts to distinguish *Mitchell v. Lyons Professional Services, Inc.*, 708 F.3d 463, 469 (2d Cir. 2013), by claiming that Parse "stood to benefit" from keeping Conrad on the jury, and "appears to have benefitted to some degree" because of the split verdict. (GBR-106). This is squarely at odds with the district court's unequivocal and emphatic finding that Conrad was a pro-government "partisan" who had no business sitting in judgment of the defendants, and, in her own words, "'did fight the good fight' against acquitting Parse on *any* counts."

29

SPA-40 (quoting Conrad's letter, *see* A-4939 (emphasis added)). Apparently the government's view is that Judge Pauley's findings on waiver are entitled to great deference no matter what their flaws, but his factual findings on Conrad's extraordinary bias are due no weight—even though the government acquiesced in them, opted not to exercise its right to appeal them, and even sought to use them to its advantage at sentencing. *See supra* p.7. As the *Dean* panel held, "[t]he way to address counsel's unjustified delay in raising…juror bias is to proceed against counsel in the appropriate forum" rather than punishing the defendant. 647 F.2d at 783.

### E.     Parse Is Entitled To A New Trial On Plain Error Review

The government appears to concede that plain error review applies if there was no "intentional" relinquishment of Parse's right to an impartial jury. (*See* GBR-107); *see also United States v. Johnson*, 688 F.3d 494, 506-07 (8th Cir. 2012) (Melloy, J., concurring in part) (plain error review applies to unpreserved claim of juror partiality when there is no knowing waiver).

By definition, the failure to remedy a verdict tainted by a biased juror affects "substantial rights." *See Gomez v. United States*, 490 U.S. 858, 876 (1989); *Nelson*, 277 F.3d at 206; (BR-35-36). The government does not cite any case suggesting otherwise. It does say that the evidence was "abundant" (GBR-107),

but even if that were true it would be irrelevant in this extraordinary context.  In any event, as explained *infra* the evidence was paper-thin at best.

## II.    IF B&R KNOWINGLY WAIVED CONRAD'S BIAS, THEY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL

The government argues that a defendant convicted by a pro-government partisan juror can "waive" the right to a new trial solely because of the inappropriate conduct of his lawyer.  At the same time, it argues that the lawyer's conduct causing that purported waiver is not ineffective assistance of counsel.  This "heads I win, tails you lose" approach would sanction a tainted verdict and pervert our most basic principles of justice and due process in criminal proceedings.  It is not the law.  It is never a constitutionally reasonable strategy to subject a client to a biased jury, and the deprivation of the right to an impartial jury is a fundamental defect in the proceedings that necessarily prejudices the defendant.

### A.    Failure To Object To A Juror Known To Be Biased Is Not Constitutionally Reasonable Strategy

1.    All the courts of appeals that have addressed the question have squarely held that it is unreasonable for a lawyer to sit silent in the face of a juror's obvious bias.  (BR-61-63, 69 (discussing case law in Fifth, Sixth and Eighth Circuits)).  Where the bias manifests itself in the form of blatant perjury by the juror, the lawyer's performance is even more deficient than in these prior cases,

because it also violates the lawyer's ethical obligations. (*See* BR-64-65). The government does not address these holdings, or the ethics problem, because it has no response.[15]

The government also ignores that, if this Court affirms the district court's finding that B&R failed to reasonably investigate Conrad's bias (for waiver purposes), then B&R necessarily rendered unreasonable performance (for *Strickland* purposes). (BR-65-66). Either B&R's failure to investigate was reasonable or it was unreasonable. The district court's conclusion that it was *both simultaneously* defies logic and common sense.

2. The government tries to paint the decision to leave Conrad on the jury as "strategic." (GBR-112-14). If, as Judge Pauley found, B&R actually knew of Conrad's bias but failed to object to it, *see* SPA-69, there was no constitutionally legitimate "strategy" in doing so. (BR-66-69). "There are many ways properly to assist a client" for *Strickland* purposes, but "making important decisions with no regard for a client's interests is not one of them." *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001). A "strategic" decision must be "'*sound* trial strategy,'"

---

[15] Contrary to the government's argument (GBR-116), *Morales v. Thaler*, 714 F.3d 295 (5th Cir. 2013), is consistent with the Fifth Circuit's repeated holdings that the failure to strike an obviously biased juror is deficient performance under *Strickland*. *See Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006); *Biagas v. Valentine*, 265 F. App'x 166, 172 (5th Cir. 2008). *Morales* held that the failure to strike a juror who "swore that she could be fair and impartial" who defense counsel "thought to be fair" was not deficient performance. 714 F.3d at 305. The court also expressly distinguished *Virgil*'s facts. *Id.* at 305-06.

*Strickland v. Washington*, 466 U.S. 668, 689 (1984) (emphasis added) taken "with an eye to benefitting [the] client." *Pavel*, 261 F.3d at 218 (emphasis added). None of the government's "strategy" theories fit the bill.

*First*, the government suggests that B&R might have thought Conrad "would more likely help than hurt the defense." (GBR-114). But Conrad was an "imposter" who committed an "extensive[]," "breathtaking" and "criminal" fraud on the court in order to serve on the jury. As Judge Pauley explained, this proved her inherent bias. SPA-44 ("Someone who commits fraud to get on a jury cannot…sit in judgment of others who are accused of fraud."). If B&R knew Conrad had committed such a massive fraud, they could not reasonably have left her on the jury, because such a perjurer is presumed to be unable to be fair to the defendant. *See supra* p. 13-14; (BR-67).[16]

 *Second*, the government asserts that a reasonable lawyer might have kept Conrad's bias secret because "the presence of a biased juror can provide a basis for an appeal." (GBR-114). As explained, this makes no sense. No reasonable lawyer would subject herself to challenge on ineffectiveness grounds, not to mention disciplinary action, particularly when the "client has little, if anything, to

---

[16] The government asserts that because the decision not to object to Conrad was "clear and conscious," it was "strategic." (GBR-113-14). The cases it cites, however, do not involve *Strickland* claims. To be constitutionally reasonable under *Strickland*, a "strategic" decision must be more than just "conscious," it must be "made…with an eye to benefitting [the] client." *Pavel*, 261 F.3d at 218.

gain and everything to lose through such a strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 382 n.7 (1986); (BR-67, 41); *supra* p.14-15.

*Third*, the government seeks to portray the district court's finding as "consistent with numerous decisions" where the juror's bias is not known, but merely suspected. (GBR-112). But all of the cases it cites involve the failure to object to "problematic" members of the venire who "equivocated" or "expressed doubts" about their ability to be impartial. None involves the situation that, under the district court's findings, is presented here.

Courts are "'not required to condone unreasonable decisions parading under the umbrella of strategy.'" *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009); *see also United States v. Richardson*, 238 F.3d 837, 841 (7th Cir. 2001) (Posner, J.) ("a waiver for which there was no strategic reason" is "a ground for…a new trial"). If B&R did know of Conrad's bias and did nothing about it, they rendered constitutionally unreasonable performance.

**B.     Prejudice Should Be Presumed**

The government contends that prejudice should not be presumed when counsel's ineffective assistance results in a biased jury. It argues that this Court's previously recognized circumstances for presuming prejudice are "narrow." (GBR-115). But the government ignores that, under *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993), a prejudice inquiry is impermissible where, as here, there is

no constitutionally valid jury verdict to examine. *See also United States v. Birbal*, 62 F.3d 456, 461 (2d Cir. 1995) (applying *Sullivan* and concluding that "*prejudice may be presumed*" for plain error review where jury receives deficient reasonable doubt instruction (emphasis added)); (BR-72-73). The verdict of a biased jury is also not a verdict within the meaning of the Sixth Amendment. (*See* BR-72). *Sullivan*'s logic applies here and compels the same presumption of prejudice.

This Court has also never squarely addressed whether to presume prejudice under *Strickland* when a defendant was convicted by a biased jury, in light of the "structural" defect caused by the "breakdown in the adversarial process that our system counts on to produce just results." *Virgil*, 446 F.3d at 612-13. The government does not dispute that Supreme Court precedent shows that harmless error analysis is inconsistent with the structural error in this case. (BR-70-71). This is not surprising, because it has previously *acknowledged* that the structural error resulting from "biased jurors" may require presumed prejudice. *Gomez v. United States*, 705 F.3d 68 (2d Cir. 2013), involved the less fundamental structural error entailed by denial of the right to a public trial. In opposition to the defendant's petition for certiorari in *Gomez*, the Solicitor General conceded that an error caused by "*biased jurors*," could require a presumption of prejudice. Br. of United States in Opp., *Gomez v. United States*, No. 12-1212, 2013 WL 2483585, at

35

*18 (2012) (emphasis added). The government gives no explanation for its about-face here.

Instead, it argues that a presumption of prejudice would somehow "swallow" the waiver rule. (GBR-115-16). But the reason for presuming prejudice has nothing to do with waiver—it has to do with the fact that a new trial is guaranteed when a juror is proven to be biased. That is why ineffective assistance claims may proceed despite waivers in many other contexts. For example, this Court has held a defendant's waiver of the right to appeal or seek habeas relief in a plea agreement does not foreclose a defendant from arguing, on appeal, that his counsel's ineffective assistance rendered the plea agreement invalid. *Johnson*, 347 F.3d at 415.

### C.     Parse Was Actually Prejudiced

Even if prejudice is not presumed, Parse was plainly prejudiced. *See infra* Point III and pp.53-54.

## III.   THE EVIDENCE WAS INSUFFICIENT

For both mail fraud and tax obstruction, the government had to prove that Parse understood the tax law in the context of this case. (*See* BR-75-77, 94-95). There was no legally sufficient evidence proving this scienter.

Parse was a broker with no tax background. He executed financial transactions that had been approved by D.B.'s management and in-house lawyers.

36

He gave no tax advice, and relied in good faith on the approval process at D.B. and on tax experts at other institutions. As Judge Pauley found, Parse was "the most unfamiliar [of the defendants] with what the tax laws were" and had no "direct knowledge about it." (A-2365/8040-41). Viewed in the light most favorable to the government, the evidence shows that Parse believed in good faith that the tax professionals he relied upon were doing their jobs properly. There is no evidence that Parse altered, destroyed, or backdated any document, or lied about any of the transactions.

The government's response blatantly mischaracterizes the record. Sufficiency review requires the Court to view the evidence in the light most favorable to the government, and to draw *reasonable* inferences in its favor. But the government repeatedly distorts the witnesses' words and the context of their testimony to the point that its description of the facts bears no resemblance to the record evidence. This cannot save the conviction. *See, e.g.*, *United States v. Cassese*, 428 F.3d 92, 101-02 (2d Cir. 2005) (jury could not draw inference of guilt where government's conclusions were unsupported or "rest[ed] on the thinnest of evidentiary predicates"); *United States v. Wood*, 207 F.3d 1222, 1230-31 (10th Cir. 2000) (evidence insufficient where "government's characterization of the evidence" to argue for inference of scienter was "misleading and unpersuasive"). The government also ignores that if there is "equal or nearly equal circumstantial

support [for] a theory of guilt and a theory of innocence, then a reasonable jury

must necessarily entertain a reasonable doubt," and the conviction must be

reversed.  *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012); *United States v.*

*Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

### A.    The Government Repeatedly Mischaracterizes The Evidence

The government paints a false and misleading picture of Parse's conduct.

For example:

- Contrary to the government's assertion (GBR-23), Parse never sent anyone "revised account statements and other documents."  (*See* BR-14-15, 16).  As Parse's assistant Carrie Yackee testified, "[o]nce a statement was in final…no one could change it" and, to her knowledge, no one ever revised an account statement.  (A-1755/5612; *see also* BR-14).

- The government's assertion that Parse "repeatedly" executed transactions without consulting with clients (GBR-41-42) is false.  Parse executed transactions relying on instructions he received from J&G or their clients' other counsel; these lawyers were acting on their clients' behalf.  (*See* A-397/210; A-1927/6296-97; A-1130/3126; A-1598-99/4986-90; *see also* A-584/954-55; A-610/1059-60; A-858/2043).

- It is inconceivable that any rational fact-finder could infer that Parse knowingly executed transactions "contrary to [the] wishes" of client John Martin, as the government claims.  (GBR-42).  J&G discussed bond transactions with Martin, but subsequently instructed Parse to execute foreign currency option transactions.  (A-870-71/2090-92).  No one told Parse that Martin had approved a different transaction.  Martin signed trade confirmations agreeing to complete the transactions and told Parse that he wanted to proceed with them.  (A-885-86/2151-53; GX 55-4; A-871/2092-93).

- The government falsely claims that Parse "said" to John Olmsted, a client investing in one of several foreign currencies, that he could "pick either one, it's not going to matter."  (GBR-39).  The "testimony is

considerably more equivocal than in the Government's account." *Coplan*, 703 F.3d at 63. Olmsted could not remember the words Parse used, and testified that Parse told him there was potential to make a (low) profit, and that he hoped to make money. (A-1336/3945-46).

- The government distorts the record when it says that Parse "stated" to BDO accountant Paul Shanbrom that D.B. "would 'move the market' to prevent the unlikely occurrence of a client making a profit." (GBR-39). Shanbrom could not remember Parse's actual words (A-2211/7427-28), and testified that Parse's comment related only to the "lottery," a financial "gimmick[]" that J&G's Mayer testified was not necessary for the legality of the shelters. (A-2088-89/6939-41; A-2135/7123; A-1103/3017-18).

- Parse never gave anyone "advice about how to deceive the IRS." (GBR-42). Parse never told Larry Morgan to lie to the IRS and had nothing to do with Morgan's audit. Giving him a book was not criminal. *Cf. Coplan*, 703 F.3d at 65 (defendant's advice to engage in trading activity to bolster business purpose of tax shelter did not show intent criminal intent to deceive IRS).

- The government mischaracterizes the meeting between Daugerdas and the Calphalon clients. (GBR-42). Parse heard a "careful" and "robust" discussion between Daugerdas and several sophisticated clients, including a lawyer, about the tax law. He also heard Daugerdas's advice that the shelters had to have a profit potential to be legal, and that Daugerdas believed and would opine that the strategy was valid. (*See* BR-11, 13).

- The government cites testimony that one client later claimed he did not have non-tax reasons for entering into the shelter (GBR-42), but there was no evidence that Parse knew that. Also, that same client testified that, in fact, he entered into the shelter with a good faith belief in its legality. (A-1929/6304).

- Parse occasionally suggested investments in companies like Microsoft and Lucent, and some of his clients profited from these transactions. (BR-12-13). The government's assertion that Parse "called" these stocks "dog tech" or "fallen angel" stocks (GBR-42), is false. The email it cites

was written by Mayer, and not even copied to Parse. (A-4473-74; A-939/2367).

- The government falsely asserts that Parse "orchestrate[d]" and "designed" the tax shelters (*see*, *e.g.*, GBR-4, 5), when there is no evidence that Parse did any such thing. All Parse did was perform duties as a broker, such as executing transactions and explaining them to customers.

## B. The Government Failed To Prove "Fraudulent Backdating"

The government's primary trial focus was on the supposed "fraudulent backdating," but there was zero evidence to support its theory. Parse did not falsify, destroy, or alter any document. The D.B. records clearly show when the new transactions occurred and that they were "as of" an earlier date to reflect when the transactions "should have occurred." (*See* BR-14-17; *see also* A-1755/5612; A-1703/5405-06). The government is unable to dispute this.

In addition, the government fails to address the evidence that the use of "as of" dates was consistent with D.B.'s ordinary practices for correcting errors, and that these particular transactions were approved by other D.B. managers, not just Parse. (*See* BR-14-15). The government also ignores that the experienced tax preparers who prepared the clients' tax returns using the corrected transactions did so with full knowledge of the facts and apparently without any concerns about the legality of doing so. (*See* BR-17-18). In fact, none of the tax experts who testified and were aware of the relevant facts suggested that they believed there was anything improper about using those transactions. (BR-18 & n.9). Given the

40

complexity of tax laws generally, and particularly the supposed "annual-accounting 'system,'" no reasonable jury could infer beyond a reasonable doubt that Parse—unlike all these tax professionals—knew that the transactions were accounted for improperly.[17] (*See* BR-84-87); Point IV *infra*.

### C. No Reasonable Jury Could Find Beyond A Reasonable Doubt That Parse Knowingly Participated In Tax Shelter Fraud

There is no evidence from which a reasonable jury could infer that Parse was aware that the J&G shelters lacked economic substance, because there was no evidence that Parse even understood what the economic substance test was, let alone that the shelters failed that test.

The economic substance doctrine was, at the time of the trial, judge-made. The doctrine was nowhere in the tax code or IRS rules, was "not a model of clarity," and was "applied differently from circuit to circuit and sometimes inconsistently within circuits." *Coplan*, 703 F.3d at 91. There was no evidence that Parse ever thought about the substance of J&G's tax analysis, much less concluded it was wrong. On the contrary, the evidence showed the opposite: that he, like other J&G clients, relied on J&G (and D.B.'s in-house lawyers), and expected them to ensure that the shelters complied with the law.

---

[17] *United States v. Micke*, 859 F.2d 473, 478 (7th Cir. 1988) (cited GBR-43) and the cases cited at GBR-44 do not help the prosecution, because unlike this case, they involved falsifying records.

1.    The government primarily argues that it is reasonable to infer that Parse knew the tax shelters lacked economic substance because he received a J&G opinion letter for his own shelter in 2001,[18] which supposedly contained misrepresentations.[19]  But even the biased jury does not appear to have drawn that inference; it *acquitted* Parse of the tax evasion and conspiracy counts.  In doing so, presumably it followed the instruction that expressly required proof that he knew that the tax shelters failed both prongs of the district court's formulation of the economic substance test.  (*See* A-2579/8889-90 (requiring jury to find defendant knew *both* that "the relevant taxpayer had no business purpose for engaging in the transaction in question apart from the creation of the tax deduction" *and* "that there was no reasonable possibility that the transaction would result in a profit")).  And the jury also acquitted Brubaker, who was situated similarly to Parse and also received the same type of opinion letter.  (GX19-1; GX19-2).  This is not surprising, for J&G's other clients also received the same types of letters.  Many of them were sophisticated professionals, lawyers, and even accountants, and testified

---

[18] The government exaggerates Parse's income, falsely claiming that he tried to "evade taxes on $3 million of his own income."  (GBR-37).  In fact, Parse made far less in the year in question (*see* GX-1001-132), and was never charged with tax evasion for his personal transaction.

[19] Contrary to the government's argument (GBR-40-41), there was no proof that the representations were actually false.  The opinion letter for Parse's tax shelter was admitted by stipulation, and no witness testified about any of the representations in the letter.  (GX800-10).

that they believed in good faith that the shelters complied with tax law based on advice by J&G (and their individual tax advisors).  (*See* BR-10).  The government does not suggest that these taxpayers committed perjury or tax crimes.  And J&G's letter opined after extensive legal analysis that the shelters *had* economic substance.  (A-3666-88).

Nor does the evidence support the government's claim that Parse knew the taxpayers had no valid non-tax purpose.  It is insufficient that J&G's clients were *primarily* motivated by tax benefits.  The government had to show that they had *no* non-tax motive, that the transactions had no reasonable possibility of profit, and that Parse knew this.  But many clients testified that they hoped to make a profit on their investments (*see, e.g.*, A-426/328; A-443/394; A-580/941; A-883/2140; A-1336/3946; A-1602/5003; A-1656/5216), and thus did have a non-tax reason for engaging in the transactions.

As for "reasonable possibility of profit," the government does not, and cannot, dispute that Parse made money on his transaction, and heard Daugerdas opine that all that was required was some profit *potential*.  (BR-12-13).  As BDO's Greisman and J&G's Mayer testified, the transactions were real investments.  (A-662/1265-67; A-707/1443; A-1083/2937; A-1189-90/3362-64; A-1195/3385).  Before considering fees to J&G and BDO, many clients made money on the investments (A-1189-92/3361-71; A-1195/3385; A-1829/5906); and Greisman and

43

Mayer testified that the shelters could have had objective economic substance were it not for the professional fees.[20]  (A-769/1687-88; A-778/1724-25; A-916/2273-74; *see also* A-2454/8391-92).  The relevance of the fees to the profit potential analysis, moreover, was debated within J&G and BDO.  (A-734/1547-50; A-1223-24/3496-3502).  Daugerdas argued that profit potential should be calculated without regard to fees; and cooperator Mayer agreed until he pleaded guilty.  (A-916/2273-74; A-1223-24/3496-3502; *see also* A-734/1550).  But there was no evidence that Parse knew anything about these debates, or that fees could be relevant to economic substance analysis.  The J&G opinions did not address the issue, no one ever discussed it with Parse, and it apparently was not even clear among the tax experts.

2.     Parse's implementation of the corrective transactions does not bear on whether he understood the economic substance doctrine or how it applied to J&G's shelters, as the government argues.  (GBR-43).  To be sure, whether a transaction was in currency or stock affected whether clients could claim capital or ordinary loss; and the corrections were made because J&G had provided the wrong instructions to implement the clients' intent in that respect.  But that doesn't mean the client's only purpose was tax-related; it is just additional evidence of the

---

[20] The government's expert testimony that it was realistically impossible to profit from HOMER irrespective of fees (GBR-22) was not admitted to show any defendant's knowledge.  (A-2573/8868).

obvious fact that clients were primarily interested in saving taxes.[21]  *Cf. Coplan*, 703 F.3d at 74-75 (evidence insufficient to sustain tax obstruction conviction where taxpayers entered into tax shelters primarily to obtain tax losses, but also to hedge risk and potentially earn profit from the transactions).

3.     The government's remaining arguments rely on distorted evidence cherry-picked from its context.  (*See* GBR-38-43).  As explained *supra* pp.38-40, when this evidence is accurately considered in context, it is not suggestive of guilt, and, even when viewed in the light most favorable to the prosecution, gives "nearly equal circumstantial support to…a theory of innocence."  *Glenn*, 312 F.3d at 70. Thus, "a reasonable jury must necessarily entertain a reasonable doubt," *Coplan*, 703 F.3d at 69, and the convictions should be reversed.

## IV.    THE "ANNUAL ACCOUNTING" INSTRUCTION ERRONEOUSLY LOWERED THE SCIENTER STANDARD

The district court's instruction on the "annual accounting system" effectively lowered the scienter standard for the "backdating" allegations, by erroneously stating that there is an "annual accounting system" under which a particular year's tax return can never "take account of events occurring in later years."  (A-

---

[21] The government says that the statements reflecting the corrected transactions were sent only to clients' tax preparers, and "not to J&G or the clients themselves" (GBR-45), but this too is false.  The D.B. account statements showing the corrected transactions, like all D.B. statements, were sent to clients.  (*See* A-1503-04/4610-13; A-4492-95; A-1712/5441-43; A-1726/5496-98; A-3035-75; A-1737-38/5540-44; A-4513-43).

2576/8877).  The court mischaracterized the "annual accounting" rule as straightforward and equated it with conduct that is obviously wrong, such as "creat[ing] false documentation," "destroy[ing] documentation of income," and "fraudulent or deceptive conduct."  (*Id.*).  This signaled that any layperson would know that the alleged "backdating" (and its use on tax returns) was obviously illegal.  (*See* BR-82-88).  In reality, it was not at all clear, even to the tax experts who testified, that there was anything improper about using the corrective transactions on the prior year's tax returns.  By erroneously telling the jury, in effect, that no one could believe in good faith that such tax accounting could be lawful, the instruction vitiated Parse's defense.  It was profoundly misleading and prejudicial, and should not have been given.  *See United States v. Hassan*, 578 F.3d 108, 129 (2d Cir. 2008) (reversing conviction where instructions "left open the possibility that the jury could convict…on an improper basis" in light of scienter requirement); (BR-82-83, 87-88).

The government seeks plain error review, protesting that Parse did not object below that "Judge Pauley's language should have acknowledged that there are exceptions to the annual accounting rule."  (GBR-51).  But the error was giving the instruction *at all*.  This is the same argument Parse made below when he objected to the instruction.  Parse submitted a letter in response to the government's proposed annual accounting charge, specifically denying that annual accounting

"exists" as a "rule of tax accounting," and objecting that stating such a "rule" would be "misleading" to the jury. (A-2747-48). At the charge conference, Parse reiterated that, in light of the many exceptions to annual accounting, the "rule doesn't exist" as a "brick wall between tax years," *and* giving the instruction would impermissibly "fill a gap in [the government's] factual case." (A-2372/8067; A-2373/8072). Moreover, when the district court's adaption of the government's proposed charge exacerbated the prejudice—by eliminating any acknowledgment of "exceptions" to annual accounting (GBR-51 n.20; A-2846)—Parse submitted a letter objecting *again*. (A-2886). The government claims this letter "objected solely to other aspects of the charge" (GBR-51 n.19), but the letter *reiterated* Parse's "previously stated objections." (A-2886). In short, Parse is advancing precisely the same objection on appeal to the same erroneous charge, and plain error does not apply. *See Hassan*, 578 F.3d at 129 (objection at charging conference sufficient under Rule 30(d) when it raised "precisely the issues" on appeal); *United States v. White*, 698 F.3d 1005, 1019 (7th Cir. 2012) (per curiam) (to preserve objection to jury instruction "counsel can simply object by stating that he or she objects and incorporates arguments previously made").

The government contends that the court's instruction "accurately summarized" the "general" annual accounting "rule." (GBR-51-52). But the Supreme Court has recognized (in a case the government ignores) that the income

47

tax law does not demonstrate "strict adherence to an annual accounting system." *Hillsboro Nat'l Bank v. Comm'r*, 460 U.S. 370, 377, 381 (1983). Indeed, the government does not contest that "annual accounting," as implemented in the Code, is so riddled with exceptions *explicitly permitting* the reopening of prior years that the very concept of annual accounting is "deceiving." *Pettibone Corp. v. United States*, 34 F.3d 536, 539 (7th Cir. 1994) (Easterbrook, J.); (*see* BR-84-87). The district court therefore misstated the law by telling the jury that "annual accounting" is a clear-cut "system" of income tax law that makes it *always* illegal to "reopen[]" a transaction from a prior year to take account of later events. (A-2576/8877).[22]

The government also denies that Parse was prejudiced. But it ignores the instruction's false message that a mere contravention of "annual accounting" is just as obviously illegal as creating phony documents. For example, the government contends that the annual accounting charge itself "did not state" that a layperson should understand the contours of annual accounting, or that Parse could not rely on tax experts who implemented the "as of" dates. (GBR-54). But the charge must be "examine[d]...as a whole." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). When the annual accounting charge is read, as it was to the jury,

---

[22] The government claims that three cases affirmed convictions "based on this 'annual accounting rule'" (cited GBR-44), but none even *mention* the so-called "annual accounting rule," let alone approve a jury instruction based upon it.

directly alongside the district court's numerous examples of obviously illegal conduct, the prejudice is apparent.

Similarly, the government argues that none of the myriad exceptions to annual accounting "appl[y] in this case." (GBR-53; *see also* GBR-55). But that is not the issue. The issue is whether a layperson would have known the applicable law, or could have believed in good faith that others with substantial expertise would comply with the law, whatever it was. The Code's many exceptions show that substantial expertise is needed to assess whether any given "reopening" of a prior year's return is permitted—contrary to the message of the jury instructions. Indeed, here the experts who prepared the tax returns concluded that they could reopen the returns in question. (*See* BR-17-18); *supra* p.40.

The government has no response. Nor does it deny that some exceptions in the Code specifically permit reopening prior years' returns for at least some error correction purposes. Here, similarly, J&G and the tax preparers used the "as of" dates to correct errors. (BR-86).[23] That Parse did not "discuss[]" the annual accounting rule with "tax expert[s]," and thus come to believe *his* "conduct came

_____

[23] At least one tax court opinion, *Dodge v. Commissioner*, 27 T.C.M. (CCH) 1170 (1968), provides authority for J&G's error-correction approach. The government devotes a lengthy and defensive footnote to *Dodge*, and protests that the case is not "binding." (GBR 53-54 n.21). But it does not deny that the court in *Dodge* gave retroactive tax effect to a taxpayer's intended transaction that was mistakenly entered into in the prior year.

within the meaning of an exception" (GBR-55), is irrelevant.  Parse's good faith

defense was not that he studied the law and believed it justified his conduct.  His

defense was that he relied in good faith on the expertise of J&G and the tax

preparers, who knew the relevant facts, to comply with the tax law.  (BR-88; *see*

*also* BR-9-11).  It is this defense that the jury instruction gutted, by sending the

message that J&G's tax accounting was obviously illegal.[24]

The prejudice was apparent at trial.  The government does not deny that it

fully exploited the instruction, arguing that Parse, as a former CPA, "knows" that

the corrective transactions were illegal.  (A-2460/8417-18; *see also* BR-89-90).

Nor does it contend that the error was otherwise harmless.  The erroneous annual

accounting charge thus entitles Parse to a new trial.  *See Quattrone*, 441 F.3d at

177 ("An erroneous instruction, unless harmless, requires a new trial."); *Hassan*,

578 F.3d at 129 (same); *see also infra* p.54.

## V.     THE MAIL FRAUD INSTRUCTION FAILED TO ADEQUATELY INFORM THE JURY OF THE SCIENTER REQUIREMENT

The district court refused Parse's request to instruct the jury that (1) Parse

must have acted both with specific intent to defraud *and* willfully, which means "a

---

[24] The government contends the district court properly excluded evidence of net operating loss carrybacks.  (GBR-55 n.22).  But it does not dispute that this evidence would have shown there are at least some exceptions the supposed "brick wall" of annual accounting.  (BR-89).  The evidence was thus relevant to Parse's good faith defense, and its exclusion further undermined the defense.

bad purpose either to disobey or to disregard the law" (A-2582/8903-04), or that (2) Parse must have had "the purpose of obtaining money or property from the alleged victim" rather than simply to cause "harm" to the victim (A-2885; A-2584/8912). Without this critical language, the jury instructions could not, and did not, properly inform the jury of the scienter requirement in the context of this case. (BR-75, 90-91); *see generally United States v. Regan*, 937 F.2d 823 (2d Cir. 1991).

The government contends that the district court's decision to omit any language about "willfulness" was correct because "the term 'willfully' does not appear in the mail fraud statute." It asserts that this Court has held that the only scienter requirement for mail fraud "is that the acts proscribed be carried out 'knowingly.'" (GBR-56-57 (citing *United States v. Precision Med. Labs., Inc.*, 593 F.2d 434, 443 (2d Cir. 1978))). It also claims that this "basic rule" applies in cases predicated on tax fraud. (*See* GBR-57 (citing *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004))).

This is dead wrong. This Court has repeatedly held that knowledge alone is insufficient to sustain a mail fraud conviction (*see* BR-74-75), and has explained that the mail fraud statute "require[s] that the defendant *must have acted willfully and with a specific intent to defraud*." *United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir. 1982) (emphasis added), *overruled on other grounds*, *McNally v. United States*, 483 U.S. 350 (1987); (*see also* BR-90 (citing Sand treatise)).

Indeed, the government's centerpiece Second Circuit case affirmed a mail fraud instruction that required willfulness. *See Precision Med. Labs.*, 593 F.2d at 443-44. The government fails to cite a single case from this Court supporting its novel effort to limit mail fraud scienter to mere knowledge.[25]

Moreover, for a mail fraud charge predicated on tax evasion, the government must prove that the defendant understood the governing tax law and knew he was participating in a scheme to violate that law. (BR-74-77 (discussing, *inter alia*, *Regan*, 937 F.2d at 827)). Nothing in *Fountain* suggests otherwise. *Fountain* did not even discuss, let alone apply, the scienter requirement; the issue there was whether taxes are considered "property" within the meaning of the mail and wire fraud statute. 357 F.3d at 255-60.

The government also argues that the "plain language of the charge" informed the jury that it must find a scheme to defraud the IRS of "money or property." (GBR-58). But the "money or property" language the government seizes upon dealt with the definition of the "scheme," not the defendant's *intent* relating to that scheme. The instructions never connected the "money or property"

---

[25] The government relies heavily on a district court case that appears to be the only reported decision refusing to give a willfulness charge. *United States v. Gole*, 21 F. Supp. 2d 161 (E.D.N.Y. 1997), *aff'd on other grounds*, 158 F.3d 166 (2d Cir. 1998). *Gole* itself recognized that use of willfulness language in mail fraud instructions is a "widespread" practice reflected in this Court's precedents and the Sand treatise. *See* 21 F. Supp. 2d at 167.

requirement to the specific intent requirement, and so did not adequately advise the jury that it must find that Parse understood the shelters violated the tax law.

Parse also demonstrated that the district court's dilution of the scienter requirement was exacerbated by its misleading good faith instruction, which married "good faith" to willfulness, suggesting that good faith was not a defense to mail fraud. (*See* BR-90-91). The government says the "plain meaning of the charge is that, in connection with determining either willfulness 'or' good faith, the jury should consider the evidence bearing on the defendant's state of mind," and that the "use of the word 'or' makes clear that the determination of good faith is separate from the determination of willfulness." (GBR-59). That misses the point, which is that the judge described "good faith" as the *opposite* of willfulness, thereby implying that good faith was a defense only to crimes (unlike mail fraud) including a "willfulness" instruction. The language indicating that good faith was a defense to all charges (GBR-59), does not cure the problem because it was inconsistent with the misleading implication, in the very same instruction, that good faith was a defense only to crimes requiring willfulness. (*See* BR-92).[26]

Finally, Parse was prejudiced by these errors, which likely led to the mixed verdict: The jury acquitted Parse of the crimes with willfulness instructions (tax

---

[26] In claiming that this issue must be reviewed for plain error, the government ignores Parse's argument that this Court reviews *de novo* the effect of this error on the preserved errors in the mail fraud instruction. (BR-92 n.29).

evasion and conspiracy), yet convicted him of mail fraud (where no such instruction was given). (BR-93-94). The government itself has previously conceded that the differing verdicts "exactly tracked" these different instructions. (BR-93). Yet it now claims Parse was not prejudiced because, in its view, there was sufficient evidence that Parse believed he was engaged in illegal conduct. (GBR-58).

We disagree. *See* Point III *supra*. But in any event, the government cannot demonstrate harmless error simply by establishing the sufficiency of the evidence. It must prove "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999); *Hassan*, 578 F.3d at 129 (same). The government must put forth "overwhelming" evidence, and inferences are *not* drawn in its favor, as on sufficiency review. *See United States v. Mejia*, 545 F.3d 179, 199 n.5 (2d Cir. 2008); *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000); *see also United States v. Tureseo*, 566 F.3d 77, 86 (2d Cir. 2009) ("substantial evidence" supporting conviction insufficient to show harmless error). The proof about Parse's purported knowledge of the legality of his conduct does not remotely approach the overwhelming level required to show harmless error.

54

## VI. THE OBSTRUCTION CHARGE WAS UNTIMELY

Parse challenges his obstruction conviction on two separate grounds. First, the charge was untimely and must be reversed, because Parse himself did not commit an obstructive act within the applicable limitations period. (BR-97-100). Second, he is at least entitled to a new trial because the statute of limitations instruction plainly misstated the law. (BR-101-04). The government conflates these arguments, and treats Parse's appeal as limited to the instructional error. (GBR-59-66). It is not.

1. As an initial matter, the obstruction conviction should be reversed because all Parse's conduct occurred outside the limitations period, which runs from the date of the last "corrupt act" committed *by the defendant*. (*See* BR-97-98). The government does not dispute this. It has never been able to point to *any* act by Parse related to J&G's tax shelters after the cutoff date of February 3, 2003, and at sentencing expressly conceded that all the alleged "backdating" occurred outside the statute of limitations. (A-6127).

Now, for the first time on appeal, the government argues that Parse's "co-schemers" committed obstructive acts within the limitations period, and that he can be "liable" for those people's obstructive acts. (GBR-60-63).

But the government is unable to cite any authority that actually supports this new theory. It relies principally on old mail fraud cases. (*See* GBR-62-63). But

the mail fraud statute, unlike the tax obstruction statute, expressly criminalizes a "scheme" to defraud, and a defendant engaged in a mail fraud scheme is responsible for the acts of other defendants undertaken in furtherance of that scheme. *See United States v. Amrep Corp.*, 560 F.2d 539, 545 (2d Cir. 1977).[27] There is no such rule for tax obstruction.

To our knowledge, no court has *ever* recognized that kind of *Pinkerton*-like principle for purposes of the tax obstruction statute. The only case we have found in which a court has addressed the issue, *United States v. Thompson*, 518 F.3d 832, 857-58 (10th Cir. 2008), rejected the idea that a defendant can be convicted for the substantive crime of obstruction based on the acts of his purported co-conspirators or co-schemers. We discussed *Thompson* in our opening brief (BR-97), and the government once again has no response.[28]

---

[27] The government also cites cases from the Sixth and Seventh Circuits involving convictions for willfully aiding or assisting in the filing of false tax returns under 26 U.S.C. §7206(2) and its predecessor. (GBR-62-63). That is a completely different statute, implicating an aiding and abetting theory. It does not support the government's claim that criminal law generally, under any statute, holds all "co-schemers" responsible for the acts of other "co-schemers."

[28] The unpublished summary order *United States v. Osuala*, No. 12-3573, 2014 WL 349877, at *1 (2d Cir. Feb. 3, 2014), does not help the government. There, on plain error review, the Court held only that the conviction was timely, even though the defendant's obstructive course of conduct began prior to the limitations period, because the *defendant's own* conduct continued into the limitations period. *Id.*; Indictment, *United States v. Osuala*, No. 10-cr-313, at 7-8, 11-14 (S.D.N.Y.).

56

In any event, the jury instructions on the elements of obstruction provided that Parse could only be guilty of obstruction based on his own acts. (BR-95). (The objectionable language addressed below was contained in separate, subsequent instructions on the statute of limitations.) This Court cannot sustain the conviction based on the government's co-schemer theory because it was never presented to the jury. (BR-99); *see, e.g.*, *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) (evidence insufficient to convict defendant on substantive offense based on co-conspirator's conduct where jury was never instructed on *Pinkerton* theory of liability). The government ignores this fatal problem too.

It is not clear what the government is arguing about §2(b) (*see* GBR-64-65), but suffice it to say that there is no support for a §2(b) theory.

*First*, it was not presented to the jury. The government requested a "willful causation" §2(b) instruction with respect to the tax evasion counts, but *not* the obstruction count. (A-2701-02; A-2356/8004-05). (*See* BR-99).

*Second*, Parse never gave tax advice, and knew nothing about any decisions to claim carry-forward losses long after he stopped executing J&G transactions. (BR-100). It is well-settled that Parse could not have "willfully caused" obstructive acts in which he had no involvement. *See United States v. Ferguson*, 676 F.3d 260, 276 & n.12 (2d Cir. 2011) (as amended) (defendant must "intend

57

that the crime would be actually committed by others" to satisfy §2(b)'s willful causation requirement); (*see also* BR-100).

2. At a minimum, Parse is entitled to a new trial because the district court incorrectly instructed the jury to find the charge timely if "someone involved in the offense committed or caused to be committed an act of obstruction" within the limitations period. (*See* BR-101-02). The government's principal defense of the instruction is that it tracks the government's "co-schemer" liability theory. (GBR-60-61). As explained, that theory cannot support Parse's conviction.

Even if it could, the instruction went too far because it was not limited to "co-schemers." The government asserts that "someone involved in the offense" means a "co-schemer." But that assertion is obviously wrong: a person could be "involved in the offense" but lack the mens rea to be a "co-schemer," and the district court never explained what "someone involved in the offense" meant. The district court invited the jury to find the charge timely if anybody they thought might be somehow "involved" in the offense took any action during the limitations period. That instruction is unprecedented, has no legal basis, and is reversible error.

The error plainly prejudiced Parse because it invited the jury to find a timely obstruction offense based on the actions of other people. The opening brief demonstrates the substantial volume of evidence about obstructive acts committed

58

or caused by others after the statute of limitations cut-off.[29] (BR-103). Parse had

no involvement in or knowledge of any of these acts, and the government does not

contend otherwise. Because the jury likely accepted the erroneous invitation in

reaching its verdict, Parse is, at a minimum, entitled to a new trial.

## VII. THE RESTITUTION ORDER SHOULD BE VACATED

The district court ordered $115,830,267 in restitution based on its own

finding about the J&G tax shelter conspiracy of which Parse was acquitted. The

government's argument that this order does not violate *Apprendi* ignores

controlling Supreme Court precedent.

*First*, *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), rejected

the reasoning of the government's principal authority, *United States v. Reifler*, 446

F.3d 65 (2d Cir. 2006). *Reifler* held that *Apprendi* does not apply where a statute

defines restitution as the amount of the victim's loss, rather than as an amount

within a fixed range. *See* 446 F.3d at 118. *Southern Union* establishes that

*Reifler*'s distinction is irrelevant under *Apprendi*:

> [T]he amount of a fine…is often calculated by reference to particular facts
> [including, *inter alia*] the amount of the defendant's gain or *the victim's*

---

[29] The only tax return filed within the statute of limitations that the government
mentions is Michael Toporek's 2002 tax return. (GBR-63-65). But there is no
evidence that it claimed carry-forward losses arising from transactions in April
2002, as the government contends. Toporek never testified, and the return the
government cites does not indicate on its face the source of any claimed losses or
otherwise support a carry-forward theory. (*See* GX 1001-81a).

> *loss*…requiring juries to find beyond a reasonable doubt facts that determine the fine's maximum amount is necessary to implement *Apprendi*'s 'animating principle': the 'preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense.'

132 S. Ct. at 2351 (emphasis added). *Southern Union* thus requires a jury to find facts that increase a monetary punishment, even where the "statutory maximum" is the victim's loss.[30]

    *Second*, *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), held that "any fact that increases the mandatory minimum [punishment] is an 'element' that must be submitted to the jury." The jury was not required to find that the government proved Parse participated in the broader tax shelter conspiracy; it could have convicted Parse of mail fraud based on the "backdating" alone, as the government invited it to do in closing. (A-2460/8417). The *judge* found Parse liable for the conspiracy, and used that finding to increase the mandatory restitution punishment to include the losses that conspiracy caused. His fact-finding violated *Alleyne*.

    Finally, contrary to the government's suggestion (GBR-120 n.37), the Supreme Court has repeatedly concluded that that criminal restitution constitutes

---

[30] This panel need not adhere to *Reifler* because *Southern Union* "casts doubt" on it. *See, e.g.*, *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010).

punishment. *See Paroline v. United States*, 134 S. Ct. 1710, 1726 (2014) (collecting cases).

## **CONCLUSION**

The judgment of conviction should be reversed and the case remanded with instructions to enter a judgment of acquittal. In the alternative, the judgment should be vacated and the case remanded for a new trial. If an acquittal or a new trial is not ordered, the restitution order should be vacated.

Dated: May 12, 2014                    Respectfully submitted,

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Marc E. Isserles
James Darrow
Chetan A. Patil
SHAPIRO, ARATO & ISSERLES LLP
500 Fifth Avenue
40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant David Parse*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE
REQUIREMENTS**

The undersigned counsel of record for Defendant-Appellant David Parse

certifies pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) that the

foregoing brief contains 14,844 words, excluding the parts of the brief exempted

by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the Word

Count feature of Microsoft Word 2013; and that this brief has been prepared in 14-

point Times New Roman.

Dated: May 12, 2014                    /s/ Alexandra A.E. Shapiro
                                       Alexandra A.E. Shapiro